Steve R. Belilove (SBN 119506)
Email: sbelilove@kaufmandolowich.com
**KAUFMAN DOLOWICH LLP**
11111 Santa Monica Blvd., Suite 850
Los Angeles, California 90025
Telephone: (310) 775-6511
Facsimile: (310) 575-9720

Attorneys for Defendant
CLEAR BLUE SPECIALTY
INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Part Four, LLC, | Case No. 2:26-cv-02058 |
| Plaintiff, | **CERTIFICATE OF SERVICE OF NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL TO FEDERAL COURT** |
| v. | |
| Clear Blue Specialty Insurance Company, and Does 1-10, inclusive, | |
| Defendants. | |

I, Susan Carty, certify and declare as follows:

I am over the age of 18 years and not a party to this action.

My business address is 11111 Santa Monica Boulevard, Suite 850, Los Angeles, California, which is located in the city, county and state where the mailing described below took place.

On February 26, 2026, I deposited in the United States Mail at Los Angeles, California, a copy of the Notice to State Court and Adverse Party of Removal to Federal Court, a copy of which is attached to this Certificate.

///

///

1

1     I declare under penalty of perjury that the foregoing is true and correct.

2     Executed on February 26, 2026.

3

4                      By: */s/ Susan Carty*

5                            Susan Carty

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE OF NOTICE TO
STATE COURT AND ADVERSE PARTY OF
REMOVAL TO FEDERAL COURT                      Case No. 2:26-cv-02058

# NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL TO FEDERAL COURT

1 | **KAUFMAN DOLOWICH LLP**
Steve R. Belilove (SBN 119506)
2 | Email: sbelilove@kaufmandolowich.com
11111 Santa Monica Blvd., Suite 850
3 | Los Angeles, California 90025
Telephone: (310) 775-6511
4 | Facsimile: (310) 575-9720

5 | Attorneys for Defendant
CLEAR BLUE SPECIALTY INSURANCE COMPANY
6 |

7 |

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 | FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

10 |

11 | PART FOUR, LLC, a California limited liability company; ) Case No. 25STCV36585

12 | ) [Assigned to the Honorable Upinder S. Kalra, Dept. 51]
Plaintiff, )

13 | )
vs. )

14 | ) **NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL TO FEDERAL COURT**
CLEAR BLUE SPECIALTY INSURANCE )

15 | COMPANY, a North Carolina corporation; )
and DOES 1-10, inclusive; )

16 | ) Complaint Filed: December 16, 2025
Defendants. ) Trial Date: None Set

17 | )

18 | )

19 | **TO THE COURT, PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

20 | PLEASE TAKE NOTICE that a Notice of Removal of this action was filed in the United

21 | States District Court for the Central District of California on February 26, 2026.

22 | A copy of the Notice of Removal is attached to this Notice, and is served and filed

23 | herewith.

24 | Dated: February 26, 2026                    KAUFMAN DOLOWICH LLP

25 |

26 |

27 | By: _____
STEVE R. BELILOVE

28 | Attorneys for Defendant
CLEAR BLUE SPECIALTY INSURANCE COMPANY

1

# NOTICE OF REMOVAL

Steve R. Belilove (SBN 119506)
Email: sbelilove@kaufmandolowich.com
**KAUFMAN DOLOWICH LLP**
11111 Santa Monica Blvd., Suite 850
Los Angeles, California 90025
Telephone: (310) 775-6511
Facsimile: (310) 575-9720

Attorneys for Defendant
CLEAR BLUE SPECIALTY
INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Part Four, LLC, | Case No. _____ |
| Plaintiff, | **DEFENDANT CLEAR BLUE SPECIALTY INSURANCE COMPANY'S NOTICE OF REMOVAL** |
| v. | |
| Clear Blue Specialty Insurance Company, and Does 1-10, inclusive, | |
| Defendants. | |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE THAT** defendant Clear Blue Specialty Insurance Company ("Defendant" or "Clear Blue"), hereby removes to this Court, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, the action captioned *Part Four LLC v. Clear Blue Specialty Insurance Company*, Case No. 25STCV36585 (the "Action"), pending in the Superior Court of California, County of Los Angeles.

## I. NATURE OF REMOVED CASE

On January 6, 2026, plaintiff Part Four, LLC ("Plaintiff" or "Part Four") filed a Complaint in the Action against Clear Blue and Does 1-10, inclusive. A true and correct copy of the Summons and Complaint filed in the Action is attached hereto as Exhibit "1" (the "Complaint").

The Complaint asserts causes of action for breach of contract and bad faith, alleging that Clear Blue issued an insurance policy to Part Four and failed to provide coverage for and defend Part Four under the policy.

Defendant was served with the Complaint in the State Action on January 27, 2026. Plaintiff has not filed an Affidavit of Service in the State Action.

Defendant timely files this Notice of Removal as required under 28 U.S.C. § 1446(b)(1), as it is filed within thirty (30) days of service of Plaintiff's initial pleading on Defendant in the Action.

## II.  REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO 28 U.S.C. § 1332

This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. The United States District Court for the Central District of California is the district embracing the place where the state court action is pending. Accordingly, removal is proper under 28 U.S.C. § 1441.

### A.  Diversity of Citizenship Exists Between the Parties

According to the Complaint, Plaintiff is a limited liability company organized under the laws of the State of California. *See* Complaint ¶ 14. For purposes of diversity jurisdiction, a limited liability company is a citizen of every state in which its members are citizens. Upon information and belief, Part Four has two members who are citizens of the State of California and the State of Oklahoma, respectively, and no other state. A review of Plaintiff's public corporate filings with the California Secretary of State reveals that the members of Part Four are Rebel Bass, LLC and GOL Capital LLC. Further corporate filings reveal that Rebel Bass, LLC is a single member limited liability company whose sole member is an individual domiciled in California, and that GOL Capital LLC is a single member limited

///

DEFENDANT CLEAR BLUE SPECIALTY
INSURANCE COMPANY'S NOTICE OF REMOVAL          Case No. _____

liability company whose sole member is an individual domiciled in Oklahoma. Accordingly, Plaintiff is a citizen of California and Oklahoma for purposes of 28 U.S.C. § 1332.

Plaintiff alleges that Defendant is "a North Carolina corporation that, on information and belief, has its principal place of business in Charlotte." *Id.* ¶ 15. That allegation is incorrect. Defendant is, and was at all relevant times—including at the time the Action was filed and at the time of removal—a corporation organized under the laws of the State of Texas, with its principal place of business in Dallas, Texas.  A corporation is a citizen of the state in which it is incorporated and the state in which it maintains its principal place of business. *See* 28 U.S.C. § 1332(c)(1). Accordingly, Clear Blue is a citizen of the State of Texas and is not a citizen of California or Oklahoma.  As indicated above, Plaintiff is not a citizen of Texas.

With respect to defendant Does 1-10, pursuant to 28 U.S.C. § 1441(b)(1), the citizenship of defendants sued under fictitious names shall be disregarded when determining removal jurisdiction. Accordingly, the citizenship of Does 1-10 should not be considered when determining whether jurisdiction based on diversity of citizenship exists in this case.

**B.     The Amount in Controversy Requirement is Satisfied**

The amount in controversy exceeds $75,000, exclusive of interest and costs. Although the Complaint does not allege a specific amount of damages, Plaintiff seeks reimbursement of defense costs incurred by Part Four in an underlying lawsuit and coverage for a settlement payment made to resolve that lawsuit. *See* Complaint ¶ 31.  Exhibit F to the Complaint is a demand letter from Plaintiff's counsel seeking reimbursement of "legal fees and costs" incurred in the underlying lawsuit and demanding $775,000 to resolve Plaintiff's claims against Defendant, which are now asserted in the Action. *See* Complaint, Ex. F, p. 2.  Plaintiff further threatens to pursue pre-judgment interest, attorneys' fees, and punitive damages "far exceeding"
///

DEFENDANT CLEAR BLUE SPECIALTY
INSURANCE COMPANY'S NOTICE OF REMOVAL                    Case No. _____

the policy limits. *See id.; see also* Complaint ¶ 45 (requesting punitive damages and attorneys' fees). The Declarations page of the policy reflects a $1,000,000 limit of liability. *See* Complaint, Ex. A, p. 7.

Based on the allegations of the Complaint and the express demand of $775,000—exclusive of additional claimed attorneys' fees and punitive damages— the amount in controversy exceeds $75,000.

Accordingly, Plaintiff places more than $75,000 in controversy. *See Acad. of Country Music v. Cont'l Cas. Co.*, 991 F.3d 1059, 1069 (9th Cir. 2021) (a settlement demand is relevant evidence of the amount in controversy where it reflects a reasonable estimate of the plaintiff's claim); *Tellez-Lagunas v. Hyatt Corp.*, No. 2022 WL 5133501 at *5 (S.D. Cal. Oct. 4, 2022) (punitive damages and attorneys' fees are part of the amount in controversy in a civil action).

***

As there is complete diversity of citizenship and the amount in controversy exceeds $75,000, this Court has original jurisdiction over this case under 28 U.S.C. § 1332(a).

Written notice of the filing of this Notice of Removal will be given to all adverse parties and Defendant shall file a copy of this Notice with the Clerk of the Superior Court of California, County of Los Angeles, as required by 28 U.S.C. § 1446(d).

Pursuant to 28 U.S.C. § 1446(a), Exhibit "2" hereto contains a copy of all process, pleadings and orders served upon Defendant in the Action that are not otherwise included in Exhibit 1.

///

///

///

///

///

4

DEFENDANT CLEAR BLUE SPECIALTY
INSURANCE COMPANY'S NOTICE OF REMOVAL                    Case No. _____

1   Dated: February 26, 2026                    **KAUFMAN DOLOWICH LLP**

2

3                                          By:  _____

4                                               STEVE R. BELILOVE

5                                               Attorneys for Defendant
                                                CLEAR BLUE SPECIALTY
6                                               INSURANCE COMPANY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

STATE OF CALIFORNIA      )
COUNTY OF LOS ANGELES )

I am employed in Los Angeles County.  My business address is 11111 Santa Monica Blvd., Suite 850, Los Angeles, CA 90025, where this mailing occurred.  I am over the age of 18 years and am not a party to this cause.  I am readily familiar with the practices of KAUFMAN DOLOWICH LLP for collection and processing of correspondence for mailing with the United States Postal Service.  Such correspondence is deposited with the United States Postal Service the same day in the ordinary course of business.

On February 26, 2026, I served the foregoing documents on the interested parties in this action entitled as follows:

## DEFENDANT CLEAR BLUE SPECIALTY INSURANCE COMPANY'S NOTICE OF REMOVAL

[XX] by placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

## SEE ATTACHED SERVICE LIST

[XX] (**BY MAIL**)  I placed such envelope for collection and mailing on this date following ordinary business practices.

[   ] (**BY PERSONAL SERVICE**)  I caused to be hand delivered such envelope to the addressee so indicated.

[XX] (**BY E-MAIL ELECTRONIC TRANSMISSION**)  I caused the documents to be sent to the person(s) at the e-mail address(es) so indicated on the attached list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was incomplete or unsuccessful.

[   ] (**BY FEDEX**)  I am "readily familiar with the firm's practice of collection and processing correspondence for mailing via Express Mail (or another method of delivery providing for overnight delivery pursuant to *C.C.P.* § 1005(b)).  Under that practice, it would be deposited with the United States Postal Service or other overnight delivery carrier (in this case, FedEx) on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

[   ] (**STATE**)  I declare under penalty of perjury that the foregoing is true and correct.

[XX] (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the services was made.

Executed on February 26, 2026, at Los Angeles, California.

_/s/ Susan Carty_____
Susan Carty

# SERVICE LIST

### *Part Four, LLC v. Clear Blue Specialty Insurance*
### *United States District Court – Central District of California*
### *Case No. _____*

| | |
|---|---|
| Ethan J. Brown, Esq.<br>Kete P. Barnes, Esq.<br>Brown Neri Smith & Khan LLP<br>11601 Wilshire Boulevard, Suite 2080<br>Los Angeles, CA 90025<br>Phone: (310) 593-9890<br>Fax: (310) 593-9980<br>Email: ethan@bnsklaw.com;<br>kete@bnsklaw.com<br><br>**Attorneys for Plaintiff PART FOUR, LLC** | |

DEFENDANT CLEAR BLUE SPECIALTY
INSURANCE COMPANY'S NOTICE OF REMOVAL                    Case No. _____

# EXHIBIT 1

Exhibit 1
Page 8

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CLEAR BLUE SPECIALITY INSURANCE COMPANY, a North Carolina corporation; and DOES 1-10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PART FOUR, LLC, a California limited liability company

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
**12/16/2025 1:47 PM**
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By C. Cervantes, Deputy Clerk**

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO!* Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court

111 N. Hill Street, Los Angeles, CA 90025

**CASE NUMBER:**
*(Número del Caso):*
25STCV36585

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Ethan J. Brown, Brown Neri Smith & Khan, LLP, 11601 Wilshire Blvd., Ste. 2080, Los Angeles, CA 90025; (310) 593-9890

DATE: 12/16/2025
*(Fecha)*

Clerk, by David W. Slayton, Executive Officer/Clerk of Court, Deputy
*(Secretario)* C. Cervantes *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify)*
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)     [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)     [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)     [ ] CCP 416.90 (authorized person)
   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

Exhibit 1
Page 9

1  Ethan J. Brown (SBN 218814)
   ethan@bnsklaw.com
2  Kete P. Barnes (SBN 302037)
   kete@bnsklaw.com
3  **BROWN NERI SMITH & KHAN LLP**
   11601 Wilshire Boulevard, Suite 2080
4  Los Angeles, California 90025
   T: (310) 593-9890
5  F: (310) 593-9980
6  *Attorneys for Plaintiff*
   Part Four, LLC

Electronically FILED by
Superior Court of California,
County of Los Angeles
12/16/2025 1:47 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By C. Cervantes, Deputy Clerk

7

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

8

### FOR THE COUNTY OF LOS ANGELES  - CENTRAL

9

10

11  PART FOUR, LLC, a California limited liability
    company;

12

13              Plaintiff,

14       v.

15  CLEAR BLUE SPECIALITY INSURANCE
    COMPANY, a North Carolina corporation; and
16  DOES 1-10, inclusive;

17              Defendants.

Case No.:  25STCV36585

**COMPLAINT FOR:**

1)  **BREACH OF CONTRACT**
2)  **BAD FAITH**

   **DEMAND FOR JURY TRIAL**

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Exhibit 1
Page 10

Plaintiff Part Four, LLC ("Plaintiff" or "Part Four"), for its Complaint against Defendants Clear Blue Specialty Insurance Company ("Clear Blue" or "Defendant"), and Does 1-10, inclusive, alleges:

**<u>INTRODUCTION</u>**

1.  Clear Blue's bad-faith refusal to provide coverage and defend Part Four caused this action.

2.  In or around May 2023, Part Four purchased a "Business Management Insurance" Policy # EX01-000743-02 from Clear Blue (the "Policy") that provided coverage for Employment Practices Liability, Third Party Liability, and Wage and Hour Claims. Each of those major areas of coverage included additional subsections, defining various types of coverage available.

3.  On August 25, 2023, Part Four employee Katie Williams ("Ms. Williams") was sued by Sly Spectrum, LLC, in the Los Angeles Superior Court Case *Sly Spectrum, LLC v. Katie Williams* (Case No. 23STCV20562) (the "Williams Case"), for actions alleged to have arose out of her employment with Part Four.

4.  Ms. Williams met with agents of Part Four who agreed to cover her legal fees because those expenses arose out of her employment. Had Part Four not agreed to do so, she would have submitted a formal demand to the company or sued it.

5.  On February 26, 2024, Part Four tendered notice to Clear Blue, referencing the Policy and Part Four's insured status. During this time, Part Four continued to incur costs and expenses of attorneys' fees defending Sly Spectrums' claims on behalf of Ms. Williams.

6.  On March 19, 2024, Clear Blue denied coverage, unreasonably and narrowly construing the Policy in their favor, against well-establish law, refusing to provide coverage as agreed by the Policy, and in bad faith.

7.  Over the next 17 months, the parties went back and forth, with Clear Blue maintaining its position to deny Part Four or Ms. William's coverage.

8.  In November 2024, Part Four notified Clear Blue of a mediation of the dispute and requested that it participate to try to resolve the case and incur no further costs. Clear Blue did not respond to the request.

Exhibit 1
Page 11

9.      In December 2024, Part Four settled the dispute. It again demanded that Clear Blue provide coverage.

10.      Clear Blue always maintained its denial of coverage.

11.      The language of the Policy indisputably provides coverage for the lawsuit against Ms. Williams.

12.      Rather than provide coverage, defend Ms. Williams, reimburse Part Four for its costs, participate in the mediation, and attempt to resolve the case as quickly, efficiently, and at the lowest cost to Part Four or Ms. Williams, Clear Blue acted solely for its own interests. It took Part Four's premium, promised to provide coverage, and left Part Four hanging when it had to answer Part Four's calls for coverage and defense.

13.      Part Four brings this claim to recover for Clear Blue's bad faith and hold it accountable for its actions.

## **THE PARTIES**

14.      Plaintiff Part Four, LLC at all relevant times, is and was, a California limited liability company.

15.      Defendant Clear Blue is a North Carolina corporation, that, on information and belief, has its principal place of business in Charlotte. Clear Blue is not registered to do business in California, but on information and belief, has regularly issued policies in California, and regularly conducts business in California.

16.      Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants named herein as Does 1-10 ("Does"), and therefore sues said defendants under such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of Does when ascertained. Defendant Clear Blue and Does may collectively be referred to herein as "Defendants."

## **JURISDICTION AND VENUE**

17.      Jurisdiction and venue are proper in Los Angeles County because Clear Blue has contracted to perform an obligation in Los Angeles County, the contract was entered into in Los Angeles County, and the amount in controversy exceeds $35,001.

Exhibit 1
Page 12

18.     The Court has personal jurisdiction over Clear Blue because they purposefully directed their conduct towards California, could reasonably be expected to be hailed into court in California, and because, on information and belief, they regularly conduct business in California.

## FACTUAL ALLEGATIONS

19.     In or around May 2023, Part Four purchased the policy from Clear Blue. A true and correct copy of the Policy is attached as **Exhibit A**.

20.     Under The Employment Practice Liability clause, Clear Blue agreed that:

> "We will pay **Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and reported to us pursuant to the terms of this Policy, for a **Wrongful Act.**"

21.     Under the Defense for Wage and Hour Actions, Clear Blue agreed that:

> We will reimburse **Defense Costs** which the **Insured** is legally obligated to pay by reason of a **Wage and Hour Action** first made against the **Insured** during the **Policy Period** or, if applicable, the **Extended Reporting Period** and reported to us pursuant to the terms of this **Policy**, for a **Wage and Hour Wrongful Act** taking place prior to end of the **Policy Period**. The maximum sublimit of liability under this section for all covered **Defense Costs for Wage and Hour Actions**, combined, shall be the Wage and Hour Costs Sublimit of Liability set forth in the Declarations.

22.     The Policy defined terms as follows:

> **"Claim"** means:
>
> 1. A written demand against the **Insured** for monetary damages or non-monetary (including injunctive) relief, including a written demand to toll or waive a statute of limitations;
>
> 2. A civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against the **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;
>
> **"Defense Costs"** means that part of **Loss** consisting of expenses, including attorneys' fees and experts' fees, incurred in the investigation, defense or appeal of a **Claim**.
>
> **Defense Costs** include the premium for any appeal, attachment or similar bond, provided that we have no obligation to issue such bond.
>
> **Defense Costs** does not include any compensation, benefit expenses, or any of the **Insured's** overhead.

COMPLAINT
3

Exhibit 1
Page 13

**"Insured"** means:

1. You;

2. Any **Insured Organization**; or

3. Any **Team Member**.

"**Loss**" means the damages, judgments, settlements, front pay and back pay, pre-judgment or post-judgment interest awarded by a court, and **Defense Costs** incurred by the **Insured**.

**"Team Member"** means any:

1. **Executive**; or

2. **Employee**.

"**Wage and Hour Wrongful Act**" means any actual or alleged violation(s) of state, local or foreign statutory or common law (including, but not limited to the Fair Labor Standards Act or Wage Payment and Collection Act), or any amendments thereto, or rule or regulations promulgated thereunder governing wage, hour and payroll policies and practices including, but not limited to:

1. The refusal, inability or failure of an **Insured Organization** or **Team Member** to pay wages or overtime pay, off-the-clock work, on-call time compensation, compensation for waiting time and dressing time, minimum wage compensation, reimbursement of expenses or any amounts representing such wages or pay or expenses, for services rendered or time spent in connection with work related activities[.]

23. On August 25, 2023, Sly Spectrum filed the Williams Case against Ms. Williams for actions alleged to have arose from her employment with Part Four. A true and correct copy of Sly Spectrum's second amended complaint is attached as **Exhibit B**.

24. Sly Spectrum alleged that through her roles as Director of Operations and Human Resource representative, Williams purportedly committed various wrongful acts in assisting Part Four manager Joshua Golsen in his purported wrongful acts against Sly Spectrum's rights. All Sly Spectrum's allegations against Williams were with respect to her employment at Part Four. Sly Spectrum alleged no separate relationship between it and Williams outside of Part Four. (*See generally*, **Ex. B**.)

25. On February 26, 2024, Part Four tendered notice for coverage to Clear Blue. Clear Blue acknowledged receipt of the claim two days later. On March 19, 2024, Clear Blue denied Part Four's

Exhibit 1
Page 14

claim. Clear Blue took the position that (among other things), the claim was made against Part Four by Sly Spectrum who is a legal entity rather than a natural person. Clear Blue also took the position that the claim arose before the policy was effective because the allegations related to another suit filed by Sly Spectrum and other Plaintiffs against Part Four in October 2021. Finally, Clear Blue also cited to various exclusions as a basis for denying coverage as well. A true and correct copy of Clear Blue's denial is attached as **Exhibit C**.

26. On December 3, 2024, the Part Four lawsuits settled, including the Williams Proceeding.

27. On March 12, 2025, Part Four contested the denial. Part Four's position was that Ms. Williams was an employee of Part Four and entitled to make a claim against Part Four for reimbursement of her legal fees for the defense of the Williams Proceeding. Had Part Four not agreed to cover Ms. Williams' employment-related expenses, she could have sued them, which would have constituted a **Claim** under the Policy, for a **Wage and Hour Wrongful Act**. Such claim would have been separate and distinct from the Williams Proceeding or any other underlying Part Four lawsuit. Part Four also contested the position that the Williams Proceeding was brought by a legal entity rather than a natural person, given that the acts alleged in the Williams Proceeding were by Ms. Williams against natural person Jonathan Dortch. *See* Ex B at ¶¶ 132, 133, 144, 151, 255, 257-259, 263, 264, 272, 273, 276, 281, 283, 288, 290, 295, and 296.  A true and correct copy of Part Four's response is attached as **Exhibit D**.

28. Six days later, Clear Blue reiterated its denial. Clear Blue argued that the Williams Proceeding arose out the same wrongful acts as those alleged in the earlier suit against Part Four that was filed in 2021. Clear Blue also argued that Ms. Williams never presented Part Four with a formal written claim or lawsuit, essentially taking that position that Part Four and Williams should have incurred extraneous unnecessary costs, when Part Four was obligated by law to reimburse Ms. Williams for her legal defense. Clear Blue argued that if Ms. Williams pursued her claim for reimbursement of her legal fees or any settlement paid to Sly Spectrum, that neither would fall within the definition of **Defense Costs**, even though Ms. William's unreimbursed attorneys' fees would be damages sought against Part Four if she brought the action (as well as her attorney's fees for bringing the action against Part Four). By agreeing to cover Ms. Williams without the need for her to file suit,

Exhibit 1
Page 15

Clear Blue benefitted by avoiding paying Part Four's **Defense Costs** it would have incurred defending Ms. Williams' suit, as well as the attorneys' fees Ms. Williams would have incurred and been entitled to if she sued Part Four. Clear Blue made no mention of this. Clear Blue also reiterated its denial based on Sly Spectrum's entity status. A true and correct copy of its denial is attached as **Exhibit E**.

29.     Part Four contested the denial again on August 5, 2025. Part Four stated that Clear Blue's position would have incurred unnecessary cost, given that Ms. Williams had to be reimbursed under California law, and that any attorneys' fees or settlement she incurred, as well as any attorneys' fees Part Four would have incurred defending a lawsuit she brought against them for the expenses, clearly fell within the definition of **Defense Costs** and **Loss**. Part Four also contested Clear Blue's position that any lawsuit Ms. Williams brought against Part Four was the same claim as the underlying lawsuits. Had Part Four denied her reimbursement of her expenses, that would have been a separate proceeding, distinct entirely from the underlying lawsuits. A true and correct copy of Part Four's response is attached as **Exhibit F**.

30.     Three days later Clear Blue maintained its denial. It reiterated its same positions as to Ms. Williams not bringing an actual suit and that the claim arose out of the underlying lawsuits. A true and correct copy of Clear Blue's denial is attached as **Exhibit G**.

31.     Clear Blue's position is bad faith. As defined above, the failure to reimburse Ms. Williams, as Part Four is obligated to do under California law, clearly constitutes a **Wage and Hour Action** and a **Claim** under the policy. Ms. Williams and Part Four would have incurred a **Loss** constituting the damages payable as reimbursable expenses for Ms. Williams' attorneys' fees, any settlement paid, and Part Four's attorneys' fees for defending against Ms. Williams' right to reimbursement.

32.     Part Four brings this complaint for Clear Blue's breach of contract and bad faith.

33.     On information and belief, Clear Blue's positions were intentional to cause further harm to Part Four that they should have covered.

/ / /

/ / /

/ / /

Exhibit 1
Page 16

**FIRST CAUSE OF ACTION**

**Breach of Contract - By Plaintiff Against All Defendants**

34.     Plaintiff incorporates each allegation of the preceding paragraphs of this Complaint as if fully set forth herein.

35.     Clear Blue contracted with Part Four to provide insurance coverage under the Policy.

36.     Part Four paid the premiums, timely provided notice, and otherwise performed or were excused from all its obligations under the Policy.

37.     Clear Blue breached the obligations contained within the Policy to provide coverage as indicated in the language of the Policy.

38.     Clear Blue's breaches were a substantial factor in causing Part Four's harm.

39.     Part Four was harmed by Clear Blue's breaches of the Policy in an amount to be proven at trial, but greater than $35,001.

**SECOND CAUSE OF ACTION**

**Bad Faith - By Plaintiff Against All Defendants**

40.     Plaintiff incorporates each allegation of the preceding paragraphs of this Complaint as if fully set forth herein.

41.     Part Four and Clear Blue entered into the Policy.

42.     Part Four timely submitted a claim to Clear Blue for coverage

43.     Clear Blue acted unreasonably, without proper cause, and in bad faith, in failing to provide coverage to Part Four, by interpreting the Policy in a manner that would force unnecessary costs and expenses on Part Four and Ms. Williams, denying coverage for applicable losses, and refusing to timely provide coverage, all to the favor of Clear Blue saving money for itself after receiving premiums from Part Four and agreeing to provide coverage.

44.     Part Four has been harmed in an amount to be proven at trial, but greater than $35,001.

45.     Clear Blue's actions were willful, oppressive, and malicious, and Part Four is entitled to punitive damages against Clear Blue. Part Four is also entitled to attorneys' fees.

/ / /

/ / /

Exhibit 1

Page 17

## **PRAYER FOR RELIEF**

**WHEREFORE**, Part Four prays for judgment against Clear Blue as follows:

1.  For monetary damages in an amount to be proven at trial, in an amount exceeding $35,001;

2.  For punitive and exemplary damages, according to proof at trial, in an amount constitutionally permissible;

3.  Costs of suit as allowable by law;

4.  Reasonable attorneys' fees as allowable by law;

5.  Pre-judgment interest allowable by law; and

6.  For such other and further relief as the Court deems appropriate.

Dated: December 16, 2025          Respectfully submitted,

**BROWN NERI SMITH& KHAN LLP**

By: _____
          Ethan J. Brown
          Kete P. Barnes

*Attorneys for Plaintiff*
Part Four, LLC

## **DEMAND FOR JURY TRIAL**

Part Four demands a trial by jury.

Dated: December 16, 2025          **BROWN NERI SMITH& KHAN LLP**

By: _____
          Ethan J. Brown
          Kete Barnes

*Attorneys for Plaintiff*
Part Four, LLC

COMPLAINT
8

Exhibit 1
Page 18

# EXHIBIT A

Exhibit 1
Page 19

# EMBROKER



# Business Management Insurance

Embroker Insurance Services LLC

5214F Diamond Heights Blvd. Unit #1261 San Francisco, CA 94131

1 844 436 276

embroker.com



Exhibit 1

Page 20

## IMPORTANT NOTICE:

**1.** The insurance policy that you have purchased is being issued by an insurer that is not licensed by the State of California. These companies are called "nonadmitted" or "surplus line" insurers.

**2.** The insurer is not subject to the financial solvency regulation and enforcement that apply to California licensed insurers.

**3.** The insurer does not participate in any of the insurance guarantee funds created by California law. Therefore, these funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised.

**4.** The insurer should be licensed either as a foreign insurer in another state in the United States or as a non-United States (alien) insurer. You should ask questions of your insurance agent, broker, or "surplus line" broker or contact the California Department of Insurance at the toll-free number 1-800-927-4357 or internet website www.insurance.ca.gov. Ask whether or not the insurer is licensed as a foreign or non-United States (alien) insurer and for additional information about the insurer. You may also visit the NAIC's internet website at www.naic.org. The NAIC—the National Association of Insurance Commissioners—is the regulatory support organization created and governed by the chief insurance regulators in the United States.

**5.** Foreign insurers should be licensed by a state in the United States and you may contact that state's department of insurance to obtain more information about that insurer. You can find a link to each state from this NAIC internet website: https://naic.org/state_web_map.htm.

**6.** For non-United States (alien) insurers, the insurer should be licensed by a country outside of the United States and should be on the NAIC's



Exhibit 1
Page 21

International Insurers Department (IID) listing of approved nonadmitted non-United States insurers. Ask your agent, broker, or "surplus line" broker to obtain more information about that insurer.

**7.** California maintains a "List of Approved Surplus Line Insurers (LASLI)." Ask your agent or broker if the insurer is on that list, or view that list at the internet website of the California Department of Insurance: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.

**8.** If you, as the applicant, required that the insurance policy you have purchased be effective immediately, either because existing coverage was going to lapse within two business days or because you were required to have coverage within two business days, and you did not receive this disclosure form and a request for your signature until after coverage became effective, you have the right to cancel this policy within five days of receiving this disclosure. If you cancel coverage, the premium will be prorated and any broker's fee charged for this insurance will be returned to you.

**D-2 (Effective January 1, 2020)**



Exhibit 1
Page 22

S09-CA-0616

# Notice of Service of Suit

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

In the event you feel that we have failed to pay a claim according to the terms of the Policy, you may initiate a suit against us. We will obey the order of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give the Court jurisdiction, and all such matters shall be determined according to the law and practice of the Court.

In any suit brought against us concerning your Policy, we will abide by the final decision of the Court, including any appellate Court in the event of the appeal.

Service of Suit may be made upon Clear Blue Specialty Insurance Company to our agent, C T Corporation System, 818 West Seventh Street - Suite 930, Los Angeles, California 90017. They are authorized and directed to accept Service of Suit on our behalf and/or provide written notice that we will appear in Court, if a suit is instituted.

Our agent so names is authorized as our true and lawful attorney for Service of Suit instituted by you, or on your behalf or on behalf of your beneficiary, in regard to your Policy, and we have designated that such process should be mailed to Clear Blue Specialty Insurance Company at 200 South College Street, Suite 1910, Charlotte, NC 28202.

All other terms, conditions and agreements remain unchanged.

**EMBROKER**

Exhibit 1
Page 23

2



# Policyholder Disclosure
# Notice of Terrorism Insurance Coverage

For policies with no terrorism exclusion or sublimit.

You are hereby notified that, under the Terrorism Risk Insurance Act (the "Act"), this policy makes available to you insurance for losses arising out of certain acts of terrorism. Terrorism is defined as any act certified by the Secretary of the Treasury of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act. Under this formula, the United States pays 85% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage. Beginning in 2016, the Federal share will be reduced by 1% per year until it reaches 80%, where it will remain.

However, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion. 10-02-1281 (Ed. 03/2015)

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

The portion of your policy's annual premium that is attributable to insurance for such acts of terrorism is: $ -0-.

If you have any questions about this notice, please contact your agent or broker.



TRIA

Exhibit 1
Page 24

**EMBROKER**

# Embroker Business Management Insurance
# Declarations



Embroker Insurance Services LLC
5214F Diamond Heights Blvd. Unit #1261 San Francisco, CA 94131
1 844 436 276
embroker.com



EMB-001-EXT-DEC-20

1

Exhibit 1
Page 25

**Declaration**
**Embroker Management Liability Program**



| NAMED INSURED | INSURER | BROKER OF RECORD |
|---|---|---|
| Part Four LLC<br>600 Wilshire Blvd<br>Suite 1750<br>Los Angeles, CA 90017 | Clear Blue Specialty Insurance Company<br>200 South College Street Suite 1910<br>Charlotte, NC 28202 | JenCap Specialty Insurance Services - WTIS<br>425 California St<br>Suite 2400<br>San Francisco, CA 94104 |

# Policy

# Coverage

**POLICY NUMBER**

EX01-000743-02

Employment Practices Liability Coverage Part

**POLICY PERIOD**

05/15/2023 to 05/15/2024

# Premium

| POLICY LIMIT OF LIABILITY | PREMIUM ATTRIBUTABLE TO TRIA | POLICY PREMIUM |
|---|---|---|
| $1,000,000 | $0 | $11,392.00 |

| EMBROKER ACCESS FEE | TOTAL PREMIUM |
|---|---|
| $500.00 | $11,892.00 |

**Optional Extended Reporting Period**

| OPTIONAL PERIOD | OPTIONAL PERIOD |
|---|---|
| One (1) Year | 100% |
| Three (3) Years | 125% |
| Six (6) Years | 150% |

**Run-Off Coverage Period**

| OPTIONAL PERIOD | OPTIONAL PERIOD |
|---|---|
| One (1) Year | 100% |
| Three (3) Years | 125% |
| Six (6) Years | 150% |

Exhibit 1
Page 26



**Declaration**
Embroker Management Liability Program

**EMBROKER**



# Employment Practices Liability Coverage

## Limits of Liability: $1,000,000

| INSURING AGREEMENTS | COVERAGE LIMITS | RETENTIONS | |
|---|---|---|---|
| A. Employment Practices Liability Coverage | $1,000,000 | For each Claim covered under Insuring Agreement A. Employment Practices Liability Coverage | $75,000 |
| B. Third Party Liability Coverage | $1,000,000 | For each Claim covered under Insuring Agreement B. Third Party Liability Coverage | $75,000 |
| | | For each Claim covered under Insuring Agreement C. Wage and Hour Claims | $75,000 |
| **SUBLIMIT OF LIABILITY** | | | |
| C. Wage and Hour Claims | $250,000 | | |



EMB-001-EXT-DEC-20

Exhibit 1
Page 27

**Declaration**
**Embroker Management Liability Program**



# Notices to Insurer

| | |
|---|---|
| **SEND NOTICE OF CLAIMS, LOSS, CIRCUMSTANCES TO:** | **SEND ALL OTHER NOTICES AND INQUIRIES TO:** |
| Embroker Insurance Services LLC | Embroker Insurance Services LLC |
| 5214F Diamond Heights Blvd. Unit #1261, San Francisco, CA 94131 | 5214F Diamond Heights Blvd. Unit #1261, San Francisco, CA 94131 |
| claims@embroker.com | success@embroker.com |
| 844 436 2765 | 844 436 2765 |

**Policy Provision:**

This Policy Declarations with the Policy Jacket, Policy Forms and Endorsements issued to form a part thereof, completes the policy as numbered on this Declaration Pages. Whenever your policy is modified, you will receive a dated revision of the Policy Declarations.

**In Witness Whereof:**

In consideration of your paid premium, Clear Blue Specialty Insurance Company is proud to extend to you the coverage offered by this insurance contract.



President, Clear Blue Specialty Insurance Company

EMB-001-EXT-DEC-20

Exhibit 1
Page 28

**Declaration**
**Embroker Management Liability Program**



# Forms List

Surplus Lines State Disclosure

Forms List                                                      EMB-001-EXT-FORMS-20

Notice of Service of Suit                                       SOS-CA-0616

Policyholder Disclosure – Notice of Terrorism Insurance Coverage    TRIA

Declarations Page                                              EMB-001-EXT-DEC-20

Policy General Terms and Conditions                           EMB-001-T-22.1-GTCPCO

Employment Practices Liability Insurance Coverage Part        EMB-001-T-22.1-EPLPCO

Exhibit 1
Page 29

Throughout this Policy, the words "you" and "your" refer to the **Named Insured** shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance. Other words and phrases that appear in bold print have special meaning. Refer to the Definitions sections in this Policy.

This Policy, including the Declarations, General Terms and Conditions, elected **Coverage Part(s)**, written endorsements, and the **Application** shall constitute the entire agreement between us and you regarding the insurance provided hereunder.

In consideration of the payment of the premium and in reliance upon the statements made and information furnished to us in the **Application**, and subject to all of the terms and conditions of this Policy (including all endorsements attached hereto), we and you agree as follows:

# I.   Terms and Conditions

Except for these General Terms and Conditions or unless stated to the contrary in any **Coverage Part** of this Policy, the terms, conditions and limitations of each **Coverage Part** shall apply only to that **Coverage Part**. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms, conditions and limitations of any **Coverage Part**, the terms, conditions and limitations of such **Coverage Part** shall control for purposes of that **Coverage Part**. Any defined term referenced in these General Terms and Conditions and also defined in a **Coverage Part**, shall, for purposes of coverage under that **Coverage Part**, have the meaning ascribed to it in that **Coverage Part**.

# II.   Definitions

A.   "**Application**" means all written materials and information, including signed applications and any information attached thereto, incorporated therein, submitted, or made available by or on behalf of you to us in connection with underwriting of this Policy or any other policy issued by us, which this Policy is a renewal or replacement. The **Application** is deemed attached to and incorporated into this Policy.

B.   "**Claim**" shall have the meaning ascribed to it in the applicable **Coverage Part**.

C.   "**Coverage Part**" means each **Coverage Part** designated in the Declarations as a part of this Policy.

D.   "**Defense Costs**" shall have the meaning ascribed to it in the applicable **Coverage Part**.

E.   "**Debtor in Possession**" means a "debtor in possession" as defined in Chapter 11 of the United States Bankruptcy Code or any similar law.

F.   "**Domestic Partner**" means any natural person qualifying as a domestic partner or party to a civil union under the provisions of any applicable federal, state or local law or under the provisions of any formal program you establish.

G. "**Employee**" means any natural person whose labor or service was, is or shall be engaged and directed by the **Insured Organization**, including full-time, part-time, seasonal, leased and temporary employees.

   **Employee** also means any:

   1. Volunteers or interns of the Insured Organization in their capacity as such; and

   2. Individual who is an **Independent Contractor** while performing services on your behalf or at your direction.

H. "**ERISA**" means the Employee Retirement Income Security Act of 1974 (as amended) and any rules or regulations promulgated thereunder or any similar law.

I. "**Executive**" means any natural person who was, is or shall be a duly elected or appointed:

   1. Director, officer, or member of the board of the managers or management committee of the **Insured Organization**;

   2. In-house general counsel of the **Insured Organization**;

   3. Advisory, supervisory, or scientific advisory board member of the **Insured Organization**;

   4. Stockholders' representative of the **Insured Organization**;

   5. Natural Person General Partner of the **Insured Organization**; and

   6. Any foreign or functional equivalent of any of the foregoing.

J. "**Independent Contractor**" means any natural person working for the **Insured Organization** in the capacity of an independent contractor while performing services on behalf of you or at your direction.

K. "**Insured**" shall have the meaning ascribed to it in the applicable **Coverage Part**.

L. "**Insured Organization**" means, collectively:

   1. **Named Insured**; and

   2. Any **Subsidiary**

   including any such organization as a **Debtor in Possession**.

M. "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

N. "**Loss**" shall have the meaning ascribed to it in the applicable **Coverage Part**.

O. "**Named Insured**" means the legal entity named as the Named Insured in the Declarations.

P.   "**Plan**" means:

1.   Any Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, as each is defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar law, which was, is now, or hereafter becomes sponsored solely by the **Insured**, or sponsored jointly by the Insured and a labor organization, solely for the benefit of the **Insured's Employees**;

2.   Any other employee benefit plan or program not subject to **ERISA** sponsored solely by the **Insured** for the benefit of the **Insured's Employees**, including any fringe benefit, or excess benefit plan;

3.   Any employee benefit plan or program otherwise described in Paragraphs 1. or 2. above while such plan or program is being actively developed, formed or proposed by the **Insured** prior to the formal creation of such plan or program;

4.   Any government-mandated insurance program for workers' compensation, unemployment, social security or disability benefits for the **Insured's Employees**;

5.   Any Voluntary Employees Beneficiary Association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended, for which the purpose is to provide life, sickness, accident or other benefits for voluntary members who are **Employees** (including their dependents or designated beneficiaries).

**Plan** shall not include any "multiemployer plan" or "employee stock ownership plan" as defined by **ERISA**, unless such plan is specifically included as a Plan by endorsement to this Policy.

Q.   "**Policy Period**" means the period specified in the Declarations, subject to any cancellation prior to the scheduled expiration date.

R.   "**Regulatory Body**" means any federal, state, local, or foreign law regulatory body or other investigative, administrative, enforcement, or governmental authority, or the enforcement unit of any securities or commodities exchange or similar self regulatory organization.

S.   "**Related Claim**" means all **Claims** arising out of a single **Wrongful Act**.

T.   "**Subsidiary**" means any entity that you:

1.   Own more than fifty percent (50%) of the issued and outstanding voting equity securities of such entity; or

2.   Control voting rights representing the present right to elect or appoint more than fifty percent (50%) of the directors or trustees of such entity.

U.   "**Team Member**" shall have the meaning ascribed to it in the applicable **Coverage Part**.

V.   "**Wrongful Act**" shall have the meaning ascribed to it in the applicable **Coverage Part**.

# III.   Limits of Liability

A.  Policy Limit of Liability

The Policy Limit of Liability stated in the Declarations is the most we will pay under this Policy for all applicable **Coverage Parts**

1.  Any **Loss** paid under one **Coverage Part** shall reduce the Policy Limit of Liability for all other **Coverage Parts**.

2.  If multiple **Coverage Parts** apply to the same **Claim**, the limit of liability that applies to such **Claim** will not exceed the highest limit of liability available under any one **Coverage Part** that applies.

B.  Coverage Part Aggregate Limit of Liability

Subject to the Policy Limit of Liability, any **Coverage Part** Aggregate Limit of Liability stated in the Declarations is the most we will pay under each respective **Coverage Part**.

C.  Coverage Limits of Liability

Subject to the Policy Limit of Liability and any **Coverage Part** Aggregate Limit of Liability, each Coverage Limit stated in the Declarations is the most we will pay under each respective Insuring Agreement.

D.  Sublimits of Liability

Each sublimit of liability, if any, stated in the Declarations the most we will pay for all **Loss** or other covered amounts that are subject to such sublimit. Any sublimit of liability set forth in any **Coverage Part** shall be part of and not in addition to, the respective **Coverage Part** Limit of Liability.

E.  Defense Costs

**Defense Costs** are part of and not in addition to the limits of liability applicable to each **Coverage Part**, and the payment by us of **Defense Costs** reduces such limits of liability.

F.  Limit of Liability Exhaustion and Payment

If the applicable limit of liability under this Policy is exhausted by payment of **Loss**, our obligations, including without limitation any duty to defend, shall be completely fulfilled and extinguished. We are entitled to pay **Loss** as it becomes due and payable by you, without consideration of other future payment obligations.

# IV. Coverage Territory

This Policy shall apply on a worldwide basis.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

Any **Loss** that you incur in any jurisdiction other than the United States or any of its territories or possessions shall be deemed, at your written direction, a **Loss** payable to you at the address shown on the Declarations. Any such payment by us to you pursuant to this paragraph shall fully discharge our liability under this Policy for such **Loss**. Any **Loss** incurred by a **Team Member** in a jurisdiction other than the United States or any of its territories or possessions and which is not indemnified or paid by you shall, to the extent permissible under applicable law, be paid to such **Team Member** in a jurisdiction mutually acceptable to such **Team Member** and us.

However, this Policy does not apply in any country, province or territory where it would be in violation of the laws of the United States including, but not limited to U.S. economic or trade sanction laws or export control laws administered by the U.S. Treasury, State, and Commerce Departments (e.g. the economic and trade sanctions administered by the U.S. Treasury Office of Foreign Assets Control).

# V. Retentions

A.  Our liability under each **Coverage Part** with respect to **Loss** on account of each **Claim** shall apply only to that part of **Loss** which is excess of the applicable Retention set forth in the Declarations.

    The Retention shall be uninsured under this Policy. The Limits of Liability will not be reduced by payment of any Retention.

B.  If a single **Claim** is covered in whole or in part under more than one **Coverage Part**, the applicable Retention under each such **Coverage Part** shall be applied with respect to coverage for such **Claim** under such **Coverage Part**, provided the sum of all applicable Retentions under all such **Coverage Parts** shall not exceed the largest of such applicable Retentions.

Exhibit 1    5
Page 34

# VI. Claims

A. Single Claims

All Claims under the **Coverage Parts** which arise out of the same **Wrongful Act** or Interrelated **Wrongful Act** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against the **Insured**, regardless of whether such date is before or during the **Policy Period**. In no event shall a single lawsuit or proceeding constitute more than one **Claim**.

B. Related Claims

If **Related Claims** are subsequently made against you and are reported to us, all such **Related Claims**, whenever made, will be considered a single **Claim** and such **Claim** will be deemed to have been made on the date the first of those **Claims** was made against the **Insured**. All **Related Claims** shall be subject to the same Retentions and Limits of Liability applicable to the earlier **Related Claim**.

# VII. Extended Reporting Period

A. Automatic Extended Reporting Period

If any **Coverage Part** is cancelled by you or is not renewed by us or you, then solely with respect to such **Coverage Part** that was cancelled or not renewed, an additional ninety (90) days during which **Claims** may be reported under this Policy (an "Automatic Extended Reporting Period") shall be made available, but only for **Wrongful Acts** that first occurred prior to the effective date of cancellation or nonrenewal. This Automatic Extended Reporting Period is not available if you purchase an Optional

Extended Reporting Period, or if you obtain another insurance policy that applies to such **Claim** within such ninety (90)-day period.

B. Optional Extended Reporting Period

1. If any **Coverage Part** is cancelled by you or is not renewed by us or you, then solely with respect to such **Coverage Part** that was cancelled or not renewed, you will have the right to purchase an Optional Extended Reporting Period to immediately follow the effective date of cancellation or nonrenewal.

2. The Optional Extended Reporting Periods and their respective additional premiums are stated in the Declarations. We must receive written notice of the Optional Extended Reporting Period elected together with payment of the applicable additional premium, within 60 days after the effective date of cancellation or nonrenewal. If we do not receive payment within such period, we will not be required to provide any Optional Extended Reporting Period.

3. If purchased, the additional premium for the Optional Extended Reporting Period shall be fully earned at the inception of the Extended Reporting Period. The Extended Reporting Period is not cancelable.

4. There is no separate limit of liability for the Extended Reporting Period. Neither the Automatic nor Optional Extended Reporting Period reinstates or increases the Limits of Liability.

5. A **Claim** reported in writing to us during any applicable Extended Reporting Period will be deemed to have been made on the last day of this **Policy Period**.

# VIII.    Defense of Claims

A. Duty to Defend

1. We shall have the right and duty to defend any **Claim** against the **Insured** which is covered under this Policy even if any of the allegations in such **Claim** are groundless, false or fraudulent.

2. We shall not be obligated to defend any **Claim** after the Policy Limit of Liability or any applicable **Coverage Part** Limit of Liability has been exhausted.

B. Settlement

1. The **Insured** agrees to neither admit nor assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur **Defense Costs** without our prior written consent, which shall not be unreasonably withheld. We shall not be liable for or as a result of any offer to settle, settlement, **Defense Costs**, assumed obligation, admission or stipulated judgment to which we have not given our prior consent.

   However, if the **Insured** is able to settle all **Claims** (including **Defense Costs**) in an amount, not exceeding the Retention, our consent is not required for the settlement of such **Claims**.

2. We shall have the right and shall be given the opportunity to make any investigation of a **Claim** we deem necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the **Insured's** consent, such consent not to be unreasonably withheld.

# IX. Claim and Potential Claim Notices

A. As a condition precedent to coverage, the **Insured** shall give us written notice of any **Claim** made against the **Insured** as soon as practicable after the Chief Executive Officer or functionally equivalent first learns of such **Claim**, but in no event later than (i) ninety (90) days after the expiration of the **Policy Period**.

B. If the **Insured** fails to provide notice of a **Claim** as soon as practicable as required by this Policy, we will not constitute it as a coverage defense with respect to such **Claim** unless we establish we are materially prejudiced by such failure.

C. You shall include with any such notice of circumstance a description of the circumstances, the nature of any potential **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insured** first became aware of the circumstances.

D. If, during the **Policy Period** or Extended Reporting Period, if applicable, you first become aware of a **Wrongful Act** or circumstances that could give rise to a **Claim**, and if written notice of such **Wrongful Act** or circumstances is given to us during the **Policy Period** or Extended Reporting Period, then any **Claim** subsequently arising from such **Wrongful Act** shall be deemed to be a **Claim** first made at the time that we receive such notice.

E. Notices to you shall be sent to you at the address specified in the Declarations.

# X. Cooperation

With respect to all **Coverage Parts**, the **Insureds** agree to provide us with all information, assistance and cooperation which we reasonably request and agree that, in the event of a **Claim**, the **Insureds** will do nothing that shall prejudice our position or our potential or actual rights of recovery. The failure of any **Insured** to comply with this Section shall not be imputed to or create a coverage defense under this Policy with respect to any other Insured.

# XI. Allocation

A. If in any **Claim** the **Insured** incurs both **Loss** covered by this Policy and loss not covered by this Policy because the **Claim** includes both covered and uncovered matters or because the **Claim** is made against both covered and uncovered parties, such amount shall be allocated as follows:

   1. 100% of **Defense Costs** shall be allocated to covered Loss; and

2. **Loss** other than **Defense Costs** shall be allocated between covered **Loss** and non-covered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters and covered and uncovered parties.

# XII.    Subrogation

We shall be subrogated to all of the **Insured's** rights of recovery regarding any payment of **Loss** under this Policy. The **Insured** shall do everything necessary to secure and preserve such rights, including, without limitation, the execution of any documents necessary to enable us to effectively bring suit in the **Insured's** name. The **Insured** will do nothing to prejudice our position or any rights of recovery.

We shall not subrogate against any **Team Member**.

# XIII.    Changes in Exposure

A. Change in Control

   If, during the **Policy Period**:

   1. One of the following occurs:

      a. any person or entity or group of persons and/or entities acting in concert acquires securities which result in ownership by such person(s) and/or entity(ies) of more than 50% of the outstanding securities representing the present right to vote for the election of directors or equivalent positions of the **Insured Organization**; or

      b. the **Insured Organization** merges into or consolidates with another organization such that the **Insured Organization** is not the surviving organization, or

      c. The **Insured Organization** completes an initial public offering of securities registered with the Securities and Exchange Commission or completes a reverse merger with a publicly traded company; or

      d. The **Insured Organization** emerges from bankruptcy as of the effective date stated in the plan of reorganization; and

   2. You provide us written notice of such Change in Control transaction as soon as practicable, but not later than 60 days after the effective date of such transaction,

      then coverage shall continue until the termination of this Policy, provided that such coverage shall apply only with respect to **Claims** for **Wrongful Acts** occurring prior to the effective date of such Change in Control transaction.

      No coverage shall be available for any **Wrongful Act** or **Loss** occurring after such Change in Control transaction.

**EMBROKER**

Exhibit 1      9

Page 38

Upon such Change in Control transaction, the entire premium for this Policy shall be deemed fully earned.

You shall give us written notice of such Change in Control transaction as soon as practicable, but not later than 60 days after the effective date of such transaction.

In the event of such transaction during the **Policy Period**, you shall have the right, upon payment of the additional premium set for in the Declarations, to an extension of coverage granted by the **Coverage Part** for the Run Off Coverage Period set forth in the Declarations, which shall commence as of the effective date of such transaction.

B.  Acquisition or Creation of a Subsidiary

If, before or during the **Policy Period**, the **Insured Organization**:

1.  creates or acquires a **Subsidiary** or a new **Plan**; or

2.  merges with another organization such that the **Insured Organization** is the surviving entity,

Then such newly created, acquired or merged organization or **Plan** shall be covered under this Policy solely for **Wrongful Acts** or covered **Loss** taking place after such acquisition, merger or creation.

This section does not apply to, and no coverage shall be available under this Policy for any: (i) **Wrongful Act** or **Loss** of any new **Insureds** occurring before such transaction; or (ii) any **Interrelated Wrongful Acts** thereto.

C.  Loss of Subsidiary Status

If, before or during the **Policy Period**, any organization ceases to be a **Subsidiary**, then coverage shall be available under this Policy for such **Subsidiary** and its **Insureds**, but only for Claims for covered **Wrongful Acts** occurring before such transaction. No coverage shall be available to such **Subsidiary** for any **Wrongful Act** or covered **Loss** occurring after such transaction.

If before or during the **Policy Period** a **Plan** is terminated, coverage for such **Plan** under the Fiduciary Liability **Coverage Part**, if purchased, shall continue until termination of such **Coverage Part** with respect to **Wrongful Acts** taking place prior to the termination of such **Plan**.

# XIV.   Application

You represent and acknowledge that the statements and information contained in the **Application** are true, accurate, and complete, and are the basis of this Policy and are to be considered incorporated into and constituting a part of this Policy.

This Policy is issued in reliance upon the truth and accuracy of the **Application**.

If the **Application** contains misrepresentations or omissions that materially affect the acceptance of the risk or the hazard assumed by us, this Policy shall not afford coverage for any **Insured** who knew on the inception date of this Policy the facts that were not truthfully disclosed in the **Application**, whether or not the **Insured** knew the **Application** contained such misrepresentation or omission.

For the purpose of determining coverage, knowledge possessed by:

1. Any **Team Member** shall not be imputed to any other **Team Member**; and

2. the **Insured Organization's** Chief Executive Officer, functionally equivalent, or anyone signing the **Application** shall be imputed to the **Insured Organization**.

# XV.   Suits Against the Insurer

No person or organization shall have any right under this Policy to join us as a party to any **Claim** against you nor shall we be impleaded by the **Insured** in any **Claim**.

# XVI.   Assignment

No change in, modification of, or assignment of interest under this Policy shall be valid unless endorsed in writing by us. This Policy and any and all rights hereunder are not assignable without our prior written consent, which consent shall be in our sole and absolute direction.

# XVII.   Named Insured's Authority

You shall act on behalf of all other Insureds regarding all matters under this Policy.

# XVIII.   Cancellation

A. We may cancel this Policy only for non-payment of premium. In such case, we will mail or deliver written notice stating when, not less than twenty (20) days thereafter, the cancellation shall be effective. Cancellation shall not become effective if you pay such premium in full during such twenty (20) day period. Any notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

B. You may cancel this Policy by sending written notice of cancellation to us. Such notice shall be effective upon receipt by us unless a later cancellation date is specified therein.

C. If this Policy is canceled, we will return to you any unearned premium, calculated pro rata, but the return of premium to you is not a condition precedent to cancellation.

# XIX. **Bankruptcy**

The bankruptcy or insolvency of the **Insured Organization** or any of any **Team Member's** estate will not relieve us of our obligation under this insurance. In the event of bankruptcy or insolvency of the **Insured Organization**, you shall waive and release any automatic stay or injunction in such proceeding that may apply to this Policy or its proceeds, and agree not to oppose or object to any efforts by us or any **Insured** to obtain relief from any such stay or injunction.

# XX. **References to Laws**

Any statute, act, or code mentioned in this Policy shall be deemed to include all amendments of, and rules and regulations promulgated under, such statute, act, or code.

Any statute, act, or code mentioned in this Policy that is followed by the phrase "or any similar law" shall be deemed to include all similar laws of all jurisdictions throughout the world, including, without limitation, any common law.

# XXI. **Determination of Jurisdiction for Punitive Damage Awards**

The insurability of such punitive, exemplary or multiple damages, civil penalties shall be determined under the internal laws of any applicable jurisdiction most favorable to the Insured, including without limitation the jurisdiction in which we, the Insured, this Policy or such Claim is located. With respect to:

A.  Judgments in which punitive, exemplary or multiplied damages are awarded;

B.  Fines, penalties or taxes incurred by **Team Members** under Section 2(g) 2(B) of the Foreign Corrupt Practices Act, as amended and Section 308 of the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7246(a)); or

C.  Any amounts which may be considered uninsurable under the law pursuant to which this Policy is construed, coverage provided by this Policy shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insured**, including without limitation the jurisdiction in which the Company, the **Insured**, this Policy or such **Claim** is located or has a substantial relationship.

# XXI.  **Additional Conditions**

A.  Changes

This Policy shall not be changed in any manner except by a written endorsement issued by us.

B.  Titles and Headings

The titles of the headings of, and endorsements to, this Policy are for reference only. Such titles shall not be part of the terms and conditions of coverage.

C.  Premium

You will pay the premium stated in the Declarations. As may be agreed upon by you and us or as otherwise provided in this Policy, the premium may be adjusted at any time during the **Policy Period** or any extensions of the **Policy Period** based upon changes in the provisions of this Policy.

D.  Choice of Law

Any disputes involving this Policy shall be resolved by applying the law of the state or jurisdiction indicated in the Declarations as the principal address of the **Named Insured**.

# I.    Insuring Agreements

A.          EMPLOYMENT PRACTICES LIABILITY

We will pay **Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and reported to us pursuant to the terms of this Policy, for a **Wrongful Act.**

B.          THIRD PARTY EMPLOYMENT PRACTICES LIABILITY

We will pay **Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the Insured during the **Policy Period** or any applicable Extended Reporting Period, and reported to us pursuant to the terms of this Policy, for a **Third Party Wrongful Act.**

C.          DEFENSE FOR WAGE AND HOUR ACTIONS

We will reimburse **Defense Costs** which the **Insured** is legally obligated to pay by reason of a **Wage and Hour Action** first made against the **Insured** during the **Policy Period** or, if applicable, the Extended Reporting Period and reported to us pursuant to the terms of this Policy, for a **Wage and Hour Wrongful Act** taking place prior to end of the **Policy Period**. The maximum sublimit of liability under this section for all covered **Defense Costs** for **Wage and Hour Actions**, combined, shall be the Wage and Hour Costs Sublimit of Liability set forth in the Declarations.

# II.    Definitions

A.    **"Claim"** means:

1.    A written demand against the **Insured** for monetary damages or non-monetary (including injunctive) relief, including a written demand to toll or waive a statute of limitations;

2.    A civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against the **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

3.    A civil proceeding against the **Insured** before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, commenced by the filing of a notice of charges, investigative order or similar document;

4.    A criminal proceeding brought in a court outside of the United States against the **Insured**, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges; and

E.  A written demand or request for arbitration, mediation, or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand

for a **Wrongful Act**, brought by or on behalf of any past, present, future or prospective **Employee**, or an applicant or prospective applicant for employment with the **Insured Organization**, in their capacity as such; or for a **Third Party Wrongful Act.**

However, **Claim** does not include a labor or grievance proceeding, which is pursuant to a collective bargaining agreement.

F.  "**Defense Costs**" means that part of **Loss** consisting of expenses, including attorneys' fees and experts' fees, incurred in the investigation, defense or appeal of a **Claim**.

**Defense Costs** include the premium for any appeal, attachment or similar bond, provided that we have no obligation to issue such bond.

**Defense Costs** does not include any compensation, benefit expenses, or any of the **Insured's** overhead.

G.  "**Insured**" means:

1.  You;

2.  Any **Insured Organization**; or

3.  Any **Team Member**.

H.  "**Loss**" means the damages, judgments, settlements, front pay and back pay, pre-judgment or post-judgment interest awarded by a court, and **Defense Costs** incurred by the **Insured**.

**Loss** also includes liquidated damages awarded under the Age Discrimination in Employment Act, Equal Pay Act, or Family Medical Leave Act.

**Loss** does not include:

1.  Taxes, fines or penalties except with respect to liquidated damages as provided above;

2.  Matters or amounts uninsurable under the laws pursuant to which this Policy is construed;

3.  The cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

4.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

5.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing benefit payments;

6.  The costs to modify or adapt any building or property to be accessible or accommodating, or to be more accessible or accommodating, to any disabled person;

7.  The cost of creating or reinstating employment;

8.  Any amount owed as wages, commissions, or salaries to any Employee, other than front pay or back pay; or

9.  Any amount for which the **Insured** is not financially liable or legally obligated to pay.

E.  "**Retaliation**" means an **Insured's** actual or alleged adverse or harmful action in return for perceived injuries or wrongs perpetrated as a response to:

1.  The disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by the **Insured** where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

2.  The actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

3.  The filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law; or

4.  Any legally-protected employee work stoppage or slowdown.

F.  "**Team Member**" means any:

1.  **Executive**; or

2.  **Employee**.

G.  "**Third Party Wrongful Act**" means any actual or alleged discrimination or harassment, whether sexual or otherwise, in violation of a person's civil rights, committed by the **Insured** against any natural person who is a customer, vendor, service provider, client, or other business invitee of the **Insured Organization** other than a past, present or future **Team Member**.

H.  "**Wage and Hour Action**" means:

1.  A written demand against the **Insured** for damages or other relief; or

2.  A civil, judicial, administrative, regulatory, or arbitration proceeding or a formal governmental investigation against you seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

3.  brought by or on behalf of one or more Employees alleging any **Wage and Hour Wrongful Act.**

I. "**Wage and Hour Wrongful Act**" means any actual or alleged violation(s) of state, local or foreign statutory or common law (including, but not limited to the Fair Labor Standards Act or Wage Payment and Collection Act), or any amendments thereto, or rule or regulations promulgated thereunder governing wage, hour and payroll policies and practices including, but not limited to:

1. The refusal, inability or failure of an **Insured Organization** or **Team Member** to pay wages or overtime pay, off-the-clock work, on-call time compensation, compensation for waiting time and dressing time, minimum wage compensation, reimbursement of expenses or any amounts representing such wages or pay or expenses, for services rendered or time spent in connection with work related activities;

2. Improper pay deductions taken by an **Insured Organization** or **Team Member** from any employee or purported employee, including but not limited to garnishments and withholdings;

3. Improper classification of any **Employee** or purported **Employee** or improper or failure to maintain accurate records;

4. Child labor;

5. Pay equity or comparable worth;

6. Failure to provide or enforce any legally required rest or meal breaks; or

7. Any similar practices, policies, or procedures.

However, **Wage and Hour Wrongful Act** does not include actual or alleged violations of the Equal Pay Act of 1963, and any amendments thereto.

J. "**Wrongful Act**" means any:

1. Wrongful dismissal, discharge or termination of employment, including but not limited to dismissal, discharge or termination resulting from a breach of an express or implied contract relating to employment, whether actual or constructive;

2. Harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

3. Employment discrimination of any protected status established under federal, state or local law, ordinance or public policy;

4. **Retaliation**;

5. Abusive or hostile work environment;

6. Employment-related misrepresentation;

7. Wrongful failure to employ or promote, wrongful deprivation of career opportunity, wrongful demotion, wrongful discipline, or failure to grant tenure;

8. Negligent employee evaluation;

9. Violation of the Uniformed Services Employment and Reemployment Rights Act or the Family and Medical Leave Act;

10. Employment related wrongful infliction of emotional distress, mental anguish, or humiliation;

11. Failure to provide or enforce adequate or consistent employment policies and procedures relating to any matters described in paragraphs 1 - 10;

12. Violation of an individual's civil rights if such conduct relates to matters described in paragraphs 1 - 9, including, but not limited to, any violation of the Civil Rights Act of 1866 or 42 U.S.C. Section 1983;

13. Libel, slander, defamation, false or wrongful imprisonment, invasion of privacy and other personal injury allegations, but only if such conduct is alleged in addition to or as part of any matters described in paragraphs 1-9; or

14. Negligent hiring, retention or supervision, but only if such conduct is alleged in addition to or as part of any matters described in paragraphs 1-9

actually or allegedly committed by an **Insured** in such capacity.

# III.  Exclusions

For the purpose of determining the applicability of any Exclusion set forth in this Exclusions Section, the **Wrongful Act** or knowledge of any **Team Member** shall not be imputed to any other **Team Member**, and only the **Wrongful Act** or knowledge of the Chief Executive Officer or functionally equivalent of the **Insured Organization** shall be imputed to the **Insured Organization**.

We shall not be liable under this **Coverage Part** to pay any **Loss** on account of that portion of any **Claim** made against you:

A. Bodily Injury and Property Damage

For bodily injury, sickness, emotional distress, mental anguish, humiliation, disease or death of any person, other than employment-related mental anguish, humiliation, or emotional distress; or damage to or destruction of any tangible property or electronic data, including loss of use of any such property or data whether or not it is damaged or destroyed.

B. Violation of Labor Law

For an actual or alleged violation of any law governing or regulating:

1. the rights of **Employees** with respect to unions, unionizing, or collective activities in the workplace, or any obligations of employers with respect to such **Employee** activities, including but not limited to the National Labor Relations Act or any similar law;

2. the obligations of an employer to notify, discuss, or bargain with its employees or others in advance of any plant or facility closing or mass layoff, or any similar obligation, including, but not limited to, the Worker Adjustment and Retraining Notification Act or any similar law;

3. workplace safety and health, including, but not limited to, the Occupational Safety and Health Act or any similar law;

4. workers' compensation, unemployment insurance, social security, or disability benefits, or any similar law; or any actual or alleged violation of the Consolidated Omnibus Budget Reconciliation Act of 1985 or any similar law; or

5. duties or obligations under the Employment Retirement Security Act of 1974 (except section Section 510 thereof) or any similar law;

except this exclusion does not apply to any **Claim** for **Retaliation** covered under the Employment Practices Liability **Coverage Part**.

C. Prior Notice

Based upon, arising out of, or attributable to any fact, circumstance, or **Wrongful Acts** that, before the inception date of this Policy, was the subject of any notice given and accepted under any prior employment practices liability or comparable insurance policy.

D. Contractual Liability

Based upon, arising out of, or attributable to any liability under any written contract or agreement, provided this exclusion shall not apply to:

1. The extent that liability would have been incurred in the absence of such contract or agreement; or

2. **Defense Costs**

E. Labor Disputes

Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any lockout, strike, picket line, hiring of replacement workers or other similar actions in connection with labor disputes or labor negotiations.

F. Conduct

Based upon, arising out of, or attributable to any willful violation of law, or any dishonest, deliberately fraudulent or criminal act committed by any Insured; if evidenced by a final and non-appealable adjudication in the underlying action or proceeding.

G.   Wage & Hour

Based upon, arising out of, or attributable to any **Wage and Hour Wrongful Act**, provided this exclusion shall not apply to:

1.   The Equal Pay Act of 1963 and any amendments thereto;

2.   Any **Claim** for **Retaliation**; or

3.   **Defense Costs** provided under and limited to the Wage and Hour Cost Sublimit of Liability under Insuring Agreement I.C (Defense for Wage and Hour Actions).

# V.   Additional Conditions

A.   Other Insurance

Coverage under this **Coverage Part** shall apply only in excess of any other valid and collectible insurance, unless such other insurance is written specifically excess of this **Coverage Part** by reference to this Policy's Policy Number.

B.   Non-Rescission

We shall not have the right to rescind this **Coverage Part**.

# EXHIBIT B

Exhibit 1
Page 50

JAMES B. DEVINE, SBN 205270
LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Email: james@jamesbdevine.com

Attorneys for Plaintiff
SLY SPECTRUM LLC, a Texas limited liability company

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

### CENTRAL JUDICIAL DISTRICT – STANLEY MOSK COURTHOUSE

| | |
|---|---|
| SLY SPECTRUM, LLC, a Texas limited liability company, <br><br> Plaintiff, <br><br> vs. <br><br> KATIE WILLIAMS, an individual, and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No.: 23STCV20562 <br><br> **UNLIMITED CIVIL JURISDICTION** <br><br> **SECOND AMENDED COMPLAINT FOR: (1) AIDING & ABETTING BREACH OF FIDUCIARY DUTY; (2) AIDING & ABETTING CONVERSION; (3) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP; (4) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; and (5) NEGLIGENT INTERFERENCE WITH ECONOMIC ADVANTAGE** <br><br> **JURY TRIAL DEMANDED** |

## CONDITIONALLY UNDER SEAL

**The enclosed record is subject to a motion to file the record under seal.**

**PUBLIC--REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD.**

Exhibit 1
Page 51

JAMES B. DEVINE, SBN 205270
LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Email: james@jamesbdevine.com

Attorneys for Plaintiff
SLY SPECTRUM LLC, a Texas limited liability company

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

## CENTRAL JUDICIAL DISTRICT – STANLEY MOSK COURTHOUSE

| | |
|---|---|
| SLY SPECTRUM, LLC, a Texas limited liability company,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>KATIE WILLIAMS, an individual, and DOES 1 through 10, inclusive,<br><br>　　　　Defendants. | Case No.: 23STCV20562<br><br>**UNLIMITED CIVIL JURISDICTION**<br><br>**SECOND AMENDED COMPLAINT FOR: (1) AIDING & ABETTING BREACH OF FIDUCIARY DUTY; (2) AIDING & ABETTING CONVERSION; (3) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP; (4) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; and (5) NEGLIGENT INTERFERENCE WITH ECONOMIC ADVANTAGE**<br><br>**JURY TRIAL DEMANDED** |

**COMES NOW** Plaintiff SLY SPECTRUM LLC ("**PLAINTIFF**"), a Texas limited liability company, who set forth the following causes of action against the Defendants, and each of them, and who allege as follows:

## GENERAL ALLEGATIONS

1.　PLAINTIFF, at all times mentioned herein, was and now is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Glendale, California, and qualified to conduct business in the State of California.

Second Amended Complaint, Page - 1

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 52

2.  PLAINTIFF is informed and believes, and based thereon alleges, that, at all times mentioned herein Defendant KATIE WILLIAMS ("**WILLIAMS**") is an individual residing in the City of Los Angeles, County of Los Angeles, State of California.

3.  PLAINTIFF is informed and believes, and based thereon alleges, Defendants DOES 1 through 20, inclusive, aided and abetted WILLIAMS in performing the acts described herein and, in doing the things herein mentioned, were acting with the permission and consent of WILLIAMS and one another.

4.  PLAINTIFF is ignorant of the true names and capacities, whether corporate, individual, partnership, associate or otherwise, of Defendants sued herein as fictitious DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. PLAINTIFF will amend this Complaint to allege their true names and capacities when ascertained.

5.  The allegations sued upon herein arose at 600 Wilshire Boulevard, Los Angeles, California.

6.  The within action is not subject to the provisions of Civil Code §§ 1801, et seq. (Unruh Act) or §§ 2981, et seq., (Reese-Levering Act).

## **PROCEDURAL HISTORY**

7.  On August 11, 2021, PLAINTIFF and its sole manager, member, and employee Jonathan Dortch ("**Dortch**") commenced a legal action in the Los Angeles County Superior Court entitled *Dortch v. Golsen*, LASC Case No. 21STCV29695, against defendants Joshua Golsen ("**Joshua**"), Barry Golsen ("**Barry**"), Rebel Bass LLC ("**Rebel**"), a limited liability company for which Joshua is the sole manager and member), GOL Capital LLC ("**GOL**"), a limited liability company whose members are Barry, Joshua, and trusts for which Barry and Joshua are the trustees and beneficiaries, and is controlled by Barry, and Part Four LLC ("**Part IV**"). In their original complaint, PLAINTIFF and Dortch alleged causes of action for: 1) FRAUD (INTENTIONAL MISREPRESENTATION AND CONCEALMENT); 2) RESCISSION OF OPERATING AGREEMENT; 3) BREACH OF OPERATING AGREEMENT; 4) BREACH OF FIDUCIARY DUTY (SLY AGAINST JOSHUA); 5) DECLARATORY RELIEF; 6) WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY; 7) VIOLATION OF LABOR CODE §1102.5; 8) UNLAWFUL, UNFAIR OR FRAUDULENT BUSINESS PRACTICES; 9) CONVERSION; 10) FAILURE TO PAY ALL WAGES WHEN DUE; 11) VIOLATION OF LABOR CODE § 203; and 12) ORDERS REQUIRING DISCLOSURE OF INFORMATION AND

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 53

DOCUMENTATION (PURSUANT TO CORPORATIONS CODE §17701.13 AND §17704.10) against Joshua, Barry, Rebel, Gol, and Part IV, which case was deemed related to this matter on October 9, 2023 (the "**Related Case**").

8.   PLAINTIFF commenced this action on August 25, 2023, by filing its initial complaint.

9.   Before service of its original complaint on WILLIAMS, PLAINTIFF filed its first amended complaint on September 14, 2023.

10.  On December 28, 2023, the Court granted PLAINTIFF leave to file its second amended complaint following a demurrer filed by WILLIAMS through her counsel that also serve as counsel for Joshua, Barry, Rebel, and GOL.

### FACTS APPLICABLE TO ALL CAUSES OF ACTION

**A.     PLAINTIFF AND DORTCH NAMED AND CO-FOUNDED PART IV**

11.  PLAINTIFF was founded by Dortch in 2012, and is a production company specializing in producing interactive advertising and marketing, and such business is primarily performed at PLAINTIFF'S principal place of business in Glendale, California.

12.  In late December 2013, Dortch and Joshua, then close friends for over a decade after meeting through a mutual friend in 2002, agreed to form a business partnership with Dortch concepting the business name "Part IV" named after a song from his favorite band, as this was going to be Dortch's fourth creative company to found and fourth business to own. Dortch had previously founded a freelance sole-proprietorship business in 2004 for video editing and motion graphics services, Black Wolf LLC, a commercial and interactive video production company in New York state in 2010, and PLAINTIFF, a commercial and interactive video production company in Texas in 2012, which registered as a foreign entity in California in 2013.

13.  PLAINTIFF is informed and believes, and based thereon alleges, that Joshua was excited to use the "Part IV" name, as he felt he was entering the fourth chapter of his professional endeavors, and Joshua liked that the "IV" roman numeral in the name reminded him of Star Wars: Episode IV. Joshua proposed an alternate name of "Chapter Four" which PLAINTIFF, through Dortch, rejected for sounding too similar to the chapter of the United States Code that was for personal bankruptcy.

14.  PLAINTIFF is informed and believes, and based thereon alleges, that Joshua was not a business

Exhibit 1
Page 54

owner prior to joining PLAINTIFF when he founded Part IV with PLAINTIFF, and had been working as a W-2 employee as a Producer and Client Services Manager at a similar advertising agency, AvatarLabs, from 2005-2013, until he was terminated for violating client confidentiality by using confidential and proprietary information from a film studio client to attempt to sell similar services to a competing studio.

15. PLAINTIFF, through Dortch, unaware of all of the details of Joshua's termination for violating client confidentiality, agreed to found and become business partners and co-owners with Joshua in a new venture.

16. PLAINTIFF is informed and believes, and based thereon alleges, that Joshua did not know how to use any of the creative software or creative tools at AvatarLabs to create creative work product for the clients. Rather, his role was only communicative and administrative, taking the work product from the artists and showing it to clients, collecting the client feedback and delivering it back to the artists. In contrast to Joshua, PLAINTIFF, through Dortch (its sole manager and member), had a long history of physically creating work product, with expertise and experience operating and producing creative work in all areas of services an entertainment agency provides, in addition to performing the communicative and administrative roles that Joshua performed at his previous place of employment.

17. As part of forming the business partnership, Dortch converted the business and operations of PLAINTIFF to form a limited liability company to take the place of the Dortch-Joshua informal partnership as an entertainment advertising agency, Part IV which Dortch co-founded with Joshua in January 2014.

18. Part IV was styled and branded as exclusively as "Part IV" in all commercial use until 2022.

**B.**     **BARRY AND JACK FORM "GOL LLC" TO INVEST IN PART IV**

19. As Dortch was working on transitioning PLAINTIFF'S infrastructure and creating the branding and service marks for the new Part IV endeavor in mid-January 2014, Joshua approached Dortch and offered that his father, Barry and grandfather, Jack wanted to invest capital in exchange for an equity stake in Part IV.

20. Dortch had met Barry several times over the course of his then 12-year friendship with Joshua, including staying at the Golsen family home in Oklahoma City in 2005 while he was filming a

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 55

documentary about the law school at the University of Oklahoma in Norman, Oklahoma, and seeing Barry when he would come out to California to visit Joshua.

21. For the 12 years Dortch had known Joshua up until forming Part IV, Joshua had always conveyed to Dortch (and everyone else) that his father, Barry, "worked in air-conditioning" at the company ClimateMaster, in Oklahoma City.

22. As negotiations were still ongoing for the terms of Barry and Jack joining the business partnership via capital investment, Dortch agreed to allow Joshua to file the initial articles of organization for Part IV, with Dortch choosing to name the legal entity "Part Four LLC" spelled out without the roman numeral for legal clarity, as the new company needed a federal employer identification number (EIN) number and Franchise Tax Board number to begin establishing banking, insurance, and credit accounts for the partnership.

23. Dortch, implicitly trusting his 12-year friendship with Joshua, agreed to allow Joshua to file the articles of organization solely with as the sole member temporarily, following a request from Barry, and pending the finalizations of capital investment from Barry and Jack, with the verbal expectations of all parties that Part IV would file documents with the taxing agencies such that Part IV would be treated as either a partnership or an "S" corporation for tax purposes within a few weeks from the filing of the articles of organization.

24. In pleadings made by Joshua, Barry, Rebel and GOL (collectively, the "**Golsen Defendants**") in the Related Case, this "on paper" initial filing of the Part IV organization with Joshua as the single-member has been purposefully and drastically mischaracterized as Joshua being the sole impetus of founding the business.

25. On or about January 31, 2014, Dortch guided Joshua through the process of filing Part IV's articles of organization through the LegalZoom website because Joshua was unfamiliar with the process, but Dortch had used LegalZoom to form a previous entity with success.

26. As Joshua and Dortch sat together completing the different options on filing the articles of organization for Part IV, they decided to select the "all members are managers" option as the management structure of the LLC. Joshua and Dortch chose this structure to indicate the collaborative partnership between Joshua and Dortch to reflect that they both were managers of this new entity and

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 56

both would have ownership and executive roles at Part IV with Dortch's ownership of Part IV through PLAINTIFF, i.e. Dortch's single-member, single-manager entity.

27. On or about February 4, 2014, terms were reached for the capital contributions for the parties' respective membership interests in Part IV. PLAINTIFF agreed to contribute $50,000 of its equipment and computer systems, and convert $85,000 of estimated billable work already contracted that PLAINTIFF would (and did) solely perform later in 2014 in exchange for a 20% equity share of Part IV. Barry and Jack agreed to provide a $500,000 capital investment for a 25% equity share of Part IV. Joshua agreed to provide $25,000 for a 55% equity share in Part IV, with a promise to convince some of Joshua's former clients from AvatarLabs to become Part IV clients.

28. Once the aforementioned terms were reached and agreed upon, PLAINTIFF filed to convert PLAINTIFF'S "S" corporation tax treatment to be a pass-through, single-member LLC, so that PLAINTIFF, a tax paying corporation in 2012 and 2013, could join Part IV as a pass-through LLC member in the anticipated Form 1065 Partnership structure for Part IV for the 2014 tax year.

29. PLAINTIFF is informed and believes, and based thereon alleges, that on or about March 20, 2014, Barry and Jack filed to register an entity named GOL LLC in Oklahoma. Concurrent with this filing, Joshua told Dortch that GOL LLC would hold Barry and Jack's 25% membership interest in Part IV, and that his father and grandfather were forming this new entity solely for the purposes of holding this membership interest.

30. Shortly thereafter, through emails with Barry, Dortch learned that Barry does not work at ClimateMaster as Joshua had always represented. Instead, Barry actually works for a publicly traded company named LSB Industries, Inc. ("**LSB**"), a chemical company started by Jack. Joshua then began describing LSB as the "parent" company of ClimateMaster, though he had never once mentioned LSB in the prior 13 years.

31. Prior to the formation of GOL LLC in March of 2014, negotiations by Barry and Jack to join Part IV were done in their individual capacity, at times using emails and meeting invites sent using their email addresses with the "@lsbindustries.com" domain. Barry continued to use his "bgolsen@lsbindustries.com" email to discuss Part IV matters until his removal from LSB in September of 2015.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 57

32. One of the first emails Dortch received from Barry using his "@lsbindustries.com" email address (which foretells the dire need for human resources oversight which WILLIAMS would be hired to provide) is a lascivious mock advertisement for pre-owned Aston Martin vehicles, that portrays a young naked woman getting in a bathtub. The caption above the woman reads, "You know you're not the first, but do you really care?" Joshua replied to his father, "nice ad."

## C. PLAINTIFF ORIGINATED, DESIGNED, AND OWNS COPYRIGHT TO CERTAIN "PART IV" RELATED INTELLECTUAL PROPERTY

33. PLAINTIFF designed the logo and other branding materials for "Part IV" using PLAINTIFF'S own equipment and software, starting in early January 2014, before the Part IV articles were ever filed. At no time had PLAINTIFF transferred, assigned, or otherwise relinquished the rights for the copyright for these designs to Part IV or any of the Golsen Defendants.

34. PLAINTIFF also concepted and designed alternative marks in early January 2014 using "Part 4" and "P4RT" where the "4" replaced the letter "A" and became "part" of the name.

35. PLAINTIFF began establishing the digital infrastructure of the new "Part IV" company including sourcing, negotiating, and purchasing the "part4.com" domain through PLAINTIFF, and hosting the "part4.com" email and website on PLAINTIFF'S web host, which PLAINTIFF made additional investments in to scale up hosting bandwidth for anticipated Part IV hosting needs.

36. PLAINTIFF also attempted in January of 2014 to negotiate purchase of "partiv.com" and "p4rt.com" but was unable to get a response from the domain owners.

37. PLAINTIFF purchased "part4.com" for £500 from the original registrant of the domain in the United Kingdom, in January 2014 using PLAINTIFF'S American Express account. The "part4.com" domain was then transferred to PLAINTIFF'S registrar from the UK owner, where the domain remained until August 2021.

38. PLAINTIFF is informed and believes, and based thereon alleges, that on February 24, 2014, PLAINTIFF is the party who makes the first public business use of the "Part IV" service mark by informing one of PLAINTIFF'S existing clients of the new business partnership with Joshua, and providing an estimate PLAINTIFF prepared on February 21, 2014, to that client for $63,400, for creating branding, animating, and editing 70 pieces of content over an 8-week schedule, sent from

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 58

"dortch@part4.com" using the "part4.com" domain registered and owned by PLAINTIFF, using the "Part IV" name, solely named by PLAINTIFF, and "Part IV" logo mark solely designed by PLAINTIFF.

39. In late February to early March 2014, Dortch designed and coded the first website for "Part IV" hosted on PLAINTIFF'S webhost using the domain "part4.com," which contained solely a portfolio of creative work produced and owned by PLAINTIFF, with marks and logos designed by Dortch, to advertise the portfolio and expertise of Part IV, as Joshua did not have any work product to contribute or advertise.

40. PLAINTIFF'S considerable labor of designing and publishing the first website for "Part IV" led Joshua to offer PLAINTIFF a modest reimbursement for Dortch's efforts, since Dortch had stopped all client work through PLAINTIFF to focus solely on Part IV, and had committed upcoming billable work contracted to PLAINTIFF to be work billed by Part IV.

41. On or about March 17, 2014, the new Part IV agency and website (containing solely PLAINTIFF'S designs and work, now rebranded as "Part IV") was announced widely by Dortch and Joshua emailing many longtime industry friends and contacts, and Part IV began advertising PLAINTIFF'S work product to prospective clients.

42. On March 17, 2014, the "launch" day for Part IV, PLAINTIFF provided Joshua invoice 14009 for design services with the description "P4 Website & Hosting Registration," which was the result of a verbal agreement between Joshua and PLAINTIFF to reimburse PLAINTIFF a significantly below market rate at a modest $1,000 for the estimated 25 hours of design labor required to build the first Part IV site, and a straight reimbursement for the $399 + tax ($437) spent by PLAINTIFF to register new, more robust webhosting abilities on the PLAINTIFF webhost.

43. The reimbursement was negotiated by PLAINTIFF because, until that time, PLAINTIFF had been incurring *all* fees for establishing the digital infrastructure of Part IV as Part IV did not yet have banking accounts until the EIN number was assigned.

44. Once the Part IV banking accounts and initial investment from Barry and Jack are made, Joshua asked Dortch how much the company could reimburse PLAINTIFF for building the website, as PLAINTIFF could not receive the proper guaranteed payment for performing services on behalf of the

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 59

LLC due to Joshua's temporary single-member filing. PLAINTIFF asked for a modest "thousand bucks" plus the straight reimbursement of the upgraded web hosting registration through MediaTemple ($437).

45. Part IV (in what is the company's first check ever written, as Dortch chose to start the check numbering at 14100 when ordering the Part IV checks) paid PLAINTIFF a sum of $1437 for the abovementioned invoice, which Joshua then hand annotated on the check stub as "Website Expenses."

46. No contract exists, verbal or otherwise for this reimbursement, and this payment of "design services" as indicated on the invoice sent from PLAINTIFF to Part IV **did not** convey ownership nor transfer of the "part4.com" domain from PLAINTIFF or any other intellectual property and copyright owned by PLAINTIFF, nor was that ever discussed between the parties at any time.

47. Domain registration and hosting registration are two distinct processes related to establishing a presence on the internet. Domain registration is the process of acquiring a unique web address (e.g. www.part4.com) for a website, akin to digital real estate, while hosting registration is the process of securing server space for the website files, which can be linked to any domain. Domain names are typically registered for a specific period, usually one year. To continue using and owning the domain, the domain registration must be renewed before it expires.

48. PLAINTIFF paid to renew the domain registration of "part4.com" in 2015 for one year, and paid again in 2016, this time for 5 years. That 5-year renewal of the domain registration for "part4.com" that was made in 2016 was due for again renewal in June 2021, which on June 4, 2021 PLAINTIFF also renewed for another 5 years.

49. These domain registrations are now ineptly and inaccurately being characterized as a "bad-faith" domain registration in the counter-claim against PLAINTIFF for one claim of "cybersquatting" in the related case. PLAINTIFF has never been reimbursed by Part IV nor offered reimbursement for these renewals, despite brazenly false statements made by Part IV to the contrary in bad-faith attempts to seize PLAINTIFF'S intellectual property.

50. ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████:

    a. ████████████████████████████████████

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 60

█████████████████████████

b. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████; and

c. ████████████████████████████████████

███████████████; and

d. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████.

51. PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS has direct knowledge that Part IV did not have a handbook or any clause governing the ownership of employee created work product prior to 2017, as WILLIAMS and Dortch worked to create the first handbook only after her hiring in 2017.

52. Dortch has not ceded his rights to any creative or intellectual property Dortch created personally, or any work product created through PLAINTIFF, prior to the establishing of a handbook which includes language governing Part IV's right to own all employee work product.

53. PLAINTIFF is informed and believes, and based thereon alleges, that the designs and marks created by Dortch, working through PLAINTIFF, grant Dortch and PLAINTIFF copyright and trademark ownership for the Part IV mark, all work product performed by Dortch or PLAINTIFF prior to 2017, and the ownership of "part4.com" and other Part IV related domains. One of the causes of action in the Related Case is a cause of action for DECLARATORY RELIEF by PLAINTIFF against Part IV, for the court to rule on the ownership of the domains in question.

**D.    DORTCH WAS NOT A TYPICAL EMPLOYEE**

54. Dortch as a negotiated co-owner (through PLAINTIFF) and co-founder of Part IV was not "hired" by Part IV or by Joshua. Instead, Dortch worked to establish the first payroll system at Part IV because he had experience managing the payroll for PLAINTIFF and in Dortch's previous partnership in New York state.

55. On or about April 1, 2014, Dortch added himself on the Part IV payroll system at or slightly

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505   Exhibit 1
Page 61

above the minimum threshold for full-time wages in 2014 at approximately $37,440 per year, so that

there could be an active employee in the system to complete the setup process.

56. Dortch offered to take keep this salary at or slightly above the minimum wage threshold for all of

2014, far below industry standards and only a fraction of Dortch's historical salary at PLAINTIFF, as a

form of additional sweat equity investment into Part IV and to maximize the capital available to

establish the company in the first year.

57. Notably, Dortch could not add Joshua on the payroll system in April 2014 as Joshua wanted to

continue to receive unemployment benefits Joshua was claiming after his AvatarLabs termination (and

would continue to claim for approximately 26 weeks through 2014) despite starting Part IV with Dortch

in January 2014 and never once looking for other employment. This was one of the first times that

Dortch observed Joshua violating the law and misrepresenting facts for his financial gain.

58. In mid-late April of 2014, Part IV hired the company's actual first employees when Joshua

poached two of his co-workers from his previous employer AvatarLabs (Chris Chung, and Millie

Vitello) for the sole purpose of enticing AvatarLabs clients who were familiar with the exemplary work

product of these employees. In particular, Mr. Chung is an extremely proficient graphic designer with

many years of industry experience in digital advertising workflows. Part IV offered both Mr. Chung and

Ms. Vitello title increases and higher salary than they had at AvatarLabs.

59. In May of 2014, Mr. Chung joined "Part IV" with the role of Creative Director and Ms. Vitello

joined with the role of Producer. Further underscoring the impending need for human resources

oversight at Part IV that WILLIAMS would later be hired to provide, in the initial hire email written by

Joshua to Mr. Chung, Joshua lists one of Mr. Chung's job responsibilities as "daily boob image

distribution."

60. For the entire duration of Dortch's employment at Part IV, Dortch was always considered an

"owner" and not an "employee" for all issues and protocols employment related.

61. Dortch co-authored the Part IV employee handbook in 2017, with no drafting contributed by

Joshua, as he has learning disabilities and does not excel at technical or formal writing.

62. Dortch, as an "employee" taking W-2 wages from Part IV, never once had a job description,

performance review, performance improvement plan, or bonus. Instead, it was Dortch who was

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 62

instrumental in establishing those protocols for the employees at Part IV.

63. Dortch had no job description (nor manager) in almost all his multifaceted day-to-day duties operating the business, as Joshua (who could overrule Dortch as President and majority owner of Part IV) maintained minimal knowledge of the many aspects of what Dortch was building or operating day-to-day for the company's creative workflows and company infrastructure.

64. ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████. Dortch never once had a formal complaint raised by any Part IV employee, and in fact, defused multiple complaints raised against Joshua prior to the company having a dedicated human resource representative.

E. **THE GOLSEN DEFENDANTS PROCURED PLAINTIFF'S CONSENT TO THE PART IV OPERATING AGREEMENT THROUGH FRAUD, MISTAKE, AND ECONOMIC DURESS**

65. Joshua orally represented to PLAINTIFF in early February 2014, that Barry (an attorney) would prepare the Operating Agreement for Part IV because Barry and Jack required specific language to "protect" Barry and Jack's $500,000 investment.

66. In August 2014, at Part IV's opening launch party, Barry and Jack both attended, and Barry Golsen had a conversation with Dortch about the Operating Agreement being prepared "soon."

67. Subsequent to the launch party, Dortch made inquiry of Joshua as to the status of the Operating Agreement. During this period of time, Joshua described his father's delay to Dortch as Barry being "busy dealing with an activist investor" who was "unhappy with the stock price" of LSB. Dortch, based on his then 12-year friendship with Joshua, and his business partner whom he trusted implicitly, did not question the facts of these statements further at the time.

68. By December 2014, the lack of Operating Agreement, and the ensuing "single-member" LLC structure on paper for Part IV created a massive tax dilemma for the company, both for PLAINTIFF'S unaccounted investment of equipment and conversion of $104,185 in billable work previously contracted for PLAINTIFF that in 2014 which PLAINTIFF solely performed and billed through Part IV.

69. By 2015, with still no Operating Agreement in place, the arrangement becomes even more

Second Amended Complaint, Page - 12

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 63

complicated. Part IV found major success based largely on work pitched and won and directed by Dortch, including innovative 3D websites and a major interactive exhibit utilizing face-tracking technology. Furthermore, Dortch designed and implemented a proprietary security workflow pipeline for Part IV that would allow the company to work on "Tier Zero" projects with sensitive intellectual property, like *Star Wars* and *Marvel* campaigns for the Walt Disney Company. The advancements put in place by Dortch, allowed Part IV to book larger and higher profile campaigns, including digital display ads for *Star Wars: The Force Awakens* in 2014, led by Mr. Chung.

70. Between June and July of 2015, Dortch put together a team of Part IV employees and outside contractors to design, develop, and produce a project for the Walt Disney Company for *Alice Through The Looking Glass*, which was tasked with being a "first to market" execution to "wow" audiences. Dortch concepted an execution pairing 3D occluded objects to 2D facial tracking data to create full character transformations. This effect is now commonly known as "filters" on social media apps. Dortch and the team he assembled were the first to successfully implement this technology using transformative 3D assets.

71. The "Alice Wonder Mirror" became the most award-winning and important project in the Part IV's history. Most people outside of the industry in Los Angeles became aware of the Part IV because of the project. Snapchat hired away Part IV's developer to implement the Part IV style of "filter" effect on the Snapchat platform.

72. This same developer reached out to Dortch in 2019 and said that during a team exercise at Snapchat he had been tasked with speaking about the person he felt had most positively and profoundly influenced his career, and he called Dortch to let him know that he had chosen Dortch, thanking him again for his direction on the *Alice* project. In fact, another current Creative Director of Part IV, frequently cited the *Alice* project as the reason he discovered Part IV, and the reason he wanted to join the company.

73. Disney was so happy with the *Alice* project that Part IV was asked to travel its exhibit to Toronto, Ontario, to multiple red-carpet events at award shows, and for a multi-month residency at Disneyland, all in the months following the launch of the project in August 2015, all managed, coordinated, and led by Dortch.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 64

74. In total, the "Alice Wonder Mirror" project became the Part IV's most successful project to date and generated approximately $600,000 in revenue in 2015 from Disney, roughly five to ten times the revenue of an average campaign.

75. Joshua had no role in the *Alice* project and maintained minimal understanding of the complexities of the custom software developed to create the project, or the significant logistical efforts to produce the face-tracking physical kiosks.

76. Part IV was in a successful and profitable position in 2015 due in large part to the massive success of *Alice*, and several other marquee projects led by Dortch. The unparalleled success of these projects were the impetus of why Dortch became extremely insistent that Barry finish drafting the Operating Agreement for Part IV, which as of October of 2015, still had not been prepared, with increasingly obtuse, contradictory, and defensive explanations provided by Joshua. These excuses ranged from Barry's struggles with Crohn's Disease, the illness of his grandmother, and the continued struggles with the "activist investor."

77. Joshua and Barry refused for Part IV to pay any distributions of income to PLAINTIFF before the Operating Agreement was in place, despite the company being profitable in 2015, and PLAINTIFF contributing at least $104,185 of pure-profit income solely performed by Dortch in 2014 (and more generated by Dortch worked on by the Part IV employees and contractors) on merely a $37,440 sweat equity "salary."

78. On or about November 20, 2015, being approximately 20 months after Part IV had been in operation and won numerous awards based on the work product of Dortch and PLAINTIFF, Joshua presented the first draft of the Operating Agreement to PLAINTIFF. The initial draft contained numerous draconian terms and conditions and some of which that were illegal in the State of California.

79. The draft Operating Agreement held PLAINTIFF to far different standards than that of Joshua, Barry, and GOL. Some of these conditions include: trying to remove their fiduciary duty to PLAINTIFF; limit what Dortch was allowed to do outside of Part IV; and, capping a buyout of PLAINTIFF'S membership interests that had expiration dates capped at eight (8) years. Furthermore, PLAINTIFF'S membership was tied to Dortch's employment; however, Joshua had no analogous terms.

80. It should be noted that at no time prior to receiving the first draft of the Operating Agreement,

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 65

were any of these terms discussed. Joshua, Barry, and GOL put PLAINTIFF in an unwinnable position as PLAINTIFF had already spent two years converting the work and infrastructure it created prior to the creation of the company to be become "Part IV."

81. Joshua was apologetic to Dortch about the Operating Agreement, explaining to Dortch that his father, Barry, insisted on these terms to protect the "family investment" and to make sure Dortch would not pull PLAINTIFF out of the business partnership immediately after receiving the first distribution of profit, which Joshua described as: "My dad doesn't want you running away with family money."

82. Because of his limited involvement and lack of agency in drafting the document, Joshua was unable to answer important specific questions regarding the legal implications or structuring or language of the Operating Agreement, which in a text message to Dortch discussing the operating agreement on December 15, 2015, he describes the Operating Agreement as "mum I jumbo" that he "still do t understand" which PLAINTIFF is informed and believes and thereby alleges that Joshua was actually trying to describe the Operating Agreement as "mumbo jumbo" that he "still doesn't understand."

83. Due to Joshua's inability to understand or discuss the Operating Agreement with PLAINTIFF, multiple conference calls were held between Barry, Joshua, PLAINTIFF, and attorney Irwin Steinhorn. Steinhorn worked at Oklahoma City law firm Connor Winters LLP who Barry had purportedly hired to draft the company Operating Agreement along with Barry. PLAINTIFF was unaware at the time that Mr. Steinhorn is the former in-house counsel to LSB and currently retained counsel for numerous LSB and other Golsen business activities. During these calls, Dortch was bullied by Barry and his attorneys, called "boy" and threatened that if he did not accept the terms of the Operating Agreement, he could "walk away." PLAINTIFF is informed, and believes, and based thereon alleges that Connor Winters LLP at no time had no attorneys at their firm that are licensed or practice law in the State of California.

84. After these calls, Joshua apologized for the tone and behavior of his father and the attorneys on the call. Joshua made multiple verbal assurances to Dortch that he did not need worry about any of the offensive terms because they were included merely to protect Barry and Jack, and asked Dortch to rely on their 13-year friendship that the upside-down provisions stacked against PLAINTIFF would not be weaponized against PLAINTIFF at any time. In addition, Joshua offered a provision in the Operating Agreement that if the company were to ever be sold, PLAINTIFF would get full market value of his

Exhibit 1
Page 66

portion of the sale.

85. For the prior two years, Dortch had co-founded Part IV, successfully led and directed multiple award-winning projects, took a reduced salary, and, converted all PLAINTIFF'S business and operations in order to sell the Part IV brand on the strengths of his work and creative leadership. Dortch felt PLAINTIFF had no choice but to agree to the proposed Operating Agreement, or else PLAINTIFF would be leaving behind all sweat equity and giving Joshua and Barry all of Dortch's and PLAINTIFF'S award-winning work for the past two years for nothing, and in the process, losing hundreds of thousands of dollars of income already invested by PLAINTIFF, as the 2015 distributions of profit were being withheld pending PLAINTIFF'S execution of the proposed Operating Agreement.

86. PLAINTIFF chose to trust Joshua and agree to the sign the Operating Agreement.

87. On or about February 23, 2016, Dortch, on behalf of PLAINTIFF, and under economic duress, executed the Part IV Operating Agreement that was dated January 1, 2015, and purported to be executed on December 31, 2015.

88. It is not until June of 2021 that PLAINTIFF discovered the true reason why Part IV's Operating Agreement was delayed for two years.

89. PLAINTIFF is informed and believes, and based thereon alleges, that, on or about September 25, 2015, Barry was named as a defendant in a federal securities fraud class action lawsuit in the Southern District of New York entitled *Wilson v. LSB Industries, Inc.*, 1:15-cv-07614, arising from misrepresentations that Barry made on behalf of LSB. In this lawsuit, Barry was personally named and accused of making "false and/or misleading statements, as well as failed to disclose material adverse facts about [LSB'S] business, operations, and prospects." The lawsuit was filed against Barry for his alleged misrepresentations and omissions concerning the status of a chemical plant LSB were building in El Dorado, Arkansas.

90. As alleged in the second amended complaint in the LSB lawsuit, throughout the relevant "Class Period," the LSB defendants (including Barry and Jack) repeatedly failed to disclose that LSB had not conducted the detailed engineering work necessary to properly calculate the costs of the project and that the project was both over budget by hundreds of millions of dollars, and behind schedule.

91. LSB's stock price plummeted, wiping out approximately 78% of LSB's market capitalization. At

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 67

all times, this situation was concealed and misrepresented to Dortch by Joshua as "my Dad is busy with work, dealing with an activist investor who is unhappy with the stock price."

92. Amidst this turmoil, Barry, was removed from his position of CEO by LSB'S Board of Directors. On September 3, 2015, LSB announced that, effective immediately, Barry had stepped down as both President and Chief Executive Officer of LSB, just nine (9) months after he had been promoted to the role after the retirement of Jack. Barry was also demoted from his Vice-Chairman position by the LSB Board of Directors.

93. At all times, the true facts surrounding Barry's departure from LSB were concealed and misrepresented to Dortch by Joshua as "my Dad is retiring from his job so he will have more time to work on the Operating Agreement and help advise us." Joshua also framed Barry's "retirement" as a positive thing for Part IV, telling Dortch that Barry was seeking new "board of directors" opportunities to utilize his business expertise after his retirement from LSB, and that this could lead to future opportunities for Part IV.

94. As of the date of this filing there is another lawsuit still active against LSB in Arkansas, regarding these same events, where the piping subcontractor for the troubled El Dorado project sued both the general contractor and the El Dorado Chemical Company, wholly owned by LSB, then under Barry's direction as CEO, accusing LSB of actively attempting to defraud the lenders of the El Dorado project by directing the piping subcontractor to fraudulently and superficially assemble non-functioning sections of the facility to "fake it" and make the project appear further along than it actually was so that the lenders would not pull funding from the disastrous project. PLAINTIFF is informed and believes, and based thereon alleges, that it is because of Barry's significant involvement in the allegations of this case that there exist no fewer than six (6) deposition notices for Barry's deposition, as recently as March 2020, and a motion to compel discovery related to Barry's communications and work product at LSB, and that Barry was served a subpoena in the case on January 30, 2020.

95. The piping subcontractor won a $7.3 million judgment against LSB in March 2020, and the case is now pending appeal in the Arkansas Supreme Court as of January 2024.

96. While Part IV was facing numerous challenges to survive the global pandemic in March 2020, Dortch was leading the company's shift to a work-from-home environment, and successfully directing

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 68

the "largest project" Part IV has ever had, Barry, undisclosed to PLAINTIFF, was still dealing with the

fallout from years of litigation actively fraudulently concealed and misrepresented to PLAINTIFF.

97. Attorney Steinhorn has submitted a sworn declaration to this court in the Related Case under

penalty of perjury that Joshua was solely responsible for hiring Steinhorn and drafting the Part IV

Operating Agreement. Steinhorn further declares that Barry had no involvement in the drafting and

finalization of the Company Agreement. PLAINTIFF is informed and believes, and based thereon

alleges, that the sworn declaration is false, and Mr. Steinhorn has committed perjury. The illegal, false,

and actionable behavior by Mr. Steinhorn was a flaccid attempt to protect his firm's money maker, the

Golsen family, as PLAINTIFF, through Dortch, has direct knowledge and evidence that Barry was

heavily involved and responsible for the undue delay and fraudulent inducement of PLAINTIFF to enter

the Part IV Operating Agreement.

98. PLAINTIFF is informed and believes, and based thereon alleges, that Mr. Steinhorn was aware

of the federal lawsuit for securities fraud against Barry and Jack while working with Barry on the

Operating Agreement, as both Connor and Winters LLP and Mr. Steinhorn, are listed as representing

LSB and other Golsen entities on multiple SEC filings involving the Golsen family prior, during, and

after the lawsuit.

99. In May 2016, in Los Angeles, California, Joshua orally represented to Dortch that Jack was no

longer going to be part of the Part IV membership, because Jack did not want his finances to be exposed

to California taxation, and that GOL was changing its name to GOL Capital LLC because of Jack

leaving the membership.

100. PLAINTIFF is informed and believes, and based thereon alleges, that the true reason

GOL LLC had to change its name was because of a conflict with a previous GOL LLC in California,

therefore GOL LLC changed the entity's name to "GOL Capital LLC," filing the paperwork in

Oklahoma to do such in March of 2016, and "GOL Capital LLC" then filed to register itself as a foreign

entity on May 5, 2016 only *after* conducting business in California for over two years and not paying

California tax on that income.

101. PLAINTIFF is informed, and believes, and based thereon alleges that Barry and Jack

Golsen had a duty to disclose that they were actively named as defendants in a federal lawsuit for

Second Amended Complaint, Page - 18

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 69

securities fraud while preparing, negotiating, and signing the Operating Agreement. Had PLAINTIFF known that Barry and/or Jack Golsen were named as defendants in a federal securities fraud class action lawsuit; the reasons and allegations behind Barry's departure from LSB, or that GOL was not properly registered to do business in California, PLAINTIFF would have ***never*** entered into the Operating Agreement. PLAINTIFF was directly harmed by being fraudulently induced into executing the Part IV Operating Agreement with Barry under false pretenses, both through association with such serious accusations of fraudulent behavior, and by the weaponizing of the Operating Agreement against PLAINTIFF after verbal assurances from Joshua to the contrary.

## F. **NUMEROUS COMPLAINTS AGAINST JOSHUA LEAD TO COMPANY SEEKING DEDICATED HUMAN RESOURCE REPRESENTATIVE**

102. As mentioned hereinabove, Part IV experienced major success in 2015 and 2016, due in large part to award-winning projects and campaigns directed and led by Dortch and Mr. Chung, and to Joshua's credit, significant client introductions made by Joshua from relationships he had formed at AvatarLabs. As a result, by 2017, Part IV had grown to around 25 full time employees, hitting a new threshold in California for workplace compliance.

103. At that time, Joshua was solely responsible for company human resource matters. Although Joshua was responsible for creating a formal handbook for the company's rules and regulations, he had failed to do so.

104. As the sole member of the Part IV human resources department, a new problem emerged in that employees began to complain about Joshua. Employees lodged a bevy of complaints against Joshua, predominately from female employees, regarding his lack of empathy and insensitivity to employee needs. Joshua also made inappropriate romantic advances on at least two (2) subordinate female employees, asking both multiple times to go out to concerts with him in a romantic, dating capacity. Dortch became aware of Joshua's inappropriate behavior when one of these employees confided in him and asked for advice on how to tactfully decline her boss asking her out.

105. Joshua established and continued a pattern of inappropriate romantic advances with the women to which he had access and over whom he had perceived power. In 2017 after Joshua purchased a home, he hired contractors to renovate portions of his new home. These contractors would need to be

Exhibit 1
Page 70

at his home in the mornings and afternoons, painting and installing crown moldings and other minor renovations. Joshua asked a part-time Part IV employee, in a personal capacity, to spend a week or so housesitting at his new home, more specifically, tasked with guarding a room downstairs in his home that Joshua had converted to hold his toy collection of *Star Wars*, *Ghostbusters*, *Transformers* and other assorted action figures and dolls as Joshua feared the contractors would try to steal his toys and memorabilia. The Part IV employee agreed to the request, and Joshua indicated that he would pay her personally for her time spent guarding Joshua's toys and housesitting. She was required to sit outside the locked room which contained his toys while the contractors were present. After the employee successfully completing her tasks, instead of paying the part-time employee, Johsua offered to take the part-time employee on a "date" to a concert at the Theater at the Ace Hotel. Confused, the part-time employee accepted, while attempting to make it clear she was not interested in Joshua romantically. After the employee conveyed to Joshua that she was not interested in a romantic relationship, Joshua never paid the employee, instead, offering that concert was compensation enough for her time and troubles.

106.     The complaints against Joshua made by multiple female employees to Dortch reached a feverish pitch on Thursday January 19, 2017. On that date, Joshua refused to grant multiple female employees' request for a day off work to attend the Friday January 20, 2017, pre-march events of the historic "Women's March" which filled the streets in Pershing Square directly outside the Part IV offices at the Pershing Square Building on Hill Street. When two of these employees pushed back, Joshua indicated to the employees that if they took an unapproved day off work, they would be terminated. When one of these employees called out sick on that Friday, and Joshua discovered that she was at the Women's March events and not actually sick, Joshua told Dortch that he was going to terminate the employee. Dortch ultimately convinced Joshua not to fire the employee. Dortch attended the "Women's March" on Saturday, January 21, 2017, with multiple Part IV employees, and opened the Part IV offices on that Saturday to be a meeting point and support system for employees who wished to attend the march, as approximately 750,000 people filled the streets outside the front doors of Part IV's office in Pershing Square. At the office that day, three female employees again expressed extreme indignation with Joshua's behavior and lack of empathy.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 71

107.     Joshua's relationship by then in particular had soured with ███████, his once close friend from AvatarLabs. ███████ was one of Part IV's first employees who told Dortch she felt Joshua was absent in his responsibilities. She explained to Dortch that she was unable to rely on Joshua for support in her role, and that Joshua's detached behavior and lack of empathy was creating an untenable work environment.

108.     After the internal tensions regarding Joshua's handling of the Women's March, Dortch approached Joshua in early 2017 about the complaints regarding his lack of empathy and suggested that Part IV needed to hire a trained human resource representative. Dortch suggested that perhaps they could find someone to fill the role of both Office Manager and Human Resource Manager due to the overlap in day-to-day duties. After the conversation, Joshua became very upset and defensive, wanting Dortch to tell him the "names" of people who had complained, saying that he wanted to terminate them from Part IV. Dortch refused and instead convinced Joshua that the company should hire someone with actual HR experience to remove him from any liability to the company. After that conversation, Joshua was exasperated and agreed that he no longer wanted to be responsible for human resources. Dortch wrote a job posting and began searching for job applicants.

109.     In the middle of their search, Joshua informed Dortch that he wanted to pause the search, as he thought that his college friend WILLIAMS, then currently living in Chicago, might be a good fit for the role. WILLIAMS' background was in finance, not in human resources, and by her own admission, she had serious reservations about taking role with HR responsibilities.

110.     PLAINTIFF is informed and believes, and based thereon alleges, that Joshua negotiated with WILLIAMS and gave her an inflated title of "Director of Operations" to support her minimum required salary, though WILLIAMS had never worked in advertising in any capacity, had no experience operating the workflows or pipeline of a creative company, had never worked in human resources in any capacity, had no experience with California employment law, and had never lived or worked in California. When Dortch raised all of these concerns, Joshua told Dortch that the most important quality in hiring the human resources role is that Joshua requires "someone he can trust." Joshua asserted that WILLIAMS' finance background might be of great assistance to growing Part IV, despite her lack of knowledge of advertising, lack of background in human resources, and lack of experience or ability in

Exhibit 1
Page 72

Part IV's industry, or the lack of any specific need for a financial advisor for Part IV.

111.     Dortch relented, based on Joshua's insistence and WILLIAMS' LinkedIn resume indicating her experience with financial matters, including Profit/Loss and Balance Sheets, hoping that WILLIAMS could indeed help Part IV grow to the next level. Joshua agreed at that time if WILLIAMS ended up not being a good fit, Joshua would agree to let her go.

112.     PLAINTIFF is informed and believes, and based thereon alleges, that, based on a conversation between Joshua and Dortch, WILLIAMS being the roommate of Joshua's long-time unrequited romantic interest would in some way help Joshua curry favor with the romantic interest.

113.     Ultimately, WILLIAMS was hired to be the Director of Operations and also the Human Resource representative for Part IV in 2017.

114.     After she was hired, WILLIAMS requested relocation assistance to move her from Chicago to Los Angeles, which both Joshua and Dortch both declined, since WILLIAMS' director level salary was already about double what the company had budgeted to spend on an Office Manager with HR training.

115.     WILLIAMS additionally requested a title of Chief Operating Officer (COO) which both Dortch and Joshua opposed based on Part IV's organizational structure not having any "Chief" roles, and instead based on "Director" roles for department heads, with the exception of Joshua, who chose the title of President, though he referred to himself as "*El Presidente*" in most official forms of communication for the company to the exasperation of Latino and Latina employees at the company, as Joshua only spoke a few words of Spanish.

116.     PLAINTIFF is informed and believes, and based thereon alleges, that subsequent to WILLIAMS' hiring and unbeknownst to Dortch, Joshua and WILLIAMS adopted a pattern and practice whereby Joshua would use WILLIAMS' role as the HR manager as weapon to retaliate against Part IV employees who dared to have the temerity to question Joshua's abusive behavior and/or rebuff his romantic advances in an effort to conceal and insulate Joshua's bad behavior.

117.     PLAINTIFF is informed and believes, and based thereon alleges, that as part of Joshua's and WILLIAMS' agreed-upon pattern and practice, one of WILLIAMS first tasks was to assist with terminating the employment of one of Part IV's Latina employees, ████████ who had attended the

Exhibit 1
Page 73

Women's March. Joshua and ███████ relationship had devolved into frequent, closed door screaming fights with each other. Their arguments were so loud that Dortch and other employees could hear them through the walls of the office. ███████ quit Part IV days before she was scheduled to be terminated in 2017.

118.      PLAINTIFF is informed and believes, and based thereon alleges, that also as part of Joshua's and WILLIAMS' agreed-upon pattern and practice, in 2018, WILLIAMS had retaliated or facilitated retaliation against another Part IV female employee who had also rejected Joshua's unrequited romantic advances. PLAINTIFF is further informed and believes, and based thereon alleges, that when the employee suffered a wrist injury she felt was developed through extensive hours of computer work for Part IV and inquired about Worker's Compensation benefits available, WILLIAMS and Joshua authorized a private investigator to follow the employee in an attempt to discredit the employee, which was undisclosed and concealed to PLAINTIFF. WILLIAMS and Joshua, when discussing the employee asking about Worker's Compensation benefits, instructed Dortch that he was forbidden from having any contact with this female employee. PLAINTIFF is also further informed and believes, and based thereon alleges, that the employee discovered the private investigator following her after being inadvertently copied on a forwarded email chain including Joshua and WILLIAMS. After discovering she was being followed, the employee resigned from her position as she no longer felt comfortable working for Part IV or interacting with WILLIAMS or Joshua.  PLAINTIFF did not discover these facts until reconnecting with this former Part IV employee in 2023.

119.      Over the years of working for Part IV, WILLIAMS frequently spoke to Dortch about her frustrations with her ██████ salary, indicating many times, that she was regretted taking a pay cut to work at Part IV. During one late, post-midnight text message exchange between WILLIAMS and Dortch in April of 2019, WILLIAMS messaged Dortch stating that she was "a tad fucked up" and "in a dark place" and that she had been approached by some friends working in finance who extended offers for WILLIAMS to work for $750 an hour (approximately $1.5 million per year). WILLIAMS indicated to Dortch she wanted to decline the offer in order to stay at Part IV, albeit it a far less salary.

120.      In that same late night text exchange WILLIAMS said she wanted to talk to Dortch and Joshua about earning more salary, as she felt she could not earn less than Mr. Chung, the Creative

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 74

Director of Part IV, an original employee with a special bonus plan, and longtime industry veteran who brought significant income to Part IV through his creative work product and industry experience. WILLIAMS described Chung's salary as making her "sick." Since the time that she was hired, WILLIAMS demonstrated her longstanding aversion and spiteful jealousy of Mr. Chung to Dortch. At multiple times, she tried to convince Dortch to coax Joshua to agree to terminate Mr. Chung and promote another employee to the lead Creative Director role. In her roles of handling human resources and serving as the office manager, with zero experience in the creative industry, WILLIAMS had no way to generate additional income for Part IV and had no ability to gauge the talent level of any creative employee like Mr. Chung. As a result, WILLIAMS she did not receive significant raise or bonus (prior to the events of June 4, 2021) much to her chagrin.

## G. WILLIAMS' FIDUCIARY BACKGROUND USED TO PROTECT JOSHUA'S BAD ACTS

121. PLAINTIFF is informed and believes, and based thereon alleges, that in WILLIAMS' prior employment to Part IV, she worked as a Senior Vice President and Managing Director at Envestnet, a financial services platform specializing in fiduciary relationships. The following excerpt describing Envestnet's service is taken from a press release in 2017 during WILLIAMS' tenure as Managing Director, just months prior to beginning her employment at Part IV:

> *The Envestnet Fiduciary Advantage™—powered by ERS's institutional-caliber research, leading technology, and experienced staff—enables plan sponsors and their advisors to ensure they are selecting, managing, and reporting plan investments in accordance with their fiduciary duty.*

122. Also in 2017, Envestnet, with WILLIAMS as Managing Director, published a whitepaper entitled "The Fiduciary Opportunity" wherein the company states "the fiduciary standard is here to stay." The last page of the whitepaper links to a dedicated webpage covering fiduciary duties on the Envestnet site – envestnet.com/fiduciary.

123. PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS was aware of Dortch being the co-founder and co-owner of Part IV through his ownership interest in PLAINTIFF, and believed the company owners to be Dortch, Jonathan, and Barry, and that Dortch was

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 75

one of her co-managers along with Joshua.

124.     WILLIAMS' recurring job duties entailed managing and inputting information for the 401K program for the company every year. PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS would input PLAINTIFF as the 20% owner of Part IV, and Joshua through Rebel as a 55% owner, and Barry through GOL as a 25% owner.

125.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS has unique experience in understanding fiduciary relationships, knew that PLAINTIFF was a 20% owner of Part IV, and had a comprehensive understanding that the owners of Part IV owed each other a fiduciary duty.

126.     As the Director of Operations, WILLIAMS was directly exposed to the bookkeeping of Part IV, including increasing responsibilities from 2019-2020 of more actively participating in the payroll, billing, employee reviews, and end of year bonuses.

127.     In mid-May 2021, PLAINTIFF discovered the negative capital account that Joshua was maintaining through his entity Rebel, undisclosed to PLAINTIFF and in breach of the Operating Agreement.

128.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS, at least as early as mid-May 2021, had actual and constructive knowledge of the negative capital account being maintained by Joshua through Rebel.

129.     On June 3, 2021, Dortch, as PLAINTIFF'S sole manager and member, spoke on the telephone with Joshua and formally requested to review the tax filings and bank records for Part IV because he believed that the tax filing were false, evasive, and potentially exposed PLAINTIFF to criminal liability as being one of the "partners" on Part IV's tax return since Part IV was treated as a partnership for tax purposes. On June 9, 2021, Dortch, as PLAINTIFF'S sole manager and member, made the same request of Joshua in person. Joshua refused both requests.

130.     Joshua's unlawful refusal of Joshua to provide tax returns and other books and records of Part IV was exacerbated by the fraudulent premise of the June 9, 2021, in-person meeting planned by and concealed by Joshua and WILLIAMS. PLAINTIFF is informed and believes, and based thereon alleges, that Joshua and WILLIAMS devised a plan by which Dortch was lured to meet Joshua under the

Second Amended Complaint, Page - 25

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 76

guise of continuing their prior conversation from June 3, 2021, regarding Rebel's negative capital account and the fraudulent and/or evasive tax filings of Part IV.

131. PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS had actual knowledge that Dortch reported the tax fraud and Rebel's negative capital account to Joshua based on her access as Director of Operations and managing company bookkeeping and payroll.

132. PLAINTIFF is informed and believes, and based thereon alleges, that, as early as June 4, 2021, WILLIAMS, instead of investigating the claims of illegal and fraudulent activity at Part IV, assisted Joshua with planning a surprise "at-will" termination of Dortch, whose employment is intrinsically linked to PLAINTIFF'S membership interest in Part IV, during an in-person meeting with Joshua, and concealed her assistance and encouragement to Joshua regarding this meeting.

133. PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS assisted and provided encouragement to Joshua in his refusals to provide the Part IV books and records that Dortch had requested on behalf of PLAINTIFF. This assistance and encouragement is found in part by WILLIAMS, minutes before the June 9, 2021, meeting, sending Joshua "█████████████████ ███████████████████████████████████ wherein Dortch printed date and time stamped records for the scheduled meeting with Joshua, which was framed to Dortch as a continuation of discussions of the financial impropriety and fraudulent tax filings.

134. PLAINTIFF is informed and believes, and based thereon alleges, that that WILLIAMS ███████████████████████████ demonstrated WILLIAMS' knowledge and awareness of the impropriety of their joint conduct and strategy by Joshua and her to terminate Dortch for raising the tax fraud and evasion issues. Otherwise, a co-owner of the business accessing the accounting system would be an unremarkable event of which WILLIAMS would normally take no notice.

135. On June 9, 2021, Dortch met with Joshua. During the meeting, Joshua revealed the true intensions of the meeting to reveal his surprise buy-out offer to PLAINTIFF, an in-kind termination of Dortch, and an attempt to get Dortch to agree to the false narrative crafted by Joshua that it was a mutual decision for Dortch to leave Part IV and not Joshua's retaliation. At the meeting, Joshua refused to have a conversation about Part IV's financial records or any of the other items that Dortch wanted to discuss with Joshua about Part IV. Instead, Joshua provided a false reason why Dortch was being terminated

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 77

(Dortch had "reached his ceiling"), told Dortch he expected Dortch to finish out his work at Part IV through June 2021, and Barry and Joshua would buy out PLAINTIFF'S interest in Part IV by then, but there was nothing Dortch could do about it. Joshua also threatened Dortch by stating that Dortch should be afraid of Joshua's and Barry's "very expensive" lawyers (Mr. Steinhorn and his firm) and that he and Barry did not think Dortch could afford to litigate a lawsuit against the Golsens. This evidence of retaliation by Joshua against Dortch out of concern that Dortch would report Joshua to the taxing agencies for fraud which is a clear violation of Labor Code § 1102.5, i.e., "…the employer believes that the employee … may disclose information, to a government … agency" (see Lab. Code, § 1102.5(b)), a concern that wound up being well-founded due to Dortch's actual reporting of the same to the IRS.

## H.   WILLIAMS ACTED CONTRARY TO HER ACTUAL JOB DUTIES AND WITH MALICE TOWARDS PLAINTIFF

136.   PLAINTIFF is informed and believes, and based thereon alleges, that Joshua's and WILLIAMS' conduct directed towards Dortch that would have a direct impact on PLAINTIFF'S membership interest in Part IV was part of the agreed-upon pattern and practice of Joshua and WILLIAMS retaliating against Dortch for his temerity to question Joshua about Part IV's tax filings, Rebel's negative account, and Part IV's financial books and records.

137.   Part IV's policies for Anti-Retaliation and Anti-Harassment state in relevant part:

*Part IV will not retaliate against you for filing a complaint or participating in any workplace investigation and will not tolerate or permit retaliation by management, employees or co-workers. (22)*
*Any employee determined by the Company to be responsible for harassment, discrimination, retaliation or other prohibited conduct will be subject to appropriate disciplinary action, up to, and including termination. Employees should also know that if they engage in unlawful harassment, they can be held personally liable for the misconduct. (23)*

138.   WILLIAMS lying to and concealing from Dortch, and providing substantial assistance and encouragement to Joshua to plan a secret termination for Dortch, one day after Dortch reported illegal activity to Joshua (Part IV's "*El Presidente*") is in violation of California statutes protecting

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 78

whistleblowers, longstanding caselaw confirming reporting any violation of state or federal law as protected activity violates Part IV's policies for Anti-Retaliation and Anti-Harassment.

139.    Part IV's Employee Conduct policy states in relevant part:

*All employees are responsible to treat coworkers, managers, clients and the public in a professional manner. That is, with respect, integrity, and courtesy. Your actions must always reflect the highest possible standards of conduct and ethics.*

*Misconduct is defined as unprofessional or inappropriate behavior and can result in disciplinary action, up to and including termination of employment. Part IV expects all employees to use common sense, good judgment, and integrity in governing their behavior at all times; and refrain from any form of misconduct. This includes avoiding conduct that is likely to damage Part IV's business or reputation. This behavior includes, but is not limited to: ... Falsification of employment records, employment information, or other records.*

140.    WILLIAMS violated this policy. Prior to being hired by Part IV, WILLIAMS falsified her LinkedIn résumé utilizing a "career coach" who inflated WILLIAMS expertise and knowledge, indicating prior expertise with Profit & Loss statements. WILLIAMS ███████████████ ████████████████████████████ and subsequently removed the P&L expertise section from her LinkedIn resume after PLAINTIFF learned of the false statements. WILLIAMS' falsified experience is more concerning given WILLIAMS' bookkeeping, payroll, and management responsibilities at Part IV, and the fact that PLAINTIFF discovered Part IV's P&L statement in June of 2021 showed the company -$1.3 million in debt, which Josh refused to discuss with PLAINTIFF, and by the fact that WILLIAMS' employment was sold by Joshua to a skeptical Dortch based solely on her financial expertise, as she had zero experience in creative advertising operations or human resources. PLAINTIFF is informed and believes, and based thereon alleges, that either WILLIAMS, as the current COO of Part IV, and former Senior Vice President and Managing Director of a Envestnet, a fiduciary specialist, actually has zero experience in baseline concepts like profit and loss, the most basic of

Exhibit 1
Page 79

concepts for a successful operation of any business, and has admitted under oath to falsifying her experience, or WILLIAMS is lying under oath to conceal her knowledge in an attempt to minimize her exposure in felony tax fraud.

141.	Part IV's Employee Conduct policy also prohibits: *Possessing, distributing, selling, transferring, or using—or being under the influence of— alcohol or illegal drugs in the workplace*. WILLIAMS violated this policy by distributing ███████ to at least one known Part IV employee, Joshua, during 2020 and 2021, including using the Part IV office as the location to illegally and repeatedly supply Joshua with ██████ WILLIAMS would also regularly drink alcohol, including organizing cocktail happy hours at the Part IV office during business hours, despite her writing on the company Slack system that ████████████████████████████ ████████████████████████████████

142.	Part IV's Employee Conduct policy also prohibits*: Engaging in criminal conduct whether or not related to job performance*. WILLIAMS violated this policy by engaging in unlawful anti-whistleblower retaliation against Dortch in violation of Labor Code § 1103 (misdemeanor), and distributing ██████ in violation of Health & Safety Code § 11352 (felony) and 11375 (misdemeanor).

143.	Part IV's Employee Conduct policy also prohibits*: Insubordination, including but not limited to failure or refusal to obey the orders or instructions of any supervisor, or the use of abusive or threatening language toward any supervisor.* WILLIAMS violated this policy by repeatedly acting insubordinately to Dortch, her co-manager, behind the back of Dortch to Joshua to disingenuously smear Dortch. When Dortch, WILLIAMS' co-manager, would provide professionally and civilly give reasonable requests for WILLIAMS to adjust and improve her job performance, including meeting etiquette, argumentative and insubordinate responses, resourcing issues including removing employees from job tasks that Dortch had assigned, without ever notifying Dortch, which harmed a relationship with a Part IV client when the job tasks were not performed, WILLIAMS ████████████████.

144.	Part IV's Employee Conduct policy also prohibits*: Violating any safety, health, or security policy, rule, or procedure of Part IV.* WILLIAMS violated this policy by violating Part IV security policies by concealing from Dortch multiple violations security workflows from Adam Golsen (Joshua's brother who is employed at Part IV) at the direction of Josh, and safety and health policies by

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 80

distributing ███ to Part IV employees who ██████████████████.

145.     Part IV's Employee Conduct policy also prohibits: *Committing a fraudulent act or a breach of trust in any circumstances.* WILLIAMS violated this policy by acting fraudulently, unethically, and dishonestly to Dortch (co-owner through PLAINTIFF) by a) concealing her involvement in planning the June 9, 2021, rug-pull, retaliatory termination, b) assisting Joshua conceal his financial impropriety, tax fraud, his negative capital account from PLAINTIFF, c) concealing Joshua was negotiating to sell Part IV during this dispute, knowing Joshua had not disclosed such negotiations to PLAINTIFF, and d) instructing multiple Part IV employees to conceal their involvement helping Joshua and WILLIAMS plan a "surprise" retaliatory termination for Dortch.

146.     WILLIAMS conduct rises to the level of multiple violations of Part IV's written policies, when taken in aggregate, mandated the termination of WILLIAMS from Part IV. PLAINTIFF is informed and believes, and based thereon alleges, that Joshua had actual knowledge, ratified, and authorized WILLIAMS' violations of Part IV's written policies, but took no action against WILLIAMS due to her providing substantial assistance and encouragement to Joshua's tortious conduct directed to PLAINTIFF and Dortch. PLAINTIFF is further informed and believes, and based thereon alleges, that Joshua's excusing WILLIAMS from her compliance with Part IV's written policies was part of the consideration that Joshua "paid" to WILLIAMS in exchange for ███████.

## I.     WILLIAMS TOOK ADVERSE ACTIONS AGAINST PLAINTIFF WHILE DORTCH WAS ON APPROVED MEDICAL LEAVE

147.     PLAINTIFF is informed and believes, and based thereon alleges, that after discovering the subterfuge regarding the "at-will" termination of co-founder Dortch, the false statements made about Dortch by Joshua, reading the allegations in both the original and amended complaints which included Barry and Jack in the LSB federal securities fraud class action lawsuit as well as the declaration offered in support of approval of an $18.5 million settlement fund for defrauded investors, and discovering that the Golsen family has been involved as the defendant through LSB in over 20 federal lawsuits since the late 1990's, including multiple lawsuits for fraud, PLAINTIFF realized that providing a false narrative to and about the co-owners of their business is a Golsen Family business practice implemented against him by both Joshua and Barry.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 81

148.     During the week of July 19 through 23, 2021, Dortch was still dealing with physical manifestations from anxiety arising from Joshua and Barry's unlawful attempts to remove PLAINTIFF as a member and terminate Dortch for exercising PLAINTIFF'S rights as a member of Part IV, and the uncertainty of PLAINTIFF'S implications with the fraudulent tax filings of the partnership, and that all these hostile actions were being taken against PLAINTIFF and Dortch at the direction of Joshua, a 19-year friend whom PLAINTIFF had (mistakenly) trusted implicitly.

149.     Due to the severity of his condition, Dortch scheduled an appointment with a physician, but the first available appointment was not until July 26, 2021. Consistent with his obligations as an "employee," Dortch notified WILLIAMS that he was using his accrued sick time and sent her a daily update using the company's Slack messaging system.

150.     On July 26, 2021, Dortch attended his medical appointment with his physician. Based on what his physician told him during the appointment, including Dortch's rights under the various medical leave laws, Dortch followed his physician's advice and notified WILLIAMS (along with a note from the physician) that Dortch was exercising his rights to take medical leave. Approximately one (1) hour after notifying WILLIAMS, Dortch received an email confirmation that his leave had been accepted by the Part IV.

151.     PLAINTIFF is informed and believes, and based thereon alleges that, on July 30, 2021, at approximately 4:00 p.m., while Dortch was at home after his third round of acupuncture treatment for physical anxiety symptoms, Joshua and WILIAMS caused the password for Dortch's company email (dortch@part4.com) to be changed from the Google G Suite administrator panel without Dortch's consent or knowledge. From a security basis, the "password change" allowed Joshua and WILLIAMS (and anyone else with the password) to access any of the myriad of Part IV systems that are tied to that email account, including the inbox for Dortch's Part IV email account (on a domain PLAINTIFF, not Part IV owns) some communications which predate Part IV existing, and which contains privileged information of the Part IV business partnership, including attorney client privileged communications, medical privacy information, and Schedule K-1 tax documents, because the only method these tax documents were delivered to PLAINTIFF by Joshua was via the "dortch@part4.com" email address.

152.     Had PLAINTIFF wished to retaliate against or cause harm to Part IV or Joshua as alleged

Exhibit 1
Page 82

by Part IV and the Golsen Defendants, PLAINTIFF could have simply turned off all company email at this time and reclaimed the dortch@part4.com email by routing communications to a different webhost. PLAINTIFF did no such thing.

153.    WILLIAMS assisted with taking these actions against PLAINTIFF ███████████████ ████████████████████████████████████████████████████████████████████████ ████████████

154.    WILLIAMS, not a member in the Part IV ownership nor its manager, had no right to access to PLAINTIFF'S financial documents and confidential attorney-client communication regarding the business partnership, which was granted to her against PLAINTIFF'S wishes by Joshua. WILLIAMS willfully assisted Joshua in violating PLAINTIFF'S privacy rights and provided updates to Joshua regarding the contents of Dortch's "part4.com" email. PLAINTIFF is informed and believes, and based thereon alleges, that at least as early as July 30, 2021, WILLIAMS had accessed the executed Part IV Operating Agreement and specific tax information regarding the business partnership. Joshua and WILLIAMS then weaponized this private information against Dortch and PLAINTIFF in a more escalated and egregious manner on September 1, 2021, after PLAINTIFF rejected the buyout offer from the Golsens and filed the lawsuit in the Related Case, by Joshua writing Dortch that he was "terminated for cause" with the unsubstantiated reason given that he "repeatedly failing to perform job duties" and that thereby PLAINTIFF has "forfeited" its membership in Part IV pursuant to the fraudulent Operating Agreement.

**J.      PLAINTIFF REJECTED A HOSTILE BUYOUT OFFER FROM JOSHUA AND BARRY, FACILITATED BY WILLIAMS, THEN FACED ADDITIONAL RETALIATION**

155.    During the June 3, 2021, phone call with Joshua, and again during the June 9, 2021, meeting, PLAINTIFF, through Dortch, requested access to books and records and tax returns pursuant to Corporations Code §§ 17701 et seq.

156.    Instead of lawfully and transparently providing access to Part IV books and records, Joshua, with the encouragement and support of WILLIAMS, planned a surprise "at-will" termination for Dortch on June 9, 2021, and, on June 17, 2021, presented PLAINTIFF with an offer of total buyout for

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 83

PLAINTIFF'S membership interest in Part IV for $300,000, paid over five (5) years to remove PLAINTIFF from Part IV. The $300,000 calculation notably included all of Dortch's unpaid accrued vacation time, which was being offered back to Dortch unlawfully over a tiered payment schedule over five (5) years in the form of a conditional contract.

157.     PLAINTIFF rejected the offer, as the true value of PLAINTIFF'S capital account as of June 2021 would have been at least $267,145, but for Joshua and Barry attempting to conceal the forgiveness of a Part IV-obtained PPP loan and pass-through capital equity of the forgiven such PPP loan, records also being refused for inspection, and approximately $348,624 after the pending forgiveness of the second PPP loan.

158.     PLAINTIFF also rejected the offer based on the discovery from late June 2021 to early July 2021 that Barry was personally named in a federal lawsuit for securities fraud in 2015-2020, which was actively concealed and fraudulently misrepresented to PLAINTIFF by Barry, and in a series of pathological lies from Joshua to PLAINTIFF from 2015-2021.

159.     PLAINTIFF also rejected the buyout offer based on Joshua's refusal to provide Part IV's books and records and tax returns in violation of Corporations Code § 17704.10 and § 17701.13, which PLAINTIFF feared indicated years of fraudulent tax filings due to Rebel's (Joshua's) negative capital account. PLAINTIFF is informed and believes, and based thereon alleges, that multiple meetings between PLAINTIFF and the Internal Revenue Service have confirmed PLAINTIFF was correct in this fear.

160.     PLAINTIFF also rejected this buyout offer based on the discovery in early August 2021 that The Ayzenberg Group ("**Ayzenberg**"), a competing agency to Part IV, had contacted Joshua via LinkedIn with intent to initiate negotiations and discussions to purchase Part IV. PLAINTIFF is informed and believes, and based thereon alleges, that Joshua told multiple people about Ayzenberg wanting to purchase Part IV, and one of those people disclosed this to PLAINTIFF. A subpoena to Ayzenberg in the Related Case confirmed both the timeline of Ayzenberg reaching out to Joshua, and Joshua beginning negotiations with Ayzenberg two weeks after the lawsuit was filed in the related case and merely days after the asserted "forfeiture" of PLAINTIFF'S membership.

161.     PLAINTIFF also rejected this buyout offer based on the discovery of (a) over fifty (50)

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 84

Twitter accounts lampooning the Golsen family in early June 2021, using the likenesses of both Jack and Barry, portraying them as unscrupulous, fraudulent business moguls based on previous and (b) active, contentious lawsuits and previous and current accusations of fraudulent behavior by Jack and Barry, all of which had been concealed to PLAINTIFF.

162.   PLAINTIFF also rejected this buyout offer due to the discovery on or about mid-June 2021 that GOL either operated, or allowed, "golcapital.com" in 2015 (around the same time as Barry was getting sued for securities fraud by angry shareholders, and was sued for multiple causes of action by aggrieved contractors on the El Dorado project in Arkansas) to be transferred to a Chinese domain registrar, with the "golcapital.com" site in 2021 hosting extremely graphic pornography, human trafficking, gambling, incest, and pedophilia. When a user clicked on one of these shockingly graphic videos, sophisticated rootkit malware was automatically downloaded to the user's device through malicious JavaScript code.

163.   In addition to the many creative roles Dortch performed at Part IV, one of the many other things that Dortch oversaw for his ownership and employment responsibilities at the company was establishing and managing the company's network security posture. The security protocols that allowed Part IV to be a "Tier 0" vendor, first for The Walt Disney Company in 2014, working with unreleased feature films, notably for franchises like *Star Wars* and the *Marvel Cinematic Universe*, then for the Trusted Partner Network (TPN) consortium consisting of all the entertainment studios in Hollywood.

164.   For a vendor in the studio system to work with full copies of unreleased feature films, there are mandatory security standards that must be followed, with established baseline security postures set by the Motion Picture Association of America. These secure production workflows include restricted network access on production systems, air-gapped and isolated network segments, hardened computer systems, detailed network diagrams, annual formal risk assessment and risk management policies, and routine vulnerability scanning of the entire company network. Part IV undergoes annual audit to ensure these standards are being met, a process that was always led by Dortch, on systems designed and implemented by Dortch.

165.   COVID drastically affected the network infrastructure of Part IV. Whereas, prior to COVID, security protocols generally mandated that all work with unreleased feature films, deemed

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 85

"security titles," had to be performed on-site at the company offices with "offline" workstations directly connected to the company servers (also designed and built by Dortch). During COVID, the entire industry experience massive upheavals of these long-established workflows.

166.     Dortch had just led Part IV through its annual audit, and passed the new "remote" standards for the TPN with zero remediation at the end of May 2021 days before the "at-will" termination event planned by WILLIAMS and Joshua. Passing a Tier 0 security audit with no remediation is extremely rare, proving the expertise and robustness of the network designed by Dortch that of which Part IV is still reaping the benefits, as Part IV is still operating on the network and servers Dortch designed and built, being operated by IT staff Dortch hired and trained.

167.     More so than almost any other industry, to work with something along the lines of unreleased Star Wars content for The Walt Disney Company, protecting assets that if leaked would case almost incalculable, potentially billions of dollars of damages, requires an extremely high level of network proficiency and a duty of care. Previous leaks in the industry have at times lead to personal liability for the offending actor.

168.     WILLIAMS has direct knowledge of the responsibilities of Part IV regarding network security protocols, as she is now a member of the Security Team at Part IV, despite having zero experience in network security and barely being able to proficiently operate a computer.

169.     For a Part IV's member (GOL) to have "golcapital.com" to be such a wretched hive of scum and villainy, hosting extremely graphic pornography that then links to malware that can cause significant harm, is beyond unacceptable for Part IV to comply with its security protocols. The intentional concealment of multiple lawsuits involving Jack and Barry, where both co-owners of Part IV were personally named in a federal lawsuit for securities fraud, and another related case where LSB is accused of refusing to pay multiple contractors, stemming nearly decade of perpetual extremely contentious litigation, by proxy, shows clear potential for numerous attack vectors against any entity owned by Jack and/or Barry. Thus, Part IV has been facing years of increased security risk, unbeknownst to Dortch and all of Part IV's clients.

170.     Part IV's mandatory annual Risk Assessments and Risk Management policies managed by Dortch, were also missing the critical disclosure of the contentious lawsuit against partners of the

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 86

company, public parody accounts of both Jack and Barry, and the "golcapital.com" website containing dangerous malware, leading to Part IV, and Dortch directly, making false assertions to all of its studio clients regarding attack vectors.

171.    If "golcapital.com" were to infect any Part IV system, or a studio client's system, it could wreak havoc at unimaginable level, including giving the exploiter access to all company file systems, encryption keys, system passwords, and email passwords. Part IV is a known commodity within the industry, with what Part IV is identifying as "famous" marks. Such a position always increases risk when dealing with attack vectors, which can be as extreme as exploit seekers going through the physical trash of company owners or company offices.

172.    This may very well be the point of a site like "golcapital.com," to simultaneously 'troll' Barry and Jack for the seemingly many enemies they have created by engaging in unscrupulous business tactics, including rug pulling business partners and being sued for securities fraud in a class action federal lawsuit, by filling "golcapital.com" with dangerous malware to attempt to exploit and access Part IV systems to obtain the billions of dollars of intellectual property residing on Part IV servers.

173.    Bewildered by the discovery of the numerous social media accounts attacking Jack and Barry Golsen, and the "golcapital.com" website filled with pornography, pedophilia, and dangerous malware, Dortch, took immediate measures to purchase additional and similar sounding domains to the PLAINTIFF owned and administered "part4.com" to protect Part IV's digital infrastructure from a similar fate.

174.    After Joshua delivered the hostile buyout offer, PLAINTIFF responded for the above referenced reasons for rejecting that buyout in a letter from PLAINTIFF'S attorney dated June 26, 2021. The response letter from PLAINTIFF, properly identified as Confidential Settlement Communication pursuant to Evidence Code §1152 and §1154, offered to settle estimated pending claims for: breach of fiduciary duty, defamation, false light invasion of privacy, unfair business practices, breach of implied covenant of good faith and fair dealing, intentional infliction of emotional distress, wrongful termination, and wage and hour law violations. PLAINTIFF and Dortch sought settlement for $4 million, which was calculated roughly as a negotiation starting point by a variety of pending items: the estimated fair market value of PLAINTIFF'S 20% interest in Part IV; the forfeiture of Barry's share of

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 87

Part IV's profits due to his fraudulent behavior; the pending liability of up to $700,000-$1,400,000 in criminal fines to the Internal Revenue Service for fraudulent tax filings made by Joshua on behalf of Part IV; and reasonable punitive damages for the wrongful termination of Dortch to attempt to force PLAINTIFF into a hostile buyout position under unlawful retaliatory circumstances.

175.     Also in this letter was a disclosure from PLAINTIFF reminding the increasingly negligent and forgetful Joshua about PLAINTIFF'S ownership of "part4.com" and other Part IV related domains, some of which Dortch through PLAINTIFF purchased pursuant to Part IV's and Dortch's responsibilities as the de facto head of network security, per the company's own policies and service agreements with multiple film studios regarding the handling of confidential intellectual property, after the discovery of the hostile internet presence against the Golsens, including the lampooning Twitter personalities attacking Barry and Jack, co-owners of Part IV, and the malicious and illegal malware, pedophilia and human trafficking on "golcapital.com." In that description of the domains, PLAINTIFF accurately describes PLAINTIFF'S historical role in owning the domains related to Dortch, through PLAINTIFF, naming and designing all of the marks for Part IV, and PLAINTIFF'S ability to choose to cease directing traffic based on PLAINTIFF having those domains in solely in PLAINTIFF'S possession and control. The only domain with any traffic was the main "part4.com" domain, all other domains redirected to that domain at all times, and "part4.com" had been in PLAINTIFF'S possession and control since January 2014.

176.     The response from Part IV retained attorney Rudy Klapper came on July 15, 2021, wherein Part IV threatens PLAINTIFF with a claim for cybersquatting if PLAINTIFF does not transfer all domains PLAINTIFF owns to the Part IV. Thirteen days prior, on July 2, 2021, Part IV, at the direction of Joshua and Barry, and with the assistance and knowledge of WILLIAMS cancelled the only trademark held by Part IV, the "Part IV" trademark, named by and designed by Dortch through PLAINTIFF in January of 2014, the registration of which had been held by the company since November of 2014 on a filing made with approval of PLAINTIFF as co-owner of Part IV. This cancellation was made without the approval or knowledge of PLAINTIFF, while PLAINTIFF was indisputably a member and co-owner of Part IV, which as abovementioned, WILLIAMS had direct knowledge of PLAINTIFF'S ownership in Part IV.

Exhibit 1
Page 88

177.     Part IV then filed multiple new trademark filings, all based on marks designed by Dortch through PLAINTIFF in January 2014:

     a.     "Part Four" filed on July 8, 2021, published for opposition on May 3, 2022;

     b.     "Part4" filed on July 8, 2021, published for opposition on May 3, 2022;

     c.     "Part IV" filed on July 8, 2021, registered on July 19, 2022;

     d.     "P4RT" filed on November 15, 2021, registered on March 7, 2023; and

     e.     "P4" filed on May 20, 2022, published for opposition on April 18th, 2023

178.     When Part IV was questioned about these dubious filings based on intellectual property created by Dortch, Part IV responded with vitriolic ad-hominem personal attacks on Dortch that have continued for multiple years in the Related Case, but without ever contradicting or responding to the substantive claims about the intellectual property created by Dortch and PLAINTIFF.

179.     PLAINTIFF responded to the threat of cybersquatting litigation, wherein the threat was alleged that PLAINTIFF had tried to "sell" Part IV related domains, by denying that accusation, writing that the domains were ***not for sale, and had never been for sale***. PLAINTIFF sought a settlement based on the settlement of the above-mentioned estimated claims for tortious injury and estimated fair market value of PLAINTIFF'S 20% membership interest, not any quantitative calculation based on the sale of domains owned by PLAINTIFF.

180.     When PLAINTIFF and Dortch commenced the Related Case, PLAINTIFF chose at that time not to pursue defensive litigation for trademark infringement and cybersquatting, and instead, peacefully and with care, transferred all domains owned by PLAINTIFF to Part IV on August 13 and 14, 2021.

181.     Transferring domains can be a consequential event, leading to potentially 72 hours of downtime where the domain will not route traffic properly, meaning lack of web and email access. Dortch worked with Part IV employee Network Administrator Richard Landaverde to facilitate the transfers on a weekend to minimize any downtime and reduce impact to Part IV's business, then Dortch helped Mr. Landaverde ensure all Domain Name Server (DNS) records accurately transferred, and instructed Mr. Landaverde to verify the records. Mr. Landaverde, the only person besides Dortch with direct knowledge of the domain infrastructure at Part IV (as he was trained directly by Dortch)

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 89

acknowledged that Dortch acted with care at all times during the peaceful transfer of all domains to the company in August of 2021 saying "he never did anything to hurt the company."

182.     Tellingly, in September 2021, when the bad faith "for cause" termination facilitated by WILLIAMS was delivered to Dortch, along with the forfeiture notice to PLAINTIFF, the reason for the "for cause" termination is allegedly Dortch "repeatedly failing to do job duties," although neither Part IV or the Golsen Defendants have provided evidence of this claim in the Related Case, and the termination notice does not once mention any allegations of "cybersquatting." In fact, Dortch, at multiple times beyond his "termination date" facilitated knowledge transfers to Part IV, including notifying Part IV of a breached legacy password that was leaked in a Spotify data breach about which Part IV was unaware.

183.     It is with bad-faith and malice that Part IV then chose, two years after the point where all domains in question were transferred to the company peacefully by PLAINTIFF, that Joshua and Barry, using false information provided by WILLIAMS that she had obtained from conversations with Dortch and from her review of Dortch's and PLAINTIFF'S private information contained in his email account, chose to have Part IV assert counterclaim PLAINTIFF with one claim of cybersquatting, wherein Part IV has suffered no damages by any actions of PLAINTIFF, and the counterclaim and the pleadings in the motions from Part IV regarding the counterclaim contains numerous falsehoods and distortions of the facts, some of which were known only by WILLIAMS based on direct conversations between Dortch and WILLIAMS.

184.     In the bad-faith counterclaim two years later, Part IV has attempted to change the narrative for Dortch's "for cause" termination and PLAINTIFF'S "forfeiture" due to "cybersquatting" and "extortion." In reality, for the past two years, Part IV's actual source for harm is that it is still a target for exploit due to GOL and Barry's careless or malicious disregard for protecting the "golcapital.com" domain, Barry's nine (9) years of perpetual contentious litigation, and Part IV being harmed by multiple felonies and misdemeanors committed by both Joshua and WILLIAMS. If Part IV was not just the alter ego of the Golsens now that PLAINTIFF and Dortch have been forced out, Part IV would pursue remedy from the parties which have caused it actual damage.

185.     As of June 2023, two years after this dispute began, "golcapital.com" was still hosting

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 90

pornography and malware. In September of 2023, the content delivery network (CDN) referenced in the "golcapital.com" source code went offline. Though as of January 2024, "golcapital.com" still points to Chinese owned DNS servers, the site still contains malicious and illegal JavaScript code, and the headers of "golcapital.com" still contain the GOL pornographic metadata. The header and metadata of the "golcapital.com" is reads:

> "content=",9999人体做爱大胆视频,久久99精品久久久久久水蜜桃,夜夜高潮次次欢爽AV女,日本被黑人强伦奸人妻完整版,欧美性XXXXX极品少妇,久久久免费无码成人影片,女人毛毛扒开自慰,美女露100‰玩奶头18禁视频,亚洲精品AV在线国自产拍,含着她两个硕大的乳峰视频"

which translates to:

> *"content=", 9999 human body making love bold video, long-lasting 99 quality long-lasting long-lasting peach, orgasm every night for AV women, Japanese raped by black men, full version of married women, European and American sex XXXXX top young women, long-lasting free uncensored Adult videos, women spread their hair and masturbate, beautiful women reveal 100% of playing with nipples, 18 banned videos, Asian high-quality AV online homemade videos, videos of her two huge breasts in her mouth."*

186.     Lest GOL be confused with any other domestic entity, a diligent search of all 50 state business entity databases has returned only one "GOL Capital" entity, the Golsen owned "GOL Capital LLC" registered in Oklahoma and California, business partners of PLAINTIFF and 25% owner of Part IV.

187.     The malware code hosted on "golcapital.com" associates GOL with illicit and sordid illegal behavior, breaking numerous Federal laws, including the Computer and Fraud Abuse Act of 1986 (CFAA), under which it is illegal to knowingly transmit a program, information, code, or command that intentionally causes damage to a computer system without authorization. The malicious JavaScript code on "golcapital.com" is also a violation of the Electronic Privacy Communications Act (EPCA) of 1986;

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505     Exhibit 1
Page 91

the EPCA prohibits the interception of electronic communications without authorization.

**K.** **WILLIAMS EVASIVENESS IN HER DEPOSITION IN THE RELATED CASE**

188.     In the deposition conducted on August 28 and 29, 2021 WILLIAMS exhibited a pattern of evasive responses, manifesting a conspicuous inability to recall crucial events, conversations, and timelines relevant to the related case and her own life. WILLIAMS' selective memory lapses raise significant concerns regarding her veracity and suggest a deliberate attempt to obfuscate pertinent information. Despite the importance of the topics under discussion, WILLIAMS ████████████ ████████████████████████████████████████████████████████ acts.

189.     Furthermore, during the deposition, ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ .

190.     ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ .

191.     ████████████████████████████████████████████ ████████████████████████████████████████████████

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 92

███████ Ms. Gerchik's firm responded that they would be representing WILLIAMS. Thus, compounding the already dubious circumstances surrounding the WILLIAMS' deposition, it is noteworthy that WILLIAMS is now represented by the same counsel who concurrently represents the Golsen Defendants in the Related Case, whereas if Joshua actively misrepresented or concealed the financial impropriety and Dortch's discovery and confrontation regarding such on June 3, 2021, creates a situation of actual conflict between WILLIAMS and Joshua.

192.    The shared legal representation raises serious questions about the WILLIAMS independence and suggests a potential collusion among the defendants. The existence of conflicting interests among co-defendants in separate cases further underscores the likelihood that the WILLIAMS in this matter is not merely a passive party, but rather actively complicit in the alleged wrongful and illegal acts. This shared legal representation, coupled with the WILLIAMS' evasive behavior during the deposition, creates a compelling narrative of concerted efforts to obstruct efforts of PLAINTIFF to seek remedy and necessitates a thorough examination of the WILLIAMS' involvement in the underlying misconduct.

193.    At the core of the ensuing dispute is the subterfuge, dishonesty, and concealment of financial impropriety at Part IV, directed by Joshua and Barry, which causes direct harm to PLAINTIFF, and the plot by Joshua to remove PLAINTIFF from Part IV by planning a "surprise" termination rug-pull based on Dortch's "at-will" employment, planned with and substantially facilitated by WILLIAMS to cover up Joshua's bad acts.

194.    Based on all of the above, PLAINTIFF is informed and believes and therefore alleges WILLIAMS' actions went beyond mere passive knowledge and provided substantial assistance and encouragement to Joshua's breaches of fiduciary duty and conversion, and that WILLIAMS provided logistical support, participated in the wrongful conduct, and actively concealed the breaches and conversion.

195.    PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS acted outside the scope of any of her job duties at Part IV, and in violation of Part IV policies for honesty and integrity, by plotting with Joshua to remove a co-founder and co-owner of her employer, concealing her involvement to PLAINTIFF, lying to PLAINTIFF, and instructing multiple other Part IV employees to

Exhibit 1
Page 93

lie to PLAINTIFF and conceal involvement in the plot planned by Joshua and WILLIAMS to force PLAINTIFF out the company.

**L.        SUBSTANTIAL ASSISTANCE AND ENCOURAGEMENT PROVIDED TO JOSHUA BY WILLIAMS**

196.        PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS provided substantial assistance or encouragement to Joshua by:

**PLANNING AND ASSISTING WITH THE WRONGFUL TERMINATION**
**OF DORTCH IN VIOLATION OF PART IV POLICY AND CALIFORNIA LAW,**
**TO FORCE PLAINTIFF OUT OF PART IV**

197.        In the Related Case, PLAINTIFF alleges that Joshua breached his fiduciary duty owed to PLAINTIFF by "[t]erminating [Dortch's] employment with the [Part IV] for the sole purpose of triggering an unlawful provision in the [Part IV's] operating agreement requiring [PLAINTIFF] to sell its membership interest for a fixed amount regardless of the actual value of the [Part IV] or [Dortch's] contributions to the [Part IV's]' success. It is important to note that intrinsically linked to this particular allegation are the correlated causes of action in PLAINTIFF'S and Dortch's Second Amended Complaint ("**SAC**") in the Related Case for WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY and for VIOLATION OF LABOR CODE §1102.5, by Dortch against Part IV, are also supporting facts surrounding the termination event that are concurrently breaches of good faith and fair dealing, loyalty, honesty, and care from Joshua to PLAINTIFF. The wrongful termination of Dortch in violation of public policy, for the sole purposes of triggering a forfeiture provision to PLAINTIFF is fundamentally a correlating breach of fiduciary duty to PLAINTIFF, as Dortch's employment was intrinsically linked to PLAINTIFF'S membership, through the Operating Agreement, now being challenged for fraud.

198.        The initial buyout offer itself, nor the "for cause" termination on September 1st 2021, planned by Joshua and Barry and facilitated by WILLIAMS, is not merely a discretionary business judgment decision made by Joshua, as absolutely zero evidence exists of Dortch's "failure to perform job duties." In fact, Dortch was actively directing and managing both active client work for Part IV's largest studio client and the entire infrastructure and pipeline at Part IV, which Dortch had led

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505        Exhibit 1
Page 94

significant changes to accommodate the pandemic and a work-from-home network that adhered to Part IV's strict security protocols, of which a detached Joshua had zero participation.

199.     After PLAINTIFF has provided over 4 Terabytes (4TB) of documents, including the entire email account, every message ever sent or received by "dortch@part4.com," and with Part IV having full unfettered access to the entire Slack communication system of the company, with every message Dortch ever sent or received, Part IV has not provided one piece of evidence that indicates Dortch ever failed to perform any job duty, nor received any lodged complaint from a client or Part IV employee.

200.     On June 4, 2021, Joshua, in response to Dortch's whistleblower activity, with the encouragement and assistance of WILLIAMS, began planning a rug-pull termination event for Dortch, based on a stipulation in the Operating Agreement that allowed for the Joshua and Barry to buy PLAINTIFF out at a reduced rate if Dortch quit or if Dortch was terminated.

201.     On June 9, 2021, Dortch was lured to a meeting at the Golden Road Brewery by Joshua under the pretenses to meet and discuss the finances and tax returns of Part IV, but in actuality, planned by WILLIAMS, concealed to PLAINTIFF, and at the express approval of Barry, was informed by Joshua that due to Dortch being an "at-will" employee he could be "fired for any reason at any time." At the June 9, 2021, Joshua again refused PLAINTIFF access to the tax returns and banking information for Part IV, in violation of California Corporations Code and federal statutes regarding tax returns filed by partnerships.

202.     Prior to the June 9, 2021, Dortch never once had a conversation in any form with Joshua or WILLIAMS regarding poor job performance or any unhappiness of Joshua or Barry in the business partnership, never been given a performance review, and never had a complaint lodged against him by any employee or client of Part IV.

203.     In April-May, 2021, immediately before the June 3, 2021, confrontation between Dortch and Joshua regarding Rebel's negative capital account and fraudulent tax filings, Dortch led Part IV through the industry Trusted Partner Network (TPN) audit of the pipeline Dortch had designed and lead the implementation of in response to COVID-19, and the company passed at the highest level of clearance with zero remediation.

Second Amended Complaint, Page - 44

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 95

204.    As of June 9, 2021, Dortch was in fact successfully managing and directing a campaign that Joshua called "the biggest campaign the company has ever had," and just the month prior in May of 2021, Dortch led the company to receive the highest level of security clearances in a comprehensive audit based on network security and workflow pipelines designed and implemented by Dortch in response to COVID-19.

205.    When the client of the campaign Dortch is still actively directing and managing at the time of the June 9, 2021, wrongful termination event reaches out for continued work, multiple Part IV employees had to tell Joshua (who is completely detached from the actual production pipeline of the company and Dortch's creative tasks) that they cannot perform this campaign without Dortch. In response, Joshua decides to attempt to give to PLAINTIFF an entire division of The Walt Disney company for PLAINTIFF to service, presumably outside the business partnership.

206.    On June 17, 2021, 12 days after Part IV has indicated that Joshua had already begun secret pre-litigation strategies based on Dortch being such a terrible and "destructive" employee, and planning with WILLIAMS, seven (7) days after Joshua notified Dortch that his "at-will" employment was being terminated, Joshua writes to Disney and says:

> "Hi REDACTED, [¶] It was great catching up with you the other day!
> First of all, I wanted to thank you so much for thinking of us for this latest
> project!!! We've looked at our schedule, and unfortunately, timing is not
> working out for us on the video portion ☺ [¶] Never fear though, we have
> a great solution ready for you – - please reach out to Jonathan directly via
> his cell (REDACTED) to discus– further!!! [¶] For the digital banner
> portion, we have room in our schedule and can help you out with all static
> and HTML requests. Once you are closer to locking down your media
> plan, let's discuss! [¶] I'm sorry timing is not working out for this one, but
> I know you will be in the best possible hands to accomplish your campaign
> goals! [¶] Looking forward to working with your team on the banners
> soon! [¶] Thank you!!

207.    Further belying the "pre-litigation" and "destructive employee" false narrative being used

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 96

to attempt to assassinate the character of Dortch, facilitated by WILLIAMS based on multiple items from private conversations between WILLIAMS and Dortch being included in the pleadings, in another an email to Dortch, notifying Dortch that Joshua wants to give the client to PLAINTIFF to service, on June 16, 2021 at 1:13 pm, Joshua writes:

> *"Hi Jonathan, I wanted to let you know that we've decided to pass on this round of MA. We'll offer to help with any banner needs at the appropriate time, but nothing more. If you're interested, I can't think of a better person to hand that off to, and I'd love to make the official referral to Eric. I'd like to get back to him tomorrow afternoon at the latest. Let me know."*

208.     Thus, the Golsen Defendants and WILLIAMS first started with the excuse that Dortch was being terminated for reaching his ceiling while falsely stating to Part IV employees that Dortch was voluntarily leaving Part IV. Then, they first shifted their false narrative to be "for cause" termination for repeatedly failing to perform job duties. Now, WILLIAMS and the Golsen Defendants are currently settled on the narrative of cybersquatting and extortion. From the other side of Joshua's forked tongue, Joshua is writing glowing messages to Dortch, saying he would "love" to hand off an entire division of Disney to PLAINTIFF, and that he "can't think of a better person to hand that off to."

209.     PLAINTIFF did assist the client, signing its own MSA with Disney and successfully completing multiple further campaigns with client, to not leave the client in the lurch as Part IV would have done without PLAINTIFF'S intervention.

210.     The real reason Joshua had to send Part IV's lucrative client to PLAINTIFF is that, due to his chronically disaffected and detached management during COVID, he was unaware of how much Dortch had been handling on the campaign. Part IV would essentially be unable to service what Joshua called the "biggest job we've ever had" without Dortch's direction, editing, motion graphics, producing, sound mixing, scripting, and leadership on the campaign. Mr. Landaverde confirmed stating that "Dortch was the only one with the abilities to handle the job."

211.     Exposed here is a clearly contradictory narrative attempting to hide the real reason for Dortch's termination – a reactionary retaliation in attempt to shield PLAINTIFF'S access to books and records and tax returns of Part IV after a documented conversation between Joshua and PLAINTIFF

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 97

about PLAINTIFF'S discovery of Joshua's negative capital account and accompanying tax fraud, just five (5) days prior to the termination event, and one (1) day before starting to plan the termination with WILLIAMS.

**ASSISTING JOSHUA CONCEAL BOOKS, RECORDS,**

**AND TAX RETURNS FROM PLAINTIFF**

212.      The corresponding allegation from the SAC in the Related Case, regarding this breach of fiduciary duty from Joshua to PLAINTIFF is for Joshua "[f]ailing to provide [Part IV] financial reports." Intrinsically linked to this particular allegation is the correlated cause of action in the SAC in the Related Case for ORDERS REQUIRING DISCLOSURE OF INFORMATION AND DOCUMENTATION by PLAINTIFF against Joshua, pursuant to the statutory requirements required by Corporations Code § 17701.13.

213.      This unlawful refusal of Joshua to provide tax returns and other books and records of the partnership to PLAINTIFF is exacerbated by the fraudulent premise of the June 9, 2021, meeting planned by and concealed by WILLIAMS, where Dortch was lured to meet Joshua under the misrepresented guise of continuing their prior conversation from June 3, 2021 wherein Dortch confronted Joshua regarding Rebel's negative capital account and the fraudulent tax filings of the Part IV taxed as a partnership. WILLIAMS started planning the termination event with Joshua, hidden from PLAINTIFF, and Dortch's time-stamped and dated print outs from the company QuickBooks system.

214.      WILLIAMS, at least as early as June 4, 2021, assisted Joshua with planning a surprise "at-will" termination of Dortch on June 9, 2021, to trigger a buyout of PLAINTIFF, after Dortch's discovery of tax fraud in mid-May, confronting Joshua regarding the tax fraud on June 3, 2021, and Joshua refusal at the June 9, 2021 meeting to actually discuss or provide financial reports for Part IV pursuant to PLAINTIFF'S requests. PLAINTIFF is informed and believes and thereby alleges WILLIAMS knew of both the reporting of tax fraud by Dortch and Joshua's negative capital account, based on disclosures from Joshua in the June 4, 2021 meeting, ███████████████████████ ████████████████████████████████████████████████ indicate WILLIAMS' awareness of the impropriety, otherwise a███████████████████████ ████████████ would be an unremarkable event of which she would normally take no notice.

Exhibit 1
Page 98

**ASSISTING JOSHUA TO CONCEAL TAX FRAUD**

**WHICH CAUSED DIRECT HARM TO PLAINTIFF**

215.    The three corresponding allegations from the SAC in the Related Case regarding these breaches of fiduciary duty by Joshua: "[a]llowing Rebel to maintain a negative capital balance with the [Part IV]; [i]mproperly allocating [Part IV] debt from first year of operations (2014) fully to [Joshua's] capital account; and "[f]ailing to disclose the balance, or keep accurate bookkeeping, of each member's capital account." Intrinsically linked to these three alleged breaches is the correlated cause of action in the SAC in the Related Case for ORDERS REQUIRING DISCLOSURE OF INFORMATION AND DOCUMENTATION, by PLAINTIFF against Joshua pursuant to the statutory requirements required by Corporations Code § 17701.13.

216.    Part IV is a limited liability company, but it is structured as a partnership under IRC § 1065 and uses a "Partnership Return of Income" form. This tax structure is used by partnerships to report their income, deductions, gains, losses, and other tax-related information to the IRS. In an LLC treated as a partnership, each partner/member is generally jointly and severally liable for the taxes owed by the partnership. The entity itself, Part IV, is merely a pass-through entity. Part IV does not pay corporate tax, nor bear any tax liability as an entity. The profit, loss, and tax liability associated, passes through from Part IV to each partner/member personally. This means that if the partnership returns contain fraudulent information, all partners/members could potentially be held liable for the resulting tax deficiencies, penalties, and interest.

217.    Moreover, the filing of fraudulent tax information in a partnership return is a federal crime. Specifically, Joshua (and Barry) filing fraudulent tax returns for the Part IV "partnership" violate 26 U.S.C. § 7201 [Attempt to evade or defeat tax: "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution."] and 26 U.S.C. § 7206 [making fraudulent and false statements, which carries the same fines and imprisonment of not more than 3 years per offense]. Thus, Joshua (and Barry) filing fraudulent tax returns for the Part IV partnership, fraudulently converting personal debt of Joshua

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 99

to capital debt of Rebel, and fraudulently indicating that Rebel's capital account is positive, implicate PLAINTIFF directly with joint liability for the tax evasion, fraudulent statements, and multiple felony violations of federal law.

218.　　For all of the years of the Part IV partnership, PLAINTIFF only received a Schedule K-1, never the full 1065 partnership return.

219.　　In early 2015, during the tax preparation for the 2014 tax year, Part IV's original accountant, Debra Rocco ("**Rocco**"), resigned abruptly, telling PLAINTIFF she planned to "retire" and that Part IV would need to find a new accountant. Rocco had also been PLAINTIFF'S accountant for nine years prior to the resignation, and PLAINTIFF hired her to be Part IV's accountant. In a phone conversation with PLAINTIFF in late 2021, Ms. Rocco conveyed to PLAINTIFF that the actual reasons she resigned abruptly were that: (a) Barry had attempted to convince Rocco to file a fraudulent tax return whereby the initial investment GOL made into Part IV would be "moved" to the 2015 tax year; (b) the lack of proper 1065 Partnership election had created a "mess" at the company whereby the $277,000 loss accrued by Part IV would actually go to Joshua's personal Schedule C tax return in 2014 with no option to carry forward; (c) Rocco did not want to sign off on such unequal divisions of equity based on unequal capital investment whereby Joshua's lowest $25,000 investment placed him at a 55% majority equity; (d) she felt the sum of Barry's requests were "so shady," and (e) she wanted no part of the illegality of filing a fraudulent tax return.

220.　　All of Barry and Joshua's conversations with Rocco were concealed from PLAINTIFF, and Rocco did not convey this information to PLAINTIFF until 2021, as she thought PLAINTIFF was complicit and aware of or condoned Barry's actions, which PLAINTIFF was not aware and quite obviously through this multi-year litigation, does not condone.

221.　　Joshua described all of this as a "nightmare accounting scenario" in a quote that is included on the website for the Abedian & Totlian LLP accounting firm, who was hired by Joshua to replace Rocco.

222.　　Around this time, in phone conversations with Joshua and Barry when Dortch raised concerns about the $277,000 loss for Part IV not being carried forward for any member since the partnership election would not be made until 2015, Barry represented to Dortch that the company will be

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 100

valued at "zero" in 2015 despite the company by that time owning hundreds of thousands of dollars of depreciating assets and receiving revenue for all of 2015 until that point, and that the loss from 2014 would just be "lost" on Joshua's personal return.

223.     Shortly after retaining counsel in June 2021, PLAINTIFF discovered that the Golsen family has an involved history with litigation, with their "family" business LSB being the defendant in over 20 federal lawsuits since the 1990's, with multiple lawsuits for fraudulent behavior, as well as a particular history with the IRS, with the "Golsen Rule" in the United States Tax Code bearing their family name over a previous bitter dispute between Jack and the IRS, where he was running, per the court's ruling, a sophisticated sham with pre-paid life insurance premiums to fraudulently reduce his tax liability (*Golsen v. Commissioner United States Tax Court, 54 T.C. 742*).

224.     As such, per Dortch's discovery of Rebel's negative capital account in May of 2021, PLAINTIFF feared the Part IV partnership was sitting on seven (7) years of fraudulent returns, stemming back to the troubled formation of the partnership tax structure, and delay of partnership filings based on Barry being named the defendant in a federal class action lawsuit for securities fraud (undisclosed to Plaintiff), implicating Dortch (the pass-through owner of PLAINTIFF) with potentially $700,000 - $1,400,000 in fines, and anywhere between 21 and 35 years in federal prison, if fully prosecuted by the IRS.

225.     It took PLAINTIFF working with the IRS with the assistance of a Tax Advocate through all of 2022, including multiple in-person meetings with the IRS field office in Carpentaria, and the Franchise Tax Board, to obtain true and accurate copies of the federal 1065 and California 565 tax returns filed on behalf of Part IV.

226.     After obtaining these returns, it is evident why the Golsen Defendants so fervently attempted to deny access. PLAINTIFF is informed and believes, and based thereon alleges, that the tax returns obtained with assistance of the IRS and the Franchise Tax Board confirm that each year, from 2014 to 2021, Joshua misreported the accurate total of his capital account in Rebel, allowing himself to actually keep a negative capital account, resulting in seven (7) consecutive years of willful tax evasion and fraudulently tax filings on behalf of the partnership.

227.     PLAINTIFF is informed and believes, and based thereon alleges Joshua's conduct in this

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 101

regard is a breach of fiduciary duty from Joshua to PLAINTIFF that is not a derivative claim, as the entity of Part IV as a whole cannot be harmed if the tax-liability and legal liabilities pass through to the owners directly. Specifically, Part IV cannot be imprisoned for upwards of 35 years; that liability extends to the individuals responsible for the federal crime of filing fraudulent tax information. Therefore, PLAINTIFF and Dortch are harmed individually by Joshua's actions and must pursue claims directly, not derivatively, for all breaches of fiduciary duty related to tax fraud in a pass-through entity.

228. WILLIAMS provides substantial assistance to this direct harm to PLAINTIFF by, for years, assisting Joshua with bookkeeping and payroll. PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS either (a) had prior knowledge of Joshua maintaining a negative capital account for Rebel before Dortch discovered this in May 2021, or (b) after Dortch discovered Joshua's actions and confronted Joshua regarding the negative capital account and fraudulent tax filings, Joshua confessed to WILLIAMS and promised an exorbitant bonus and title increase to solicit WILLIAMS' support in forming a plot to remove PLAINTIFF from Part IV, and further conceal these federal crimes, and that together (c) WILLIAMS and Joshua both believed PLAINTIFF would be unable to afford complex (and years long) litigation against the Golsens, especially under the pressure and threat of a hostile buyout attempt in the middle of a severely depressed job market in the middle of the global COVID-19 pandemic.

### WILLIAMS' MANAGED THE PART IV PAYROLL AT THE JOSHUA'S DIRECTION TO INTENTIONALLY AVOID OVERTIME LIABILITY

229. The corresponding allegation from the SAC in the Related Case regarding this breach of fiduciary duty by Joshua is "[e]xposing [Part IV] to wage and hour law violations for its failure to pay non-exempt employees overtime compensation." Beginning with her assumption of payroll duties in 2017-2018, WILLIAMS managed large portions of the company's payroll system in the company's human resource portal, Gusto, with all payroll and contractor payments approved by Joshua. Managing payroll was one of the administrative tasks not overseen by Dortch.

230. Labor Code § 510 establishes the general requirement for employers to pay overtime wages to non-exempt employees. It specifies that non-exempt employees are entitled to receive overtime pay at a rate of one and a half times their regular rate of pay for hours worked beyond a certain threshold

Second Amended Complaint, Page - 51

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 102

1    in a workday (over 8 hours) or workweek (over 40 hours).

2    231.    In July of 2021, while Dortch was still working amicably and peacefully to transfer the

3    many systems he founded and administered at Part IV to other Part IV employees, including

4    WILLIAMS and part-time employee, Mr. Landaverde, that Dortch began to take notice of the long

5    hours Mr. Landaverde was being forced to work to facilitate the transfer of Dortch's responsibilities.

6    When Dortch asked Landaverde about his overtime, Landaverde confesses to Dortch he has never

7    received any overtime from Part IV, despite frequently working in excess of 8 hours per day, and 40

8    hours per week in a part-time hourly capacity.

9    232.    At the direction and approval of Joshua, WILLIAMS actively participated in the failure

10   to pay non-exempt employees overtime compensation by:

11         a.   Creating "invoices" for part-time hourly employees to use as time cards that include no

12              ability for employees to indicate overtime hours;

13         b.   Violating Labor Code § 226 by not keeping accurate totals of total hours worked and pay

14              rate;

15         c.   Despite WILLIAMS' role as the Director of Operations and HR manager, not knowing

16              the difference between a 1099 contractor and a part-time hourly employee;

17         d.   Failing to address Part IV's failure to properly compensate employees for overtime work,

18              even after having the issue brought to her attention.

19   233.    PLAINTIFF is informed and believes, and based thereon alleges, that █████████████

20   ███████████████████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████████.

22   Although, the failure to pay Mr. Landaverde overtime is an issue between Mr. Landaverde and Part IV,

23   these facts demonstrate WILLIAMS' substantial assistance to Joshua in violating the law as to Part IV

24   employees and demonstrates a pattern and practice of WILLIAMS' assistance to Joshua in violating the

25   law as to Part IV employees.

26   234.    PLAINTIFF is informed and believes, and based thereon alleges, that Part IV's counsel

27   Mr. Kozberg had actual knowledge about Part IV's ███████████████████████████, but that

28   Part IV had not taken any action against Joshua or WILLIAMS for such unlawful conduct. PLAINTIFF

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 103

is further informed and believes, and based thereon alleges, that Part IV's failure to take action against Joshua or WILLIAMS for the unlawful conduct demonstrates that Part IV would never take action against Joshua for anything he ever did to cause harm to Part IV making the argument Part IV's, the Golsen Defendants' and WILLIAMS' arguments that PLAINTIFF lacks standing to pursue a derivative action against Joshua patently uncredible. If it were not for PLAINTIFF'S actions, Part IV would let the Golsen Defendants get away with any violation of any law because Joshua and Barry now fully control Part IV.

235.    Dortch is also the direct victim of similar chronic practices of wage theft during his termination, as Joshua tried to unlawfully pay all of Dortch's accrued sick and vacation time over a five (5) year structure period, and as alleged in cause of action for FAILURE TO PAY ALL WAGES DUE in the SAC in the Related Case, as Part IV failed to timely pay Dortch his final wages in accordance with Labor Code § 209.

**WILLIAMS' CRIMINAL BEHAVIOR OF SUPPLYING JOSHUA**

**WITH ▇▇▇▇ WHICH DIRECTLY ALTERED JOSHUA'S BEHAVIOR**

**AND IMPAIRED HIS ABILITY TO OPERATE PART IV**

236.    Based on a 20 year long and once close friendship with Joshua, Dortch has a unique perspective to take notice of the changes in Joshua's behavior and personality that align directly with the evidence provided by Part IV of WILLIAMS (not a doctor), repeatedly through the pandemic, providing Joshua ▇▇▇▇▇▇▇▇▇▇▇▇▇, a controlled substance, in violation of, at least, Health & Safety Code §§ 11352 and 11375.

237.    PLAINTIFF is informed and believes, and based thereon alleges, that the following allegations from the SAC in the Related Case regarding the Joshua's breach of fiduciary duty by Joshua, were directly impacted by Joshua's use and abuse of ▇▇▇▇ supplied to him by WILLIAMS:

    a.    Neglecting to act on information and requested budgets to repair critical [Part IV] systems like the aging RAID array;

    b.    Failing to respond to normal business discussions regarding any strategy of reducing [Part IV] liabilities in response to COVID-19;

    c.    Failing to properly document or manage the sales pipeline of [Part IV] including the lack

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 104

of any CRM tools whatsoever, despite multiple attempts by [Dortch] to implement this critical process;

    d.   Failing to notify [Part IV's] security team of protected client volumes to which [Joshua] maintained improper access, which was later corrected by [Dortch];

    e.   Turning down requests for estimates based on petty personal disputes; and

    f.   Failing to manage [Part IV] payroll liabilities in relation to active billable work.

238.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS, while represented by both Ms. Gerchik and Mr. Kozberg, admitted under oath and penalty of perjury that she ████████████████████████████████.

239.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS' admissions of criminal behavior in her deposition testimony to which there was no objection by either Ms. Gerchik or Mr. Kozberg, and offering to supply Joshua ████████ on the company-owned Slack communication system constitute a waivers of her medical privacy as to how WILLIAMS obtained ██ ████ she supplied to Joshua. Shockingly, WILLIAMS and Joshua used the company Slack communication system of which Dortch was the primary administrator and registered "owner," to coordinate the logistics of WILLIAMS supplying ████ to Joshua wherein Joshua refers to ████ ████████ Together, WILLIAMS and Joshua used the Part IV office and WILLIAMS' residence as "dead drops" for WILLIAMS to leave ████ for Joshua to pick up. Part IV policies regarding company owned communication systems clearly indicate WILLIAMS has no right to privacy using the company owned system.

240.     PLAINTIFF is informed and believes, and based thereon alleges, that Part IV has ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████.

241.     PLAINTIFF is informed and believes, and based thereon alleges, that Dortch and other Part IV employee witnesses will testify as to the change in Joshua's personality and habits during the 2020-2021 time period when WILLIAMS begins supplying Joshua with ████████████████ ████████████████████. PLAINTIFF is further informed and believes, and based thereon

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 105

alleges, that the witnesses will testify about Joshua's detached behavior, significant issues with memory retention, living in solitude and refusing to leave his home to attend to Part IV business needs, or maintaining the company's office space throughout the pandemic. PLAINTIFF is also further informed and believes, and based thereon alleges, that Joshua also experienced problematic short term memory loss where Joshua would forget entire conversations and significant events that had occurred.

242. In one of the only negative comments Joshua made about Dortch's job performance at the June 9, 2021, termination event, Joshua cited an event from early May 2021, when Dortch took an approved vacation leave to visit his family in Texas and visit his elderly and ailing grandmother, saying, erroneously, that Dortch had "put the company in a bad spot" by taking his trip without letting him or WILLIAMS know when he was leaving. Dortch first called WILLIAMS on May 6, 2021, to notify her of the time off, as WILLIAMS managed the out-of-office calendars for herself and the two company owners, Joshua and Dortch. WILLIAMS, on a Thursday afternoon, was actually in Las Vegas, unbeknownst to Dortch, and answered the phone at a bar in a highly intoxicated state with slurred speech. Dortch informed her of the trip and WILLIAMS told Dortch to have fun visiting his family. Dortch then called Joshua and had an 11 minute conversation about the trip, giving Joshua multiple details, including that Dortch was driving to Texas with one of their mutual friends, the make and model of the rent car they were driving, the times Dortch and the friend planned to leave and arrive in Texas two days later, that there would be portions on the desert highway where Dortch would be out of cell phone reception, and that he would bring his laptop in case of emergencies. During this call, Joshua sounded tired and detached during the conversation, but ended the conversation with telling Dortch to enjoy the time seeing his family. When Dortch and the friend left, after crossing the state line into Arizona, Dortch answered a call from Joshua who was indignant asking "where are you?" and through the conversation it became clear that Joshua had little to no memory of the long conversation Dortch had regarding the trip or the timing of the trip. Thereafter, WILLIAMS and Joshua then converse with one another on the company Slack system saying disparaging things about Dortch leaving on an approved trip to visit his family, wherein both Joshua and WILLIAMS seem to have no recollection of their conversations with Dortch.

243. When access control logs that demonstrate who was in the Part IV office and when were

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 106

1    requested in discovery in the Related Case, ███████████████████████████████

2    ███████████████████████████. PLAINTIFF is informed and believes, and based thereon

3    alleges, that Joshua's unauthorized use of █████ supplied to him by WILLIAMS greatly contributed to

4    Joshua's abandonment and refusal to work at the Part IV office.

5        244.    PLAINTIFF is informed and believes, and based thereon alleges, that the access control

6    logs for Joshua may not exist because, since March of 2020, Joshua has rarely gone to the Part IV office

7    or attended to the Part IV infrastructure, dumping all managerial responsibility to Dortch and others.

8        245.    PLAINTIFF is informed and believes, and based thereon alleges, that during the

9    pandemic from March 2020 to September 2021, except for one instance, Joshua only went to the Part IV

10   office to retrieve █████ from WILLIAMS and/or pick up the mail. The other instance was to have a

11   Father's Day 2021 meeting with WILLIAMS, Mr. Landaverde, and another Part IV employee, Paul

12   Major, at which WILLIAMS and Joshua began spreading the false narrative about Dortch's departure to

13   the Part IV employees.

14       246.    PLAINTIFF is informed and believes, and based thereon alleges, that, after Dortch

15   peacefully and with care transferred all of the disputed web domains owned by PLAINTIFF to Part IV

16   in August of 2021, Joshua, just a few days later *forgot* that this transfer had occurred. Not surprisingly,

17   Part IV's cybersquatting counterclaim grossly misstates and mischaracterizes the facts because those

18   facts were likely supplied by Joshua and WILLIAMS who very well may have been under the influence

19   of █████ when they provided the facts to Part IV's counsel.

20       247.    PLAINTIFF is informed and believes, and based thereon alleges, that Joshua accessed

21   critical Part IV digital infrastructure at a ratio of only 2.7% relative to the rest of the company during the

22   2020-2021 time period in question. Even though VPN access was provided to Joshua, he never used it.

23       248.    On June 22, 2021, Mr. Major visited Dortch's home, which is also PLAINTIFF'S

24   principal place of business, because PLAINTIFF was allowing Mr. Major to borrow equipment owned

25   by PLAINTIFF that had recently been removed from the Part IV office due to the ongoing dispute.

26   Standing in the driveway outside the home, Dortch asked Mr. Major, a longtime friend of Joshua, if had

27   ever known Joshua to have a drug problem. Dortch asked Mr. Major this question based on the erratic

28   behavior of Joshua prior to and during the ongoing dispute, Joshua's significant weight loss during this

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 107

time period, and bouts of sweating and visible and uncontrollable shaking during the events of the June 9, 2021 lunch, which was the first time PLAINTIFF had seen Joshua in person since December of 2020, as Joshua rarely left his home during COVID.

249.     Another longtime colleague of Joshua described Joshua's personality to Dortch as having significantly changed since 2021, like he "couldn't carry a conversation," was "slow," and "detached."

250.     The legality behind sharing controlled substances, even prescriptions, stems from crucial factors concerning individual health and safety. Each person's reaction to medication can vastly differ due to unique body chemistry, existing health conditions, and potentially other prescription medication that the person may be taking. Controlled substances, therefore, are strictly regulated and lawfully prescribed by licensed medical professionals. Sharing these medications disregards the careful consideration given by healthcare providers to ensure their safe usage. Notably, ██████████████) is a controlled substance both federally and in California, in part because of the psychological and cognitive effects of ██████ which include:

    a.  ████████████████████████████████
████████████████████████████████
████████████████████
██████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████
████████████████████
█ ██████████████████████████████
████████████████████████[1]

251.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS' felony conduct of repeatedly supplying Joshua with ██████ significantly contributed to Joshua's breaches of fiduciary duty. Based on Dortch's experience as Joshua's former friend of 20 years, Dortch will testify to Joshua's memory issues, difficulty concentrating, drastic mood swings, societal

[1] ████████████████████████████████████████████████████████████████

Second Amended Complaint, Page - 57

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505          Exhibit 1
Page 108

withdrawal, abandonment of managerial responsibilities, and reckless behavior that appeared after beginning to abuse ▮▮▮ which WILLIAMS' has directly assisted by substantially encouraging the consumption of and illegally supplying ▮▮▮ to Joshua.

252.     PLAINTIFF is informed and believes, and based thereon alleges, that Dortch's reporting of illegal activity to Joshua is in accordance with Part IV's "Complaint Process" process policy.

## FIRST CAUSE OF ACTION

## AIDING & ABETTING BREACH OF FIDUCIARY DUTY

## (Against WILLIAMS and DOES 1 through 10)

253.     PLAINTIFF repeats each and every allegation contained in Paragraphs 1 through 252, inclusive, of this Complaint and incorporates the same by this reference, as though set forth at length herein.

254.     PLAINTIFF is informed and believes, and based thereon alleges, that, as a result of Joshua being the manager of Part IV and PLAINTIFF being a member of Part IV, Joshua owed PLAINTIFF a fiduciary duty and breached that duty by, inter alia, engaging in the acts described in hereinabove and that, taken together, such conduct constitutes gross negligence, reckless conduct, intentional conduct, or knowing violations of the law.

255.     PLAINTIFF is informed and believes, and based thereon alleges, that, by engaging in the conduct alleged hereinabove, WILLIAMS and DOES 1 through 10, inclusive (collectively, the "**DEFENDANTS**") had actual knowledge of Joshua's breaches of his fiduciary duties owed to PLAINTIFF as described herein and that PLAINTIFF was a 20% owner in Part IV and Dortch was a co-founder of the company.

256.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS' pre-Part IV employment provided her with substantial experience with fiduciary responsibilities and gave her actual knowledge that the person controlling the business owes the business owners a fiduciary duty. As a result, DEFENDANTS, through WILLIAMS, had actual knowledge that Joshua's gross negligence, reckless conduct, intentional conduct, and/or knowing violations of the law or attempts to take advantage of a Part IV owner, even by the slightest misrepresentation or concealment would constitute a breach of Joshua's fiduciary duties.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 109

257.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANTS knew that Joshua's conduct constituted a breach of his fiduciary duties owed to PLAINTIFF because, inter alia, WILLIAMS asked to be "removed" from her responsibilities in the termination process after she was informed by Joshua that he and Barry were proceeding with a "for cause" termination for Dortch and a "forfeiture" of PLAINTIFF'S membership interest, two weeks after the Related Case was filed because she felt "uncomfortable" and still as of August 2023, could think of "no reason" why Dortch would be validly terminated "for cause." PLAINTIFF is informed and believes, and based thereon alleges, that these statements by WILLIAMS were made out of her consciousness of guilt in that she had participated in and had provided substantial assistance or encouragement to Joshua in breaching his fiduciary duties harm to PLAINTIFF.

258.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANTS, through WILLIAMS, provided substantial assistance or encouragement to Joshua Joshua's gross negligence, reckless conduct, intentional conduct, and/or knowing violations of the law or attempts to take advantage of a Part IV owner, even by the slightest misrepresentation or concealment by, at least:

    a.  Providing logistical support for the wrongful termination of Dortch by unlawfully weaponizing Dortch's at-will employment to force PLAINTIFF from Part IV, a plan set into motion by Joshua and WILLIAMS on June 4, 2021, one day after the June 3, 2021, confrontation between Dortch and Joshua regarding financial impropriety and tax fraud, whereby PLAINTIFF alleges that Dortch reporting this discovery to Joshua, created an immediate condition of protected activity;

    b.  Secretly planning with Joshua methodologies and contingencies for a surprise retaliatory termination reveal to Dortch;

    c.  In her Human Resource capacities at Part IV, facilitating a "for cause" termination of Dortch's employment without actual cause existing and zero history of employment issues, complaints, or reprimands to Dortch by Part IV;

    d.  Actively concealing from PLAINTIFF both her prior knowledge and active planning of Joshua's breach of fiduciary duties;

    e.  Instructing other Part IV employees to conceal their participation in and prior knowledge

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 110

of Joshua's efforts to remove PLAINTIFF from Part IV in violation of Part IV policies for honesty and integrity;

f.   Despite years of on-the-job training in her Human Resource responsibilities, taking no consideration of the protected activity of Dortch's whistleblower disclosures of tax fraud or investigating the veracity of the complaint made by Dortch to Joshua on June 3, 2021, per Part IV "Complaint Process" policy;

g.   ████████████████████████████████████████ ██████████████ despite participating in drafting portions of the Part IV Employee Handbook dealing with protected activity;

h.   Participating in unlawful retaliation against Dortch as a whistleblower pursuant to Labor Code § 1102.5;

i.   Perpetuating a false narrative to multiple Part IV employees about Dortch wanting to leave the company he co-founded and had invested fifteen years of his life to, to go on to do other "creative things" to conceal the bad-faith behavior of Joshua;

j.   Assisting Joshua with secretly planning the June 9, 2021 meeting, fraudulently framed to Dortch as a meeting to further discuss the books and records of Part IV, while in reality was an unlawful "at-will" surprise termination event concealed from Dortch, to shock and cause maximum harm to PLAINTIFF;

k.   ██████████████████████████████████████████ ████████████████████████████████████ ████;

l.   ████████████████████████████████████████ ██████████████████████████;

m.   Choosing sides in a dispute between the owners of her employer, both of whom were her co-managers, outside the scope of her job duties and in violation of multiple Part IV policies;

n.   Receiving a title increase and ████████████ bonus for her assistance in helping Joshua enact and conceal the plot to remove PLAINTIFF, a bonus that was 6 to 12 times

Second Amended Complaint, Page - 60

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505
Exhibit 1
Page 111

higher than any bonus compensation WILLIAMS had ever received, and higher than any bonus ever paid to any Part IV employee, and even higher than PLAINTIFF'S ownership distribution from 2018, 2019, 2020, and 2021;

o. Providing advice and assistance to Joshua in his planning to remove PLAINTIFF from Part IV for which Joshua thanked her on June 10, 2021;

p. Misrepresenting to Joshua the nature and substance of multiple conversations between WILLIAMS and Dortch in 2020 and 2021 to curry favor and disingenuously smear Dortch;

q. Planning with Joshua a pivoting plan to terminate Dortch "for cause" for refusing to accept a forceful buyout at reduced value and challenging the Operating Agreement due to fraud, despite knowing no "cause" existed, that Dortch was a founder and owner, not a typical employee of Part IV, did not have a job description, had never had any complaint lodged against him, had never been on a performance improvement plan, had never once had a conversation with Joshua regarding job performance prior to June 9, 2021, and was actively responsible for significant portions of Part IV's infrastructure and work product at the point of the surprise termination; and

r. Violating security protocols of Part IV during the reckless termination of Dortch, who was the super-administrator of all Part IV systems and was de facto head of the Security Team at Part IV.

259. PLAINTIFF is informed and believes, and based thereon alleges, that, but for the substantial assistance and encouragement provided by DEFENDANTS to Joshua, Joshua would have been unable to engage in the conduct alleged hereinabove because Joshua is a reliant person and is incapable of unfurling a plan to remove Dortch as his business partner alone. Joshua and WILLIAMS have a unique and close relationship, as WILLIAMS was the college roommate of Joshua's longtime unrequited love, and was hired to her position at Part Four without any requisite experience in human resources or the digital advertising industry. Had DEFENDANTS' support and encouragement to Joshua been absent, Joshua would have likely just deferred a resolution of his tax fraud and accounting concerns by blaming the accountants or the directions of his serial defendant father, Barry. Instead,

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 112

WILLIAMS relied on her previous college and "unique" relationship with Joshua to drive a wedge between Joshua and Dortch and be Joshua's second in command, with a title change and promise of a large cash bonus.

260.     As a direct and proximate cause of DEFENDANTS' substantial assistance and encouragement to Joshua as alleged hereinabove, PLAINTIFF has suffered harm has suffered economic damages in an amount to be proven at trial, but not less than $1,510,213.80 comprised of (a) $1,161,589.80 for the estimated value of PLAINTIFF'S 20% membership interest in Part IV, and (b) $348,624 for PLAINTIFF'S capital account including the forgiven PPP loan forgiveness properly accounted.

261.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS engaged in the foregoing activities out of "malice" as that term is defined in Civil Code § 3294 in that WILLIAMS facilitated and substantially assisted Joshua's breaches of fiduciary duty with intent to cause harm to PLAINTIFF and remove PLAINTIFF from Part IV, because WILLIAMS believed she could gain a title increase and substantial additional compensation, including a promised bonus of ██████████ for assisting Joshua conceal his felony behavior, fraudulent tax filing, and for fabricating with Joshua an unlawful faith "for cause" termination of Dortch employment solely for the bad faith purposes of triggering a challenged provision in the Operating Agreement that would have allowed a "forfeiture" of PLAINTIFF'S membership interest, and PLAINTIFF is informed and believes, and based thereon alleges, that the actions described herein directly enriched Joshua, Barry, and WILLIAMS and directly harmed PLAINTIFF.

WHEREFORE, PLAINTIFF requests judgment as set forth hereinbelow.

## SECOND CAUSE OF ACTION

### AIDING & ABETTING CONVERSION

### (Against WILLIAMS and DOES 1 through 10)

262.     PLAINTIFF repeats each and every allegation contained in Paragraphs 1 through 252, and 254 through 261, inclusive, of this Complaint and incorporates the same by this reference, as though set forth at length herein.

263.     PLAINTIFF is informed and believes, and based thereon allege, that two weeks after the

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 113

complaint was served on the defendants in the Related Case, on September 1, 2021, Joshua notified PLAINTIFF that Dortch was being terminated "for cause" for "repeatedly failing" to do his job and that PLAINTIFF'S membership interest in Part IV was being seized by claimed "forfeiture."

264.     PLAINTIFF is informed and believes, and based thereon alleges that there was no "cause" for Dortch's termination, and the actual termination for Dortch was a wrongful termination in violation of public policy, an unlawful whistleblower retaliatory action taken against PLAINTIFF for discovering financial impropriety and fraudulent tax filings and filing a lawsuit against the Golsens and Part IV.

265.     PLAINTIFF is informed and believes, and based thereon alleges that on September 1, 2021, PLAINTIFF'S capital account in Part IV was also wrongfully seized by Joshua and Part IV and never returned, even though *no provision* in Part IV Operating Agreement allows for a forfeiture or seizure of a member's capital account.

266.     PLAINTIFF is informed and believes, and based thereon alleges that Joshua and Barry intentionally misappropriated PPP funds, that upon forgiveness of the loans, became pass-through equity to the members of Part IV, concealing the forgiveness from PLAINTIFF and allocating all of the forgiven PPP funds long-term liability account, $888,247 to be non-taxable pass-through equity for the benefit of Joshua and Barry causing direct economic loss and direct harm PLAINTIFF, whereby Part IV as the pass-through entity suffered no loss or harm.

267.     PLAINTIFF is informed and believes, and based thereon alleges, that Joshua disclosed to WILLIAMS specific details of the Operating Agreement of Part IV at least as early as June 4, 2021, and that as a result DEFENDANTS, through WILLIAMS, had specific knowledge of the Operating Agreement and its provisions about the forfeiture of membership interests.

268.     PLAINTIFF is informed and believes, and based thereon alleges that DEFENDANTS, through WILLIAMS, knew PLAINTIFF was a 20% owner in Part IV resulting in both a membership interest and a capital account.

269.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS was copied on the "forfeiture" notice sent by Part IV to PLAINTIFF and thus knew of the claimed "forfeiture" of PLAINTIFF'S membership interest and capital account.

Exhibit 1
Page 114

270.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS' prior employment as the Senior Vice President and Managing Director of a financial services company specializing in fiduciary relationships provided DEFENDANTS with specific and specialized knowledge to advise and assist Joshua and Barry convert PLAINTIFF'S capital account.

271.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANTS' actions described herein constitute DEFENDANTS providing substantial assistance and/or encouragement to Joshua in the conversion of PLAINTIFF'S membership interest and capital account provided in exchange for additional salary, bonus, and title for WILLIAMS.

272.     PLAINTIFF is informed and believes, and based thereon alleges that DEFENDANTS' actions constitute providing substantial assistance and/or encouragement to Joshua in the conversion of PLAINTIFF'S by assisting Joshua first plan an "at-will" termination event to Dortch and unlawfully structured buyout to PLAINTIFF where by PLAINTIFF'S capital account was not included, and Dortch's sick and vacation leave was only to be returned under a conditional contract with a five (5) year payout.

273.     PLAINTIFF is informed and believes, and based thereon alleges, that once PLAINTIFF rejected that proposal for reasons described hereinabove, DEFENDANTS then assisted Joshua and Barry with planning a "for cause" termination with the reason listed that Dortch "repeatedly failed to perform job duties" on September 1, 2021, two weeks after the lawsuit in the Related Case was filed, and by which evidence shows that Dortch never once failed to perform any job duty, was never reprimanded, and does not even have a job description to accompany his W-2 wages he took as an owner.

274.     PLAINTIFF is informed and believes, and based thereon alleges, that DEFENDANTS provided advice, logistical assistance, and with her background in finance and fiduciary responsibilities, unique knowledge of how to assist Joshua and Barry with converting PLAINTIFF'S membership and capital account.

275.     PLAINTIFF is informed and believes, and based thereon alleges, that, as a direct and proximate cause of DEFENDANTS' actions described herein, PLAINTIFF has suffered harm has suffered economic damages in an amount to be proven at trial, but not less than $1,510,213.80

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 115

comprised of (a) $1,161,589.80 for the estimated value of PLAINTIFF'S 20% membership interest in Part IV, and (b) $348,624 for PLAINTIFF'S capital account including the forgiven PPP loan forgiveness properly accounted.

276.    PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS engaged in the foregoing activities out of "malice" as that term is defined in Civil Code § 3294 in that WILLIAMS facilitated and substantially assisted Joshua's breaches of fiduciary duty with intent to cause harm to PLAINTIFF and remove PLAINTIFF from Part IV, because WILLIAMS believed she could gain a title increase and substantial additional compensation, including a promised bonus of ███████████, for assisting Joshua conceal his felony behavior, fraudulent tax filing, and for fabricating with Joshua an unlawful faith "for cause" termination of Dortch employment solely for the bad faith purposes of triggering a challenged provision in the Operating Agreement that would have allowed a "forfeiture" of PLAINTIFF'S membership interest, and PLAINTIFF is informed and believes, and based thereon alleges, that the actions described herein directly enriched Joshua, Barry, and WILLIAMS and directly harmed PLAINTIFF.

WHEREFORE, PLAINTIFF requests judgment as set forth hereinbelow.

### THIRD CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

### (Against WILLIAMS and DOES 1 through 10)

277.    PLAINTIFF repeats each and every allegation contained in Paragraphs 1 through 252, 254 through 261, and 263 through 276, inclusive, of this Complaint and incorporates the same by this reference, as though set forth at length herein.

278.    Prior to the date that WILLIAMS became an employee of Part IV in 2017, PLAINTIFF was a co-founder of Part IV in January 2014, and a party to Part IV's Operating Agreement in February 2016.

279.    PLAINTIFF is informed and believes, and based thereon alleges, that, after she became an employee of Part IV, WILLIAMS had actual knowledge of the Part IV Operating Agreement and the terms thereof based on disclosures from Josh on or before a June 4, 2021 meeting that occurred between Joshua and WILLIAMS.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 116

280.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS' conduct hereinabove constitute intentional acts designed to induce a breach of or otherwise disrupt the contractual relationship between PLAINTIFF and Part IV.

281.     PLAINTIFF is informed and believes, and based thereon alleges, that Joshua's conversion of PLAINTIFF'S membership interest in and capital account with Part IV, along with the wrongful termination of Dortch as an employee of Part IV constitutes an actual breach and disruption of PLAINTIFF'S contractual relationship with Part IV and its other members.

282.     PLAINTIFF is informed and believes, and based thereon alleges, that, as a direct and proximate cause of DEFENDANTS' actions described herein, PLAINTIFF has suffered harm has suffered economic damages in an amount to be proven at trial, but not less than $1,510,213.80 comprised of (a) $1,161,589.80 for the estimated value of PLAINTIFF'S 20% membership interest in Part IV, and (b) $348,624 for PLAINTIFF'S capital account including the forgiven PPP loan forgiveness properly accounted.

283.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS engaged in the foregoing activities out of "malice" as that term is defined in Civil Code § 3294 in that WILLIAMS facilitated and substantially assisted Joshua's breaches of fiduciary duty with intent to cause harm to PLAINTIFF and remove PLAINTIFF from Part IV, because WILLIAMS believed she could gain a title increase and substantial additional compensation, including a promised bonus of ▮▮▮▮▮▮▮, for assisting Joshua conceal his felony behavior, fraudulent tax filing, and for fabricating with Joshua an unlawful faith "for cause" termination of Dortch employment solely for the bad faith purposes of triggering a challenged provision in the Operating Agreement that would have allowed a "forfeiture" of PLAINTIFF'S membership interest, and PLAINTIFF is informed and believes, and based thereon alleges, that the actions described herein directly enriched Joshua, Barry, and WILLIAMS and directly harmed PLAINTIFF.

WHEREFORE, PLAINTIFF requests judgment as set forth hereinbelow.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## (Against WILLIAMS and DOES 1 through 10)

Second Amended Complaint, Page - 66

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 117

284.     PLAINTIFF repeats each and every allegation contained in Paragraphs 1 through 252, 254 through 261, 263 through 276, and 278 through 283, inclusive, of this Complaint and incorporates the same by this reference, as though set forth at length herein.

285.     PLAINTIFF is informed and believes, and based thereon alleges, that an economic relationship existed between PLAINTIFF and Part IV that contained a probability of future economic benefit to PLAINTIFF, evidenced by the other two members of Part IV, Rebel and GOL increasing the value of their capital accounts significantly in 2021 and 2022.

286.     PLAINTIFF is informed and believes, and based thereon alleges, that, at all times mentioned herein, DEFENDANTS, and each of them, knew about the relationship between PLAINTIFF and Part IV, that PLAINTIFF founded Part IV and converted resources and work portfolio of PLAINTIFF to Part IV.

287.     PLAINTIFF is informed and believes, and based thereon alleges, that the conduct described of DEFENDANTS described hereinabove constitute intentional acts designed to disrupt the economic relationship between PLAINTIFF and Part IV.

288.     PLAINTIFF is informed and believes, and based thereon alleges, that Joshua's conversion of PLAINTIFF'S membership interest in and capital account with Part IV, along with the wrongful termination of Dortch as an employee of Part IV in violation of Labor Code § 510 constitutes an actual disruption of PLAINTIFF'S contractual relationship with Part IV, as Dortch's employment was intrinsically linked to PLAINTIFF'S membership through the operating agreement of the company, and that Joshua perpetrated these acts with considerable assistance, planning, and support of DEFENDANTS.

289.     PLAINTIFF is informed and believes, and based thereon alleges, that, as a direct and proximate cause of WILLIAMS' interference with PLAINTIFF'S contractual relationship with Part IV and its other members, PLAINTIFF has suffered harm has suffered economic damages in an amount to be proven at trial, but not less than $1,510,213.80 comprised of (a) $1,161,589.80 for the estimated value of PLAINTIFF'S 20% membership interest in Part IV, and (b) $348,624 for PLAINTIFF'S capital account including the forgiven PPP loan forgiveness properly accounted.

290.     PLAINTIFF is informed and believes, and based thereon alleges, that WILLIAMS

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505     Exhibit 1
Page 118

engaged in the foregoing activities out of "malice" as that term is defined in Civil Code § 3294 in that WILLIAMS facilitated and substantially assisted Joshua's breaches of fiduciary duty with intent to cause harm to PLAINTIFF and remove PLAINTIFF from Part IV, because WILLIAMS believed she could gain a title increase and substantial additional compensation, including a promised bonus of $30,000-$60,000, for assisting Joshua conceal his felony behavior, fraudulent tax filing, and for fabricating with Joshua an unlawful faith "for cause" termination of Dortch employment solely for the bad faith purposes of triggering a challenged provision in the Operating Agreement that would have allowed a "forfeiture" of PLAINTIFF'S membership interest, and PLAINTIFF is informed and believes, and based thereon alleges, that the actions described herein directly enriched Joshua, Barry, and WILLIAMS and directly harmed PLAINTIFF.

WHEREFORE, PLAINTIFF requests judgment as set forth hereinbelow.

## FIFTH CAUSE OF ACTION

### NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against WILLIAMS and DOES 1 through 10)

291. PLAINTIFF repeats each and every allegation contained in Paragraphs 1 through 252, 254 through 261, 263 through 276, and 278 through 283, inclusive, of this Complaint and incorporates the same by this reference, as though set forth at length herein.

292. PLAINTIFF is informed and believes, and based thereon alleges, that an economic relationship existed between PLAINTIFF and Part IV that contained a probability of future economic benefit to PLAINTIFF, evidenced by the other two members of Part IV, Rebel and GOL increasing the value of their capital accounts significantly in 2021 and 2022.

293. PLAINTIFF is informed and believes, and based thereon alleges, that, at all times mentioned herein, DEFENDANTS, and each of them, knew about the relationship between PLAINTIFF and Part IV, that PLAINTIFF founded Part IV and converted resources and work portfolio of PLAINTIFF to Part IV.

294. PLAINTIFF is informed and believes, and based thereon alleges, that, at all times mentioned herein, DEFENDANTS, and each of them, had actual and/or constructive knowledge that the relationship would be disrupted if DEFENDANTS failed to act with reasonable care.

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 119

295. PLAINTIFF is informed and believes, and based thereon alleges, that Joshua's conversion of PLAINTIFF'S membership interest in and capital account with Part IV, along with the wrongful termination of Dortch as an employee of Part IV in violation of Labor Code § 510 constitutes an actual disruption of PLAINTIFF'S economic relationship with Part IV, as Dortch's employment was intrinsically linked to PLAINTIFF'S membership through the operating agreement of the company, and that Joshua perpetrated these acts with considerable assistance, planning, and support of DEFENDANTS.

296. PLAINTIFF is informed and believes, and based thereon alleges, that Joshua's conversion of PLAINTIFF'S membership interest in and capital account with Part IV, along with the wrongful termination of Dortch as an employee of Part IV in violation of Labor Code 510 constitutes an actual disruption of PLAINTIFF'S contractual relationship with Part IV, as Dortch's employment was intrinsically linked to PLAINTIFF'S membership through the operating agreement of the company, and that Joshua perpetrated these acts with considerable assistance, planning, and support of DEFENDANTS.

297. PLAINTIFF is informed and believes, and based thereon alleges, that, as a direct and proximate cause of WILLIAMS' interference with PLAINTIFF'S contractual relationship with Part IV and its other members, PLAINTIFF has suffered harm has suffered economic damages in an amount to be proven at trial, but not less than $1,510,213.80 comprised of (a) $1,161,589.80 for the estimated value of PLAINTIFF'S 20% membership interest in Part IV, and (b) $348,624 for PLAINTIFF'S capital account including the forgiven PPP loan forgiveness properly accounted.

WHEREFORE, PLAINTIFF prays for judgment as set forth hereinbelow.

## DEMAND FOR JURY TRIAL

PLAINTIFF demands a jury trial on all issues to which it is entitled to a jury.

## PRAYER

WHEREFORE, PLAINTIFF prays for judgment against Defendants, and each of them as follows:

## ON THE FIRST, SECOND, THIRD, AND FOURTH CAUSES OF ACTION:

1. For compensatory damages in an amount to be proven at trial, but in no event less than

Second Amended Complaint, Page - 69

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 120

$1,510,213.80;

   2.  For punitive damages pursuant to Civil Code § 3294;

**ON THE FIFTH CAUSE OF ACTION:**

   3.  For compensatory damages in an amount to be proven at trial, but in no event less than $1,510,213.80;

**ON ALL CAUSES OF ACTION:**

   4.  For pre-judgment interest pursuant to extent permitted by law;

   5.  For the costs of suit herein incurred; and

   6.  For such other and further relief as the Court deems just and proper.

Dated: January 17, 2024            LAW OFFICES OF JAMES B. DEVINE, APC

By: */s/ James B. Devine*
      James B. Devine
      Attorneys for Plaintiff
      SLY SPECTRUM LLC, a Texas
      limited liability company

Second Amended Complaint, Page - 70

LAW OFFICES OF JAMES B. DEVINE, APC
418 Chapala Street, Suite B
Santa Barbara, California 93101
Tel: 805-845-7500
Fax: 805-845-7505

Exhibit 1
Page 121

# EXHIBIT C

Exhibit 1
Page 122



120 Broadway, Suite 900, New York, NY 10271

March 19, 2024

**VIA EMAIL**:  Thomasin K. Bernhardt (thomasin@bnsklaw.com)

Thomasin K. Bernhardt
Brown Neri Smith & Khan, LLP
600 Wilshire Blvd., Suite 1750
Los Angeles, CA 90017

| | | |
|---|---|---|
| Insured | : | Part Four, LLC |
| Coverage | : | Employment Practices Liability |
| Policy No. | : | EX01-000743-02 |
| Claim No. | : | 2023769630 |

Dear Ms. Bernhardt:

Please accept the following as Clear Blue Specialty Insurance Company's ("Clear Blue") acknowledgement of the above referenced matter.  The purpose of this letter is to analyze coverage afforded by Clear Blue to its Insureds under the above referenced policy number ("Policy").  Please note that words and phrases that appear in bold have special meaning and such terms are defined in the Policy.  Please refer to your Policy.  It is my understanding that you represent Part Four, LLC ("Part Four").  Please forward this correspondence to all pertinent personnel at Part Four.

We are in receipt of a Complaint, dated August 25, 2023, a First Amended Complaint, dated September 14, 2023, and a partially redacted copy of a Second Amended Complaint, dated January 17, 2024 (collectively, "the Williams Complaints"), each of which was filed in Los Angeles County Superior Court by attorney James B. Devine, counsel representing Sly Spectrum, LLC ("Plaintiff"), alleging claims against Part Four's employee, Katie Williams ("Williams") and Does 1 through 10, inclusive.  This matter was first reported to Clear Blue on February 26, 2024.

**As discussed in greater detail below, we regretfully must advise you that the Policy does not afford coverage for this matter, including defense cost coverage.**

<u>**The Policy**</u>

Clear Blue provides Part Four with Employment Practices Liability coverage within the Policy.  The Employment Practices Liability Coverage Part of the Policy ("EPL Part") includes a limit of liability of $1,000,000 subject to a $75,000 retention for each **Claim**.  The Policy maintains a sublimit of $250,000 for **Wage and Hour Claims** subject to the same $75,000 retention.  Subject to its terms and conditions, the

1

Exhibit 1
Page 123



120 Broadway, Suite 900, New York, NY 10271

Policy covers **Claims** first made and reported to Clear Blue during the Policy Period from May 15, 2023, to May 15, 2024.

<u>**The Claim**</u>

Reference to the allegations in this matter is not intended to suggest that the allegations have any factual or legal basis. A review of such allegations, however, is necessary to determine coverage afforded under the Policy.

In the Williams Complaints, Plaintiff alleges its sole member and manager, Jonathan Dortch ("Dortch"), formed Part Four with Joshua Golsen ("Joshua") in 2013 as a marketing company geared toward the entertainment industry. Plaintiff alleges Barry Golsen ("Barry"), Joshua's father, formed GOL Capital, LLC ("GOL"), to invest capital in Part Four in exchange for a 25% equity share in Part Four. Plaintiff alleges it invested capital in Part Four in exchange for a 20% equity share of Part Four, and that Joshua invested capital through his entity, Rebel Bass, LLC ("Rebel"), in exchange for a 55% equity share of Part Four. Plaintiff claims Dortch was an owner and co-founder of Part Four. Plaintiff alleges that Joshua and Barry convinced Dortch through fraud and duress to sign an operating agreement for Part Four that included numerous unfavorable terms for Dortch to the advantage of the other owners of Part Four.

Plaintiff alleges that Part Four hired defendant Williams in 2017 to handle its human resources and operational needs due to numerous complaints of sexual harassment and gender discrimination against Joshua. Plaintiff alleges that Williams aided and abetted Joshua in falsifying tax returns and financial books on behalf of Part Four. Plaintiff alleges that in June 2021 Joshua attempted to force Dortch to accept a buy-out of his equity in Part Four as retaliation for Dortch questioning Part Four's fraudulent financial and tax documentation. Dortch rejected the buy-out offer, but Part Four, with Williams' assistance, terminated Dortch's employment, which Part Four misrepresented as "at-will," as opposed to his status as an equity owner and co-founder of Part Four. Further, Plaintiff alleges Williams assisted in locking Dortch out of Part Four's network and his Part Four email, and otherwise prevented Dortch from accessing Part Four or performing any services for Part Four.

Plaintiff raises five causes of action against Williams: Aiding and Abetting Breach of Fiduciary Duty, Aiding and Abetting Conversion, Intentional Interference with Contractual Relationship, Intentional Interference with Prospective Economic Advantage, and Negligent Interference with Prospective Economic Advantage. Plaintiff demands compensatory damages of no less than $1,510,213.80, punitive damages, interest, costs, and all other relief the court deems just and proper.

In the Second Amended Complaint, Plaintiff also alleges it and its member and manager, Dortch, commenced a lawsuit on August 11, 2021, in Los Angeles County Superior Court ("the Related Suit") against Part Four, and its owners, Joshua, Barry, Rebel, and GOL (collectively, "the Related Suit

Exhibit 1
Page 124



120 Broadway, Suite 900, New York, NY 10271

Defendants"). We are in receipt of pleadings filed in the Related Suit by Plaintiff and Dortch against the Related Suit Defendants, including a Complaint, dated August 11, 2021, a First Amended Complaint, dated November 17, 2021, and a Second Amended Complaint, dated March 4, 2022 (collectively, "the Related Suit Complaints").

In the Related Suit Complaints, Plaintiff and Dortch repeat the allegations raised in the Williams Suit Complaints, including Plaintiff's narrative regarding co-founding Part Four, investment in Part Four by Plaintiff, Joshua, Barry, and their respective entities, hiring Williams, the Related Suit Defendants' attempt to force Plaintiff to accept a buy-out, and Dortch's eventual wrongful termination. In the Related Suit, Plaintiff and Dortch raise twelve causes of action arising from the foregoing allegations: Fraud (Intentional Misrepresentation and Concealment), Rescission of Operating Agreement, Breach of Operating Agreement, Breach of Fiduciary Duty, Declaratory Relief, Wrongful Discharge, Violation of California Labor Code § 1102.5, Unlawful, Unfair, or Fraudulent Business Practices, Conversion, Failure to Pay All Wages Due, Violation of California Labor Code § 203, and Orders Requiring Disclosure of Information and Documentation. In concluding the Related Suit Complaints, Plaintiff and Dortch demand compensatory damages of no less than $2,021,177.10 on their first cause of action and $1,301.256.90 on their fourth and fifth causes of action, punitive damages, declaratory judgment, past and future earnings, punitive damages, interest, costs, attorney's fees, and all other relief the court deems just and proper.

## Coverage Analysis

Insuring Agreement Section I.A. of the EPL Part states that Clear Blue "will pay **Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period, and reported to **Us** pursuant to the terms of this Policy, for a **Wrongful Act**."

Further, Insuring Agreement Section I.C. of the EPL Part states as follows:

> We will reimburse **Defense Costs** which the **Insured** is legally obligated to pay be reason of a **Wage and Hour Action** first made against the **Insured** during the **Policy Period**, or if applicable, the Extended Reporting period and reported to us pursuant to the terms of this Policy, for a **Wage and Hour Wrongful Act** taking place prior to end of the **Policy Period**. The maximum sublimit of liability under this section for all covered **Defense Costs** for **Wage and Hour Actions**, combined, shall be the Wage and Hour Costs Sublimit of Liability set forth in the Declarations.

Pursuant to Definitions Section II.A, E, and J of the EPL Part:

A. "**Claim**" means, in part:

Exhibit 1
Page 125



120 Broadway, Suite 900, New York, NY 10271

1. A written demand against the **Insured** for monetary damages or non-monetary (including injunctive) relief, including a written demand to toll or waive a statute of limitations;

2. A civil, judicial, administrative, regulatory or arbitration proceeding or a formal governmental investigation against the **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

. . .

for a **Wrongful Act**, brought by or on behalf of any past, present, future or prospective **Employee**, or an applicant for employment with the **Insured Organization**, in their capacity as such; or for a **Third Party Wrongful Act.**

E.  "**Retaliation**" means an **Insured's** actual or alleged adverse or harmful action in return for perceived injuries or wrongs perpetrated as a response to:

1. The disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by the **Insured** where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder;

2. The actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights;

3. The filing of any claim under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistleblower" provision of any law; or

4. Any legally-protected employee work stoppage or slowdown.

H.  "**Wage and Hour Action**" means:

1. A written demand against the **Insured** for damages or other relief; or

4

Exhibit 1
Page 126



120 Broadway, Suite 900, New York, NY 10271

    2.  A civil, judicial, administrative, regulatory, or arbitration proceeding or a formal governmental investigation against you seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

    3.  brought by or on behalf of one or more Employees alleging any **Wage and Hour Wrongful Act**.

I.  "**Wage and Hour Wrongful Act**" means any actual or alleged violation(s) of state, local or foreign statutory or common law (including, but not limited to the Fair Labor Standards Act or Wage Payment and Collection Act), or any amendments thereto, or rule or regulations promulgated thereunder governing wage, hour and payroll policies and practices including, but not limited to:

    1.  The refusal, inability or failure of an **Insured Organization** or **Team Member** to pay wages or overtime pay, off-the- clock work, on-call time compensation, compensation for waiting time and dressing time, minimum wage compensation, reimbursement of expenses or any amounts representing such wages or pay or expenses, for services rendered or time spent in connection with work related activities;

    2.  Improper pay deductions taken by an **Insured Organization** or **Team Member** from any employee or purported employee, including but not limited to garnishments and withholdings;

    3.  Improper classification of any **Employee** or purported **Employee** or improper or failure to maintain accurate records;

    4.  Child labor;

    5.  Pay equity or comparable worth;

    6.  Failure to provide or enforce any legally required rest or meal breaks; or

    7.  Any similar practices, policies, or procedures.

However, **Wage and Hour Wrongful Act** does not include actual or alleged violations of the Equal Pay Act of 1963, and any amendments thereto.

J.  "**Wrongful Act**" means any:

Exhibit 1
Page 127



120 Broadway, Suite 900, New York, NY 10271

1. Wrongful dismissal, discharge or termination of employment, including but not limited to dismissal, discharge or termination resulting from a breach of an express or implied contract relating to employment, whether actual or constructive;

2. Harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment, or unlawful workplace harassment, including workplace harassment by any non-employee;

3. Employment discrimination of any protected status established under federal, state or local law, ordinance or public policy;

4. **Retaliation**;

5. Abusive or hostile work environment;

6. Employment-related misrepresentation;

7. Wrongful failure to employ or promote, wrongful deprivation of career opportunity, wrongful demotion, wrongful discipline, or failure to grant tenure;

8. Negligent employee evaluation;

9. Violation of the Uniformed Services Employment and Reemployment Rights Act or the Family and Medical Leave Act;

10. Employment related wrongful infliction of emotional distress, mental anguish, or humiliation;

11. Failure to provide or enforce adequate or consistent employment policies and procedures relating to any matters described in paragraphs 1-10;

12. Violation of an individual's civil rights if such conduct relates to matters described in paragraphs 1-9, including, but not limited to, any violation of the Civil Rights Act of 1866 or 42 U.S.C. Section 1983;

13. Libel, slander, defamation, false or wrongful imprisonment, invasion of privacy and other personal injury allegations, but only if such conduct is alleged in addition to or as part of any matters described in paragraphs 1-9; or

6

Exhibit 1
Page 128



120 Broadway, Suite 900, New York, NY 10271

14. Negligent hiring, retention or supervision, but only if such conduct is alleged in addition to or as part of any matters described in paragraphs 1-9

actually or allegedly committed by an **Insured** in such capacity.

Pursuant to Definitions Section II.G of the General Terms and Conditions:

G. **Employee**" means any natural person whose labor or service was, is or shall be engaged and directed by the **Insured Organization**, including full-time, part-time, seasonal, leased and temporary employees.

**Employee** also means any:

1. Volunteers or interns of the Insured Organization in their capacity as such; and

2. Individual who is an **Independent Contractor** while performing services on your behalf or at your direction.

\*\*\*

As a preliminary matter, the Williams Complaints are brought by Plaintiff Sly Spectrum, LLC. Plaintiff is a legal entity and not a natural person. For a **Claim** to be made under insuring clauses A and C, the matter must be brought by an **Employee,** as defined by the Policy. Hence the **Claim** must be made by a natural person. **Here, the Claim is made by a legal entity and not a natural person, and thus, there is no coverage under the Policy for this matter.**

While the analysis above is dispositive of coverage I next, direct your attention to Section VI. of the General Terms and Conditions of the Policy ("the GTC"), which provides as follows:

A. Single Claims

All **Claims** under the **Coverage Parts** which arise out of the same **Wrongful Act** or **Interrelated Wrongful Act** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against the **Insured**, regardless of whether such date is before or during the **Policy Period**. In no event shall a single lawsuit or proceeding constitute more than one **Claim.**

7

Exhibit 1
Page 129



sedgwick®

120 Broadway, Suite 900, New York, NY 10271

Both the Williams Complaints and the Related Case Complaints constitute **Claims**, as they commence civil proceedings alleging **Wrongful Acts** against **Insureds** seeking monetary damages and other relief. Because the Williams Complaints and the Related Case Complaints both arise out of the same **Wrongful Acts**, they shall be deemed one **Claim** first made on the date the Original Complaint in the Related Suit was sent to, and received by, Part Four. Based on the court's docket in the Related Suit, Part Four received the Original Complaint in the Related Suit no later than October 12, 2021, when Part Four filed a demurrer to the Original Complaint in the Related Suit.

The Insuring Agreement affords coverage for **Claims** first made during the Policy Period, but the **Claims** stated in the Williams Complaints and the Related Suit Complaints were first made before the effective date of the Policy and not first made within the policy period. **Accordingly, the Claims raised in the Williams Complaints and the Related Suit Complaints do not trigger coverage under the Insuring Agreement, and the Policy affords no coverage for the Claims raised in the Williams Complaints and the Related Suit Complaints.**

\*\*\*\*

I next direct your attention to Section III. Exclusions of the Policy, which states, in pertinent part:

We shall not be liable under this **Coverage Part** to pay any **Loss** on account of that portion of any **Claim** made against you:

C.    Prior Notice

Based upon, arising out of, attributable to any fact, circumstance, or **Wrongful Acts** that, before the inception date of this Policy, was the subject of any notice given and accepted under any prior employment practices liability or comparable insurance policy.

The **Claims** raised in the Williams Complaints and the Related Suit Complaints were received by Part Four prior to the inception date of this Policy. Pursuant to Section III.C. of the Policy, Clear Blue hereby reserves the right to disclaim coverage for the **Claims** raised in the Williams Complaints and the Related Suit Complaints to the extent they were the subject of any notice given and accepted under any prior employment practices liability or comparable insurance policy.

D.    Contractual Liability

Based upon, arising out of, or attributable to any liability under any written contract or agreement, provided this exclusion shall not apply to:

Exhibit 1
Page 130



120 Broadway, Suite 900, New York, NY 10271

    1.   The extent that liability would have been incurred in the absence of such contract or agreement; or

    2.   **Defense Costs**

Plaintiff claims in the Williams Complaints that it is a co-founder and equity owner of Part Four and is thus entitled to compensatory damages and other relief arising out of his ownership of Part Four. Pursuant to Section III.D. of the Policy, Clear Blue hereby reserves the right to disclaim coverage for the **Claims** raised in the Williams Complaints and the Related Suit Complaints to the extent they are based upon, arising out of, or attributable to any liability under any written contract or agreement, including Part Four's bylaws, operating agreement, or any other written contract or agreement in place between Plaintiff and Part Four or its other owners, provided that this exclusion does not apply to the extent that liability would have been incurred in the absence of such contract or agreement; or **Defense Costs**.

F.   Conduct

    Based upon, arising out of, or attributable to any willful violation of law, or any dishonest, deliberately fraudulent or criminal act committed by any **Insured**; if evidenced by a final and non-appealable adjudication in the underlying action or proceeding.

Plaintiff alleges **Claims** arising from willful violations of the law and dishonest and fraudulent acts by Joshua, Barry, and Williams. Clear Blue hereby reserves all rights, pursuant to Section III. F., to disclaim coverage for any **Loss** on account of any final and non-appealable adjudication in the underlying action or proceeding finding that an **Insured** committed any willful violation of law, or any dishonest, deliberately fraudulent or criminal act.

G.   Wage and Hour

    Based upon, arising out of, or attributable to any **Wage and Hour Wrongful Act**, provided this exclusion shall not apply to:

    1.   The Equal Pay Act of 1963 and any amendments thereto;

    2.   Any **Claim** for **Retaliation**; or

    3.   **Defense Costs** provided under and limited to the Wage and Hour Cost Sublimit of Liability under Insuring Agreement I.C (Defense for Wage and Hour Actions).

Exhibit 1
Page 131



120 Broadway, Suite 900, New York, NY 10271

Plaintiff alleges it is owed unpaid compensation from Part Four—a **Wage and Hour Wrongful Act**. Clear Blue hereby reserves all rights, pursuant to Section III.G., to exclude coverage for any **Loss** based upon, arising out of, or attributable to any **Wage and Hour Wrongful Act**, provided that this reservation of rights shall not apply to **Defense Costs** provided under and limited to the Wage and Hour Cost Sublimit of Liability under Insuring Agreement I.C. (Defense for Wage and Hour Actions).

If you have not already done so, we recommend placing any other applicable insurers on notice of this matter.

Clear Blue reserves its right to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all of the provisions, terms, conditions, exclusions, endorsements, definitions set forth in the Policy and any additional facts that may come to our attention. As such, the above analysis does not purport to be a comprehensive analysis of all potentially applicable coverage issues and policy provisions. The mention of specific coverage issues of policy provision does not negate the relevance of any others. Similarly, nothing herein shall be construed as an admission of coverage or liability by Clear Blue, or as a waiver, estoppel or modification to the terms, conditions or limitations of the Policy and Clear Blue hereby reserves all rights, remedies and defenses, legal and equitable.

Pursuant to California law, if you believe all or part of the claim has been wrongfully denied or rejected, you may contact the California Department of Insurance at the following address and telephone number:

California Department of Insurance
Claims Service Bureau
300 S. Spring Street, 11th Floor
Los Angeles, California 90013
(213) 346-6523
(800) 927-4357
www.insurance.ca.gov

If you have any information that you believe would impact the above analysis, please forward such information to my attention. In addition, if you have any questions or if you would like to discuss this matter further, do not hesitate to contact me.

10

Exhibit 1
Page 132



sedgwick ®

120 Broadway, Suite 900, New York, NY 10271

Sincerely,

*David B. Belk*

David B. Belk, Esq.
Professional Liability Claims Advisor
(504) 429-0734
david.belk@sedgwick.com

11

Exhibit 1
Page 133

# EXHIBIT D

Exhibit 1
Page 134



March 12, 2025

**_Via Email and U.S. Mail_**

David B. Belk, Esq.
Sedgwick
120 Broadway, Suite 900
New York, NY 10271
david.belk@sedgwick.com

      Insured: Part Four, LLC
      Coverage: Employment Practices Liability
      Policy No.: EX01-000743-02
      Claim No.: 2023769630

Dear Mr. Belk,

      We write in response to Clear Blue Specialty Insurance Company's ("Clear Blue") March 19, 2024 denial of coverage for the above-referenced claim. On December 3, 2024, the Part Four, LLC ("Part Four") lawsuits were globally settled. We understand that Clear Blue has denied coverage and that it disagrees with Part Four on coverage issues. We write to resolve the coverage dispute, put this matter behind our client, and avoid any coverage lawsuits otherwise.

      Part Four has incurred significant legal fees because of the two underlying lawsuits. Both the defense costs incurred, and the settlement amount exceed the applicable policy limits of $1,000,000. Part Four is willing to resolve this dispute for $775,000. For the reasons set forth below, we believe that Clear Blue faces liability should a coverage lawsuit be necessary.

### Katie Williams Right to Reimbursement of Legal Costs

      First, Clear Blue fails to recognize that Ms. Williams is an employee of Part Four entitled to indemnification of her attorneys' fees incurred because of the lawsuit against her. *See* Labor Code § 2802. "California has a strong public policy that favors the indemnification (and defense) of employees by their employers for claims and liabilities resulting from the employees' acts within the course and scope of their employment.' Labor Code section 2802 codifies this policy and gives an employee a right to indemnification from his or her employer." *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 952. "Section 2802 ... requires an employer to indemnify an employee who is sued by third persons for conduct in the course and scope of his or her employment, including paying any judgment entered and

11601 Wilshire Blvd., Suite 2080, Los Angeles, California 90025 | tel. (310) 593-9890  fax (310) 593-9980
650 Town Center Drive, Suite 520, Costa Mesa, CA 92626 | tel. (949) 676-0030
BNSLAW.COM

Exhibit 1
Page 135



attorney's fees and costs incurred in defending the action. [Citations.] As long as the employee is acting within the scope of his or her employment, the right to indemnity is not dependent upon a finding that the underlying action was unfounded." *Nicholas Lab'ys, LLC v. Chen* (2011) 199 Cal.App.4th 1240, 1247.

Ms. Williams was an employee of Part Four. (*See* Los Angeles Superior Court Case No. 23STCV20562, Second Amended Complaint ("SAC"), at ¶ 113.) Sly Spectrum, as a third party, sued Ms. Williams directly for acts within the scope of her employment. The entire basis for Ms. Williams being sued by Sly Spectrum is for her actions as Director of Operations and Human Resource Representative of Part Four. *See generally* SAC.

If Part Four denied Ms. Williams the right to reimbursement of her legal fees under Labor Code § 2802, it would have been sued by an employee for "the refusal…or failure…to pay reimbursement of expenses, for services rendered or time spend in connection with the work related activities," which constitutes a "Claim" for a "Wage and Hour Wrongful Act." This separate action is distinct from any claim regarding Sly Spectrum or Jonathan Dortch's lawsuit against Part Four.

Part Four did not need to engage in extra unnecessary litigation and agreed to reimburse Ms. William's before she had to sue it. Accordingly, Clear Blue's insurance obligations provide for reimbursement of Ms. Williams' legal costs pursuant to Labor Code § 2802.

**Sly Spectrums' Suit In Substance is One by Jonathan Dortch**

Additionally, we disagree with Clear Blue's denial of coverage on the basis that the claim was made by Sly Spectrum, and not a natural person "Employee." As the complaint alleges throughout, Ms. Williams' actions were directed against employee Jonathan Dortch. *See* SAC ¶ 132 ("WILLIAMS…assisted with planning a surprise 'at-will' termination of Dortch."); ¶ 133 ("WILLIAMS assisted and provided encouragement to Joshua in his refusals to provide the Part IV books and records that Dortch had requested on behalf of Plaintiff."); ¶ 144 ("WILLIAMS violated this policy by repeatedly acting insubordinately to Dortch, her co-manager, behind the back of Dortch to Joshua to disingenuously smear Dortch."); ¶ 151 ("Joshua and WILIAMS caused the password for Dortch's company email (dortch@part4.com) to be changed from the Google G Suite administrator panel without Dortch's consent or knowledge."); *see also* ¶¶ 255, 257-259, 263, 264, 272, 273, 276, 281, 283, 288, 290, 295, and 296.

The claims are based, in substantive part, on Jonathan Dortch's employment

11601 Wilshire Blvd., Suite 2080, Los Angeles, California 90025 | *tel. (310) 593-9890 fax (310) 593-9980*
650 Town Center Drive, Suite 520, Costa Mesa, CA 92626 | *tel. (949) 676-0030*
BNSKLAW.COM

Exhibit 1
Page 136



and his ownership of Sly Spectrum, LLC. Without the actions taken against Jonathan Dortch, none of the claims would exist here against Ms. Williams, or Part Four. As further stated in the SAC, Dortch is the sole manager, member, and employee of Sly Spectrum. In substance, the claims are brought by Dortch, Part Four's employee.

Part Four is willing to resolve this dispute without the need for a coverage lawsuit. Part Four offers to settle all claims for $775,000. If no settlement can be reached, Part Four will sue Clear Blue for breach of contract and bad faith, and seek pre-judgment interest, attorneys' fees, and punitive damages far exceeding the policy limits. Please let me know by March 26, 2025, if Clear Blue will accept this offer. If you would like to discuss anything further, I can be reached directly at (310) 593-9898.

Sincerely,

Ethan J. Brown

11601 Wilshire Blvd., Suite 2080, Los Angeles, California 90025  |  tel. (310) 593-9890  fax (310) 593-9980
650 Town Center Drive, Suite 520, Costa Mesa, CA 92626  |  tel. (949) 676-0030
BNSKLAW.COM

Exhibit 1
Page 137

# EXHIBIT E

Exhibit 1
Page 138

**sedgwick**

120 Broadway, Suite 900, New York, NY 10271

March 18, 2025

VIA EMAIL: Ethan J. Brown (ethan@bnsklaw.com)

Ethan J. Brown
11601 Wilshire, Blvd., Suite 2080
Los Angeles, California 90025

| | |
|---|---|
| Insured: | Part Four, LLC |
| Coverage: | Employment Practices Liability |
| Policy No.: | EX01-000743-02 |
| Claim No.: | 2023769630 |
| Claimant: | Sly Spectrum, LLC |

Dear Mr. Brown:

As you know, Sedgwick Claims Management Services, Inc., is the third-party claims administrator for Clear Blue Specialty Insurance Company ("Clear Blue"), which issued Policy No. EX01-000743-02 ("the Policy") to your client, Part Four, LLC ("Part Four"). We issued a letter dated March 19, 2024 ("the Declination Letter"), declining coverage for **claims** raised in a Lawsuit filed by Sly Spectrum, LLC ("Sly Spectrum"), against Katie Williams ("Williams") and Does 1 through 10, inclusive, in Los Angeles County Superior Court, bearing case number 23STCV20562 ("the Williams Suit"). We are in receipt of your letter, dated March 12, 2025, responding to the Declination Letter and disputing our coverage determination. This letter is offered in response.[1]

*The Claims in the Williams Suit Were Made Before the Policy Commenced*

As a threshold matter, I note that your letter omits facts and Policy language dispositive of coverage. The Williams Suit arose out of the same **Wrongful Acts** and factual allegations at issue in an earlier lawsuit, commenced on August 11, 2021, before the Policy incepted. As such, I will first address this issue before turning to the arguments raised in your letter.

Section I.A. of the Employment Practices Liability Part of the Policy ("the EPL Part") states that Clear Blue "will pay **Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the **Insured** during the **Policy Period.**" The Policy Period is May 15, 2023, to May 15, 2024. Further, Section VI. of the General Terms and Conditions of the Policy ("the GTC") provides that all **claims** "which arise out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** *and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against the **Insured**, regardless of whether such date is before or during the **Policy Period**.*" (emphasis added). Section II. of the EPL Part defines a **Wrongful Act** as, among other things, "[w]rongful dismissal, discharge or termination of employment, including but not limited to dismissal, discharge or termination resulting from a breach of an express or implied contract relating to employment, whether actual or constructive," and "[r]etaliation." Section II. of the EPL Part defines **Interrelated Wrongful Acts** as "**Wrongful Acts** that have as a common nexus any fact, circumstance,

---

[1] This letter is intended to supplement, but not supersede, the Declination Letter. Clear Blue maintains and reiterates all coverage disclaimers and reservations of rights stated within the Declination Letter.

Exhibit 1
Page 139

sedgwick

120 Broadway, Suite 900, New York, NY 10271

situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."

Aside from the Original Complaint, the First Amended Complaint and the redacted Second Amended Complaint filed in the Williams Suit, we are also in receipt of a Complaint, dated August 11, 2021, a First Amended Complaint, dated November 17, 2021, and a Second Amended Complaint, dated March 4, 2022, filed by Sly Spectrum and its owner, Jonathan Dortch, against Part Four, and its owners, Joshua Golsen ("Joshua"), Barry Golsen, Rebel Bass, LLC, and GOL Capital, LLC (collectively, "the 2021 Suit Defendants"), in Los Angeles County Superior Court, bearing case number 21STCV29695 ("the 2021 Suit").

Both the Williams Suit and the 2021 Suit arise from the same **Wrongful Acts** and share a common nexus of facts, circumstances, situations, events, transactions, and causes. The **Wrongful Acts** common to both lawsuits include but are not limited to: alleged retaliation against Dortch for complaining about potential violations of law and the alleged wrongful discharge of Dortch. Further, both suits arise from Joshua's alleged breach of fiduciary duty owed to Sly Spectrum, and conversion of Sly Spectrum's membership interest in Part Four and Sly Spectrum's capital account with Part Four. In the 2021 Suit, these are each raised as causes of action against Part Four and/or Joshua, and in the Williams Suit, Sly Spectrum raises cause of action against Williams for aiding and abetting Part Four and/or Joshua in the causes of action raised in the 2021 Suit.

Moreover, there are numerous factual allegations common to both the Williams Suit and the Related Suit. For instance, the wrongful discharge claim in the 2021 Suit is based on Dortch's allegation that he was terminated in retaliation for requesting access to financial statements and complaining about suspected violations of local, state, or federal law. In the Williams Suit, Sly Spectrum alleges that Williams "[a]ssisted Joshua with coordinating the wrongful termination of Dortch after Dortch began to question the financial condition of Part Four[.]" Likewise, in the 2021 Suit, Sly Spectrum alleges Part Four converted its membership interest and capital account in Part Four, and, in the Williams Suit, Sly Spectrum contends that Williams "gave substantial assistance or encouragement to Joshua in converting PLAINTIFF'S membership interest in and capital account with Part Four." Further, in the Williams Suit, Sly Spectrum alleges that the assistance Williams provided to Part Four in the wrongful discharge and conversion at issue in the 2021 Suit amounted to claims against Williams for intentional and negligent interference with Sly Spectrum's contractual relationship and prospective economic advantage.

The foregoing allegations are only a few of the myriad circumstances and claims common to both proceedings and demonstrate that the Williams Suit and the 2021 Suit arise from common **Wrongful Acts**—wrongful discharge and **retaliation**, among others—and share a common nexus of facts and circumstances.[2] Consequently, both the 2021 Suit and the Williams Suit are deemed one **Claim** first made on the date the Original Complaint in the 2021 Suit was sent to, and received by, Part Four. This date is no later than October 12, 2021, when Part Four filed a demurrer to the Original Complaint in the 2021 Suit. Because the **Claims** at issue were first made before the effective date of the Policy, Clear Blue maintains its position that the Policy affords no coverage for the Claims raised in the Williams Suit and the 2021 Suit.

---

[2] The common nexus of the 2021 Suit and the Williams Suit seems to be further bolstered by the consolidation of the two proceedings in the 2021 Suit docket. I have requested, but not received, a copy of the Joint Ex Parte Application to Consolidate Related Cases and Continue Trial Date filed on behalf of all parties on March 4, 2024.

Exhibit 1
Page 140

**sedgwick**

120 Broadway, Suite 900, New York, NY 10271

\*\*\*\*

While the above analysis is dispositive of coverage, I will also address the arguments raised in your letter.

*The Policy Provides No Coverage for Williams' Hypothetical Attorney's Fee Reimbursement Claim*

In your letter you contend that, in declining coverage, Clear Blue failed to recognize that Ms. Williams had a right to reimbursement of legal costs from Part Four as its employee. Although Williams never made a claim for reimbursement of legal costs to Part Four, you suggest that Williams' hypothetical claim provides a basis for coverage under the Policy.

As an initial matter, Insuring Agreement I.A. of the EPL Part covers "**Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the **Insured** during the **Policy Period** . . . for a **Wrongful Act.**" The Policy provides several definitions of a **claim**, including a "written demand against the **Insured** for monetary damages," and "a civil . . . proceeding . . . against the **Insured.**" Common to each of the definitions of a **claim** is an actual, rather than hypothetical, demand or legal proceeding, without which, the Policy provides no coverage. Clear Blue was never presented with any **claim** by Williams against Part Four. As such, Clear Blue had no obligation to provide coverage for a non-existent claim. Regardless, your argument assumes that a demand from Williams for reimbursement of costs defending the Williams Suit would be covered. However, the last clause of Insuring Agreement I.A. requires a **claim** against the **Insured** be made "for a **Wrongful Act.**" The Policy sets forth several acts or omissions defined as a **Wrongful Act**, none of which include a claim for reimbursement of legal fees. In the absence of a **claim** first made against the **Insured** during the **Policy Period** for a **Wrongful Act**, the Policy provides no coverage.

In another letter, issued March 18, 2025, you amend your argument by contending that the hypothetical legal reimbursement claim Williams could have, but did not, pursue against Part Four constitutes a **Wage and Hour Action** under Insuring Agreement I.C. As with coverage under Insuring Agreement I.A., coverage under Insuring Agreement I.C. requires an *actual* **Wage and Hour Action**, which is defined as either "a written demand" or "a civil, judicial, administrative, regulatory, or arbitration proceeding," first made against the **Insured** during the **Policy Period**. Clear Blue was never presented with any **Wage and Hour Action** by Williams against Part Four. As such, Clear Blue had no obligation to provide coverage for the non-existent reimbursement claim.

This argument also fails to acknowledge that Insuring Agreement I.C. provides coverage for **Defense Costs** only up to the Policy's $250,000 **Wage and Hour Claims** sublimit. Under the hypothetical scenario presented by your argument, had Williams pursued Part Four for reimbursement of legal expenses, neither the costs of her legal fees nor the settlement paid to Sly Spectrum or Dortch would fall within the definition of **Defense Costs**. And since Williams did not pursue a **Wage and Hour Action** against Part Four, it is apparent that Part Four incurred no **Defense Costs** defending Williams' hypothetical legal fee reimbursement action, much less **Defense Costs** in excess of the **Wage and Hour Claims** sublimit.

Moreover, this argument again ignores the language of Section VI. of the General Terms and Conditions of the Policy, which states: "All **Claims** . . . which arise out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against the **Insured**, regardless of whether

Exhibit 1
Page 141

sedgwick

such date is before or during the **Policy Period**." Even if Williams' hypothetical claim for reimbursement of legal fees constituted a **Wrongful Act** or a **Wage and Hour Wrongful Act**—which is denied—it would still be deemed one **claim** with the 2021 Suit and be deemed first made before the Policy Period, as both arose out of a common nexus of facts, circumstances, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

*The Plain Language of the EPL Part Limits Coverage to Claims Made by Natural Persons*

Lastly, you argue that the Williams Suit, filed by Sly Spectrum is "in substance" a lawsuit by Dortch, Part Four's former employee, because Dortch was the sole manager, member, and employee of Sly Spectrum. As such, you suggest that Clear Blue was incorrect in disclaiming coverage for the Williams Suit because it was not made by an **employee**, defined as "a natural person," and thus does not qualify as a **claim** or a **wage and hour action**.

While you correctly suggest that a juridical person, such as a limited liability company, is a legal fiction, both the Policy and the law respect that legal fiction and distinguish between natural and juridical persons. For purposes of defining who is an **employee**, the Policy does not distinguish between a sole member LLC or a publicly traded corporation—neither are deemed an **employee**. As such, the Williams Suit, filed by a limited liability company, does not constitute a **claim**. In the absence of a **claim** first made against the **Insured** during the **Policy Period** for a **Wrongful Act**, the Policy provides no coverage.

For the foregoing reasons, the Policy affords no coverage for the Williams Suit or the 2021 Suit. Clear Blue maintains and reiterates its declination of coverage.

If you have not already done so, we recommend placing any other applicable insurers on notice of this matter.

Clear Blue reserves its right to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all of the provisions, terms, conditions, exclusions, endorsements, definitions set forth in the Policy and any additional facts that may come to our attention. As such, the above analysis does not purport to be a comprehensive analysis of all potentially applicable coverage issues and policy provisions. The mention of specific coverage issues of policy provision does not negate the relevance of any others. Similarly, nothing herein shall be construed as an admission of coverage or liability by Clear Blue, or as a waiver, estoppel or modification to the terms, conditions or limitations of the Policy and Clear Blue hereby reserves all rights, remedies and defenses, legal and equitable.

Pursuant to California law, if you believe all or part of the claim has been wrongfully denied or rejected, you may contact the California Department of Insurance at the following address and telephone number:

Exhibit 1
Page 142

**sedgwick**

120 Broadway, Suite 900, New York, NY 10271

California Department of Insurance
Claims Service Bureau
300 S. Spring Street, 11th Floor
Los Angeles, California 90013
(213) 346-6523
(800) 927-4357
www.insurance.ca.gov

If you have any additional information that you believe would impact the above analysis, please forward it to my attention.  In addition, if you have any questions or if you would like to discuss this matter further, do not hesitate to contact me.

Sincerely,

*David B. Belk*

David B. Belk, Esq.
Professional Liability Claims Advisor
(504) 429-0734
david.belk@sedgwick.com

Exhibit 1
Page 143

# EXHIBIT F

Exhibit 1
Page 144



August 5, 2025

*Via Email*
David B. Belk, Esq.
Sedgwick
120 Broadway, Suite 900
New York, NY 10271
david.belk@sedgwick.com

   Insured: Part Four, LLC
   Coverage: Employment Practices Liability
   Policy No.: EX01-000743-02
   Claim No.: 2023769630

Dear Mr. Belk,

   We write in response to Clear Blue Specialty Insurance Company's ("Clear Blue") March 18, 2025 denial of coverage for the above-referenced claim.

   **Katie Williams Right to Reimbursement of Legal Costs**

   In its denial, Clear Blue took the position that no coverage was available to Part Four for the defense costs that it paid to avoid a wage and hour claim by its employee Katie Williams. Ms. Williams indisputably is entitled under California law to reimbursement of her legal expenses that arose out of her employment with Part Four. *See* Labor Code § 2802. Ms. Williams did not submit a formal demand to Part Four for reimbursement because the parties agreed that her legal expenses would be covered by the company as required. Provided with this letter is a declaration from Ms. Williams describing such and averring that she would have sued Part Four had they denied her request for payment of her legal fees.

   Had Part Four denied Ms. Williams' request, it would have committed a **Wage and Hour Wrongful Act** of "the refusal…or failure of an **Insured Organization** to pay…reimbursement of expenses[.]" Part Four is not required to force Ms. William to incur further costs by first denying her reimbursement, so that she can later sue Part Four to be provided coverage by Clear Blue. Ms. Williams made an actual claim. Part Four agreed to cover her as it was required to.

   Clear Blue's argument that "neither the costs of her legal fees nor the settlement paid to Sly Spectrum or Forth would fall within the definition of **Defense Costs**," is contrary to the policy language. "'**Defense Costs**' means that part of **Loss** consistent of expenses, included attorneys' fees…incurred in the investigation, defense, or appeal of a **Claim**." "**Loss**" means…settlements…and **Defense Costs** incurred by the Insured." Part Four incurred the **Loss** of the settlement and **Defense Costs** that it was required to

11601 Wilshire Blvd., Suite 2080, Los Angeles, California 90025 | *tel. (310) 593-9890 fax (310) 593-9980*
650 Town Center Drive, Suite 520, Costa Mesa, CA 92626 | *tel. (949) 676-0030*
BNSKLAW.COM

Exhibit 1
Page 145



reimburse Ms. Williams for. These costs are covered by the policy.

Finally, Clear Blue's argument that the **Claim** arises out of the same **Wrongful Act** or **Interrelated Wrongful Act** is incorrect. The **Wrongful Act** is Part Four denying Ms. Williams her right to reimbursement as a California company employee. It is separate and distinct from any underlying lawsuit because the denial would have been a separate violation, apart and distinct from any claims made by Sly Spectrum or Dortch. Thus, Clear Blue must provide coverage for the reimbursement of Ms. Williams' legal fees and costs.

Part Four is willing to resolve this dispute without the need for a coverage lawsuit. Part Four offers to settle all claims for $775,000. If no settlement can be reached, Part Four will sue Clear Blue for breach of contract and bad faith, and seek pre-judgment interest, attorneys' fees, and punitive damages far exceeding the policy limits. Please let me know by August 19, 2025, if Clear Blue will accept this offer. If you would like to discuss anything further, I can be reached directly at (310) 593-9898.

Sincerely,

Ethan J. Brown

Exhibit 1
Page 146

# EXHIBIT G

Exhibit 1
Page 147

sedgwick

August 8, 2025

VIA EMAIL ONLY:  Ethan J. Brown (ethan@bnsklaw.com)

Ethan J. Brown
11601 Wilshire, Blvd., Suite
2080 Los Angeles, California
90025

| | |
|---|---|
| Insured: | Part Four, LLC |
| Coverage: | Employment Practices Liability |
| Policy No.: | EX01-000743-02 |
| Claim No.: | 2023769630 |
| Claimant: | Sly Spectrum, LLC |

Dear Mr. Brown:

As you know, Sedgwick Claims Management Services, Inc., is the third-party claims administrator for Clear Blue Specialty Insurance Company ("Clear Blue"), which issued Policy No. EX01-000743-02 ("the Policy") to your client, Part Four, LLC ("Part Four"). We issued a letter dated March 19, 2024 ("the Declination Letter"), declining coverage for **claims** raised in a Lawsuit filed by Sly Spectrum, LLC ("Sly Spectrum"), against Katie Williams ("Williams") and Does 1 through 10, inclusive, in Los Angeles County Superior Court, bearing case number 23STCV20562 ("the Williams Suit"). We subsequently issued a March 18, 2025 letter reaffirming the declination in response to your March 12, 2025 correspondence. We are now in receipt of your letter, dated August 5, 2025, responding to the Declination Letter and March 18, 2025 Letter and further disputing our coverage determination.[1]

*Your Assertion That Katie Williams Has A Right To Reimbursement Of Legal Costs*

In your August 5, 2025 letter, you first assert: "Ms. Williams indisputably is entitled under California law to reimbursement of her legal expenses that arose out of her employment with Part Four." You attached a declaration from Ms. Williams stating she did not submit a formal demand to Part Four for reimbursement because she understood her legal expenses would be covered by the company.  You made a similar argument in your March 18, 2025 letter.

As an initial matter, Insuring Agreement I.A. of the EPL Part covers "**Loss** the **Insured** is legally obligated to pay arising from a **Claim** first made against the **Insured** during the **Policy Period**
. . . for a **Wrongful Act.**"  The Policy provides several definitions of a **claim**, including a "written demand against the **Insured** for monetary damages," and "a civil . . . proceeding . . . against the

---

[1] This letter is intended to supplement, but not supersede, the Declination Letter and letter of March 18, 2025. Clear Blue maintains and reiterates all coverage disclaimers and reservations of rights stated within the Declination Letter and March 18, 2025 Letter.

Exhibit 1
Page 148

**Insured.**" Common to each of the definitions of a **claim** is an actual, rather than hypothetical, demand or legal proceeding, without which, the Policy provides no coverage. Clear Blue was never presented with any **claim** by Williams against Part Four. As such, Clear Blue had no obligation to provide coverage for a non-existent claim. Regardless, your argument assumes that a demand from Williams for reimbursement of costs defending the Williams Suit would be covered. However, the last clause of Insuring Agreement I.A. requires a **claim** against the **Insured** be made "for a **Wrongful Act.**" The Policy sets forth several acts or omissions defined as a **Wrongful Act**, none of which include a claim for reimbursement of legal fees. In the absence of a **claim** first made against the **Insured** during the **Policy Period** for a **Wrongful Act**, the Policy provides no coverage.

Next, we will turn to your argument that had Part Four denied Ms. Williams' request, it would have committed a Wage and Hour Wrongful Act. Instead, Part Four provided Ms. Williams with a defense and she was made part of the Settlement Agreement executed on or about December 3, 2024. As with coverage under Insuring Agreement I.A., coverage under Insuring Agreement I.C. requires an *actual* **Wage and Hour Action**, which is defined as either "a written demand" or "a civil, judicial, administrative, regulatory, or arbitration proceeding," first made against the **Insured** during the **Policy Period**. Clear Blue was never presented with any **Wage and Hour Action** by Williams against Part Four. As such, Clear Blue had no obligation to provide coverage for the non-existent reimbursement claim.

This argument also fails to acknowledge that Insuring Agreement I.C. provides coverage for **Defense Costs** only up to the Policy's $250,000 **Wage and Hour Claims** sublimit in excess of the $75,000 retention. Under the hypothetical scenario presented by your argument, had Williams pursued Part Four for reimbursement of legal expenses, neither the costs of her now claimed legal defense fees nor the settlement paid to Sly Spectrum or Dortch would fall within the definition of **Defense Costs**. Contrary to your argument, **Defense Costs** do not include all **Loss**. Specifically, "**Defense Costs** include that part of **Loss** consisting of expenses, including attorneys' fees and expert's fees, incurred in the investigation, defense or appeal of a **Claim**" (emphasis added). And since Williams did not pursue a **Wage and Hour Action** against Part Four, it is apparent that Part Four incurred no **Defense Costs** defending Williams' hypothetical legal fee reimbursement action, much less **Defense Costs** in excess of the **Wage and Hour Claims** retention and sublimit.

Finally, you state that Clear Blue's argument that the **Claim** arises out of the same **Wrongful Act** or **Interrelated Wrongful Act** is incorrect. Specifically, you assert "[t]he **Wrongful Act** is Part Four denying Ms. Williams her right to reimbursement as a California company employee. It is separate and distinct from any underlying lawsuit because the denial would have been a separate violation, apart and distinct from any claims made by Sly Spectrum or Dortch." This argument again ignores the language of Section VI. of the General Terms and Conditions of the Policy, which states: "All **Claims** . . . which arise out of the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed one **Claim** and such **Claim** shall be deemed to be first made on the earliest of such **Claims** is first made against the **Insured**, regardless of whether such date is before or during the **Policy Period**." Even if Williams' hypothetical claim for reimbursement of legal fees constituted a **Wrongful Act** or a **Wage and Hour Wrongful Act**—which is denied—it would still be deemed one **claim** with the 2021 Suit[2] and be deemed first made before the Policy Period, as both arose out of a

---

[2] The 2021 Suit refers to the Complaint, dated August 11, 2021, a First Amended Complaint, dated November 17, 2021, and a Second Amended Complaint, dated March 4, 2022, filed by Sly Spectrum

Exhibit 1
Page 149

common nexus of facts, circumstances, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

For the foregoing reasons, the Policy affords no coverage for the Williams Suit or the 2021 Suit. Clear Blue maintains and reiterates its declination of coverage.

If you have not already done so, we recommend placing any other applicable insurers on notice of this matter.

Clear Blue reserves its right to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all of the provisions, terms, conditions, exclusions, endorsements, definitions set forth in the Policy and any additional facts that may come to our attention. As such, the above analysis does not purport to be a comprehensive analysis of all potentially applicable coverage issues and policy provisions. The mention of specific coverage issues of policy provision does not negate the relevance of any others. Similarly, nothing herein shall be construed as an admission of coverage or liability by Clear Blue, or as a waiver, estoppel or modification to the terms, conditions or limitations of the Policy and Clear Blue hereby reserves all rights, remedies and defenses, legal and equitable.

Pursuant to California law, if you believe all or part of the claim has been wrongfully denied or rejected, you may contact the California Department of Insurance at the following address and telephone number:

California Department of Insurance

Claims Service Bureau

300 S. Spring Street, 11th

Floor Los Angeles, California

90013

(213) 346-6523

(800) 927-4357

www.insurance.ca.gov

*The remainder of this page is intentionally left blank.*

---

and its owner, Jonathan Dortch, against Part Four, and its owners, Joshua Golsen ("Joshua"), Barry Golsen, Rebel Bass, LLC, and GOL Capital, LLC (collectively, "the 2021 Suit Defendants"), in Los Angeles County Superior Court, bearing case number 21STCV29695. Please refer to the Declination Letter and March 18, 2025 Letter.

3

Exhibit 1

Page 150

sedgwick

    If you have any additional information that you believe would impact the above analysis, please forward it to my attention.  In addition, if you have any questions or if you would like to discuss this matter further, do not hesitate to contact me.

Sincerely,

*Megan Fischer*

Megan Fischer, Esq., CPCU, ARM, AIS
Claims Advisor, Professional Liability
717.740.3931
megan.fischer@sedgwick.com

cc:     *via electronic mail*
        Corrie Hurm <corrie.hurm@embroker.com>
        Jason Oglesby <joglesby@cbinsgroup.com>
        Kete Barnes <kete@bnsklaw.com>

Exhibit 1
Page 151

# EXHIBIT 2

Exhibit 2
Page 152

RECEIVED

DEC 23 2025

Filing Window

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER: | *Reserved for Clerk's File Stamp* |
|---|---|---|
| Ethan J. Brown; Kete P. Barnes<br>Brown Neri Smith & Khan, LLP<br>11601 Wilshire Blvd., Ste. 2080<br>Los Angeles, CA 90025<br>T: (310) 593-9890; F: (310) 593-9980; E: ethan@bnsklaw.com | 218814; 302037 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br><br>DEC 2 3 2025<br><br>David W. Slayton, Executive Officer/Clerk of Court<br><br>By: L. Naphen, Deputy |

ATTORNEY FOR (Name): Plaintiff Part Four, LLC

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
111 N. Hill Street, Los Angeles, CA 90012

PLAINTIFF/PETITIONER:
Part Four, LLC

DEFENDANT/RESPONDENT:
Clear Blue Specialty Insurance Company

| **PEREMPTORY CHALLENGE TO JUDICIAL OFFICER**<br>**(Code Civ. Proc., § 170.6)** | CASE NUMBER:<br>25STCV36585 |
|---|---|

### This form is exempt from eFiling.

| Name of Judicial Officer: (PRINT)<br>Richard L. Fruin | Dept. Number:<br>15 |
|---|---|
| [✓] Judge  [ ] Commissioner  [ ] Referee | |

I am a party (or attorney for a party) to this action or special proceeding. The judicial officer named above, before whom the trial of, or a hearing in, this case is pending, or to whom it has been assigned, is prejudiced against the party (or his or her attorney) or the interest of the party (or his or her attorney), so that declarant cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judicial officer.

---

## DECLARATION

**I declare under penalty of perjury, under the laws of the State of California, that the information entered on this form is true and correct.**

Filed on behalf of:  Part Four, LLC
                     Name of Party

[✓] Plaintiff/Petitioner          [ ] Cross Complainant
[ ] Defendant/Respondent          [ ] Cross Defendant
[ ] Other:

Dated:  December 23, 2025

Signature of Declarant

Ethan J. Brown
Printed Name

LASC CIV 015 Rev. 07/25
For Optional Use

**PEREMPTORY CHALLENGE TO JUDICIAL OFFICER**
**(Code Civ. Proc., § 170.6)**

Code Civ. Proc., § 170.6

Exhibit 2
Page 153

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Stanley Mosk Courthouse, Department 15

**25STCV36585**
**PART FOUR, LLC vs CLEAR BLUE SPECIALTY
INSURANCE COMPANY**

January 2, 2026
4:36 PM

Judge: Honorable Richard L. Fruin
Judicial Assistant: Araceli Hernandez
Courtroom Assistant: Lori Naphen

CSR: None
ERM: None
Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Plaintiff's Peremptory Challenge to Judicial
Officer Pursuant to Code of Civil Procedure 170.6

The Court reviews the Peremptory Challenge filed by Part Four, LLC (Plaintiff) on 12/23/2025
pursuant to Code of Civil Procedure section 170.6 and finds that it was timely filed, in proper
format, and is accepted.

Good cause appearing and on order of the Court, the above matter is reassigned at the direction
of the Supervising Judge to Judge Upinder S. Kalra in Department 51 at the Stanley Mosk
Courthouse for all further proceedings.

If any appearing party has not yet exercised a peremptory challenge under Code of Civil
Procedure section 170.6, peremptory challenges by them to the newly assigned judge must be
timely filed within the 15 day period specified in Code of Civil Procedure section 170.6, with
extensions of time pursuant to Code of Civil Procedure section 1013 if service is by mail.
Previously non-appearing parties, if any, have a 15-day statutory period from first appearance to
file a peremptory challenge (Government Code section 68616(1)).

On the Court's own motion, the Non-Appearance Case Review [CLERICAL-JA] scheduled for
01/09/2026 is advanced to this date and vacated.

Counsel for plaintiff to give notice to all parties and to file notice of ruling.

Certificate of Service is attached.

---

Minute Order

Page 1 of 1

Exhibit 2
Page 154

# Complaints and Other Initiating Documents

2:26-cv-02058 Part Four, LLC v. Clear Blue Specialty Insurance Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered by Belilove, Steven on 2/26/2026 at 1:14 PM PST and filed on 2/26/2026

| | |
|---|---|
| **Case Name:** | Part Four, LLC v. Clear Blue Specialty Insurance Company |
| **Case Number:** | 2:26-cv-02058 |
| **Filer:** | Clear Blue Specialty Insurance Company |

**Document Number:** 1

**Docket Text:**
**NOTICE OF REMOVAL from Los Angeles County Superior Court - Central District, case number 25STCV36585 Receipt No: ACACDC-41604429 - Fee: $405, filed by Defendant Clear Blue Specialty Insurance Company. (Attachments: # (1) Exhibit Summons and Complaint, # (2) Exhibit Peremptory Challenge and Minute Order) (Attorney Steven R Belilove added to party Clear Blue Specialty Insurance Company(pty:dft))(Belilove, Steven)**

**2:26-cv-02058 Notice has been electronically mailed to:**

Steven R Belilove      sbelilove@kaufmandolowich.com

**2:26-cv-02058 Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

Part Four, LLC

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\2026-2-26 Clear Blue's Notice of Removal.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/26/2026] [FileNumber=42022959-0
] [44d8d5565ba687bdd50d5422e74fadfc3016a99b5d5dd749a7edff975914229e096
c98573caadf8730b3f235ce825878454bcc65e3b5d9a0f745994601461c8c]]
**Document description:**Exhibit Summons and Complaint
**Original filename:**C:\fakepath\Exhibit 1 - Summons and Complaint.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/26/2026] [FileNumber=42022959-1
] [acc9503a201c4946b9bffa1204de5f9fe0fed8ed8c50d2b2cc97bf60a575ea2afb9
89529ee0733bf986d884d23cc9c9e8a0fc176bdf82bda4685c5774696aa28]]
**Document description:**Exhibit Peremptory Challenge and Minute Order
**Original filename:**C:\fakepath\Exhibit 2 - Peremptory Challenge and Minute Order.pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=2/26/2026] [FileNumber=42022959-2
] [2d84f315db8fe721ee2fe1e56c164c87b2e5233ab499c9c2e3e01ad6584fdbaaad3
2a5924f2b3c52d62b06766cf58d406e938133efe1c9d09b37d3654931cfe5]]

**PROOF OF SERVICE**

STATE OF CALIFORNIA          )
COUNTY OF LOS ANGELES        )

I am employed in Los Angeles County.  My business address is 11111 Santa Monica Blvd., Suite 850, Los Angeles, CA 90025, where this mailing occurred.  I am over the age of 18 years and am not a party to this cause.  I am readily familiar with the practices of KAUFMAN DOLOWICH LLP for collection and processing of correspondence for mailing with the United States Postal Service.  Such correspondence is deposited with the United States Postal Service the same day in the ordinary course of business.

On February 26, 2026, I served the foregoing documents on the interested parties in this action entitled as follows:

**NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL TO FEDERAL COURT**

[XX]    by placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

**SEE ATTACHED SERVICE LIST**

[XX]    (**BY MAIL**)  I placed such envelope for collection and mailing on this date following ordinary business practices.

[   ]    (**BY PERSONAL SERVICE**)  I caused to be hand delivered such envelope to the addressee so indicated.

[XX]    (**BY E-MAIL ELECTRONIC TRANSMISSION**)  I caused the documents to be sent to the person(s) at the e-mail address(es) so indicated on the attached list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was incomplete or unsuccessful.

[   ]    (**BY FEDEX**)  I am "readily familiar with the firm's practice of collection and processing correspondence for mailing via Express Mail (or another method of delivery providing for overnight delivery pursuant to *C.C.P.* § 1005(b)).  Under that practice, it would be deposited with the United States Postal Service or other overnight delivery carrier (in this case, FedEx) on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

[   ]    (**BY FACSIMILE**)  I caused to be served, via facsimile, the above-entitled document(s) to the office of the addressee so indicated.

[XX]    (**STATE**)  I declare under penalty of perjury that the foregoing is true and correct.

[   ]    (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the services was made.

Executed on February 26, 2026, at Los Angeles, California.

*/s/ Susan Carty*
Susan Carty

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**

*Part Four, LLC v. Clear Blue Specialty Insurance*
*Los Angeles County Superior Court – Central District, Case No. 25STCV36585*

| | |
|---|---|
| Ethan J. Brown, Esq.<br>Kete P. Barnes, Esq.<br>Brown Neri Smith & Khan LLP<br>11601 Wilshire Boulevard, Suite 2080<br>Los Angeles, CA 90025<br>Phone: (310) 593-9890<br>Fax: (310) 593-9980<br>Email: ethan@bnsklaw.com;<br>kete@bnsklaw.com<br><br>**Attorneys for Plaintiff PART FOUR, LLC** | |

NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL TO FEDERAL COURT

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
COUNTY OF LOS ANGELES )

      I am employed in Los Angeles County.  My business address is 11111 Santa Monica Blvd., Suite 850, Los Angeles, CA 90025, where this mailing occurred.  I am over the age of 18 years and am not a party to this cause.  I am readily familiar with the practices of KAUFMAN DOLOWICH LLP for collection and processing of correspondence for mailing with the United States Postal Service.  Such correspondence is deposited with the United States Postal Service the same day in the ordinary course of business.

      On February 26, 2026, I served the foregoing documents on the interested parties in this action entitled as follows:

## CERTIFICATE OF SERVICE OF NOTICE TO STATE COURT AND ADVERSE PARTY OF REMOVAL TO FEDERAL COURT

[XX] by placing [ ] the original [X] true copies thereof enclosed in sealed envelopes addressed as follows:

## SEE ATTACHED SERVICE LIST

[XX] (**BY MAIL**)  I placed such envelope for collection and mailing on this date following ordinary business practices.

[   ] (**BY PERSONAL SERVICE**)  I caused to be hand delivered such envelope to the addressee so indicated.

[XX] (**BY E-MAIL ELECTRONIC TRANSMISSION**)  I caused the documents to be sent to the person(s) at the e-mail address(es) so indicated on the attached list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was incomplete or unsuccessful.

[   ] (**BY FEDEX**)  I am "readily familiar with the firm's practice of collection and processing correspondence for mailing via Express Mail (or another method of delivery providing for overnight delivery pursuant to *C.C.P.* § 1005(b)).  Under that practice, it would be deposited with the United States Postal Service or other overnight delivery carrier (in this case, FedEx) on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.

[   ] (**STATE**)  I declare under penalty of perjury that the foregoing is true and correct.

[XX] (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the services was made.

3

1    Executed on February 26, 2026, at Los Angeles, California.

2

3                                         /s/ Susan Carty
                                          Susan Carty
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE OF NOTICE TO
STATE COURT AND ADVERSE PARTY OF
REMOVAL TO FEDERAL COURT                              Case No. 2:26-cv-02058

# SERVICE LIST

### *Part Four, LLC v. Clear Blue Specialty Insurance*
### *United States District Court – Central District of California*
### *Case No. 2:26-cv-02058*

| | |
|---|---|
| Ethan J. Brown, Esq.<br>Kete P. Barnes, Esq.<br>Brown Neri Smith & Khan LLP<br>11601 Wilshire Boulevard, Suite 2080<br>Los Angeles, CA 90025<br>Phone: (310) 593-9890<br>Fax: (310) 593-9980<br>Email: ethan@bnsklaw.com;<br>kete@bnsklaw.com<br><br>**Attorneys for Plaintiff PART FOUR, LLC** | |

CERTIFICATE OF SERVICE OF NOTICE TO
STATE COURT AND ADVERSE PARTY OF
REMOVAL TO FEDERAL COURT                    Case No. 2:26-cv-02058